UNITED STATES DISTRICT COURT FOR THE DISTRICT OF
DELAWARE

ANTHONY ZUPPO,

    Petitioner,

v.

WARDEN THOMAS CARROLL,

    Respondent.

)
)
)
)
)
)
)
)
)

**FILED**

JUL 18 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

Case No.     05 - 504

---

APPENDIX FOR GROUND ONE

---

Dated: July 15, 2005

ANTHONY ZUPPO Pro-se
Delaware Correction Center
1181 Paddock rd.
Smyrna, DE 19977

Petitioner

## TABLE OF CONTENTS

SENTENCE ORDER . . . . . . . . . . . . . A-1

EXHIBITS FOR STATEMENT OF FACTS . . . . . . . . . A-8

EXHIBITS FOR GROUND ONE ARGUMENT . . . . . . . . A-23

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE

     VS.

ANTHONY G ZUPPO

Alias: See attached list of alias names.

DOB: 05/06/1965
SBI: 00283480

| CASE NUMBER: | CRIMINAL ACTION NUMBER: |
|---|---|
| 0101004412 | IN01-09-2232 |
| | RAPE 2ND(F) |
| | IN01-09-2231 |
| | ATT. RAPE 2nd(F) |
| | IN01-08-1607 |
| | ASSAULT 1ST(F) |
| | IN01-09-2238 |
| | AGG.ACT/INTIMI.(F) |
| | IN01-09-2241 |
| | AGG.ACT/INTIMI.(F) |
| | IN01-09-2242 |
| | AGG.ACT/INTIMI.(F) |
| | IN01-09-2227 |
| | UNLAW IMPR 1ST(F) |
| | LIO:KIDNAP 2ND |
| | IN01-09-2233 |
| | ASSAULT 3RD(M) |
| | IN01-09-2236 |
| | HARASSMENT(M) |
| | IN01-09-2229 |
| | OFF TOUCHING(M) |
| | IN01-09-2234 |
| | NONC W/CON BOND(M) |
| | IN01-09-2235 |
| | NONC W/CON BOND(M) |
| | IN01-09-2240 |
| | NONC W/CON BOND(M) |
| | IN01-09-2243 |
| | NONC W/CON BOND(M) |
| | IN01-09-2226 |
| | NONC W/CON BOND(M) |

<u>SENTENCE ORDER</u>

NOW THIS 11TH DAY OF APRIL, 2002, IT IS THE ORDER OF THE
COURT THAT:

The defendant is adjudged guilty of the offense(s) charged.
The defendant is to pay the costs of prosecution and all
**APPROVED ORDER**    1    June 25, 2002 14:06

A·1

STATE OF DELAWARE
          VS.
ANTHONY G ZUPPO
DOB: 05/06/1965
SBI: 00283480

statutory surcharges.


 AS TO IN01-09-2232 : TIS
 RAPE 2ND


   The defendant shall pay his/her restitution as follows:
$25000.00 TO VIOLENT CRIMES COMP. BOARD

Effective August  1, 2001  the defendant is sentenced
as follows:

 The defendant is placed in the custody of the Department
of Correction for 10 year(s) at supervision level 5


 AS TO IN01-09-2231 : TIS
 ATT. RAPE 2nd

 The defendant is placed in the custody of the Department
of Correction for 5 year(s) at supervision level 5


 AS TO IN01-08-1607 : TIS
 ASSAULT 1ST

 The defendant is placed in the custody of the Department
of Correction for 4 year(s) at supervision level 5

 - Suspended after serving 2 year(s)  at supervision level 5

 - For 2 year(s)  supervision level 2

 - Suspended after serving 1 year(s)  at supervision level 2

 - For 1 year(s)  supervision level 1

 Probation is consecutive to criminal action number
IN01092231

**APPROVED ORDER**    2    June 25, 2002 14:06

A-2

STATE OF DELAWARE
         VS.
ANTHONY G ZUPPO
DOB: 05/06/1965
SBI: 00283480

 AS TO IN01-09-2238 : TIS
 AGG.ACT/INTIMI.

 The defendant is placed in the custody of the Department
of Correction for 2 year(s) at supervision level 5


 - Suspended after serving 1 year(s)  at supervision level 5


 - For 1 year(s)  supervision level 2


 - Suspended after serving 6 month(s)  at supervision level
2

 - For 6 month(s)  supervision level 1


 Probation is consecutive to criminal action number
IN01081607


 AS TO IN01-09-2241 : TIS
 AGG.ACT/INTIMI.

 The defendant is placed in the custody of the Department
of Correction for 2 year(s) at supervision level 5


 - Suspended after serving 1 year(s)  at supervision level 5


 - For 1 year(s)  supervision level 2


 - Suspended after serving 6 month(s)  at supervision level
2

 - For 6 month(s)  supervision level 1


 Probation is consecutive to criminal action number
IN01092238


 AS TO IN01-09-2242 : TIS
 AGG.ACT/INTIMI.

 The defendant is placed in the custody of the Department

**APPROVED ORDER**    3    June 25, 2002 14:06

A-3

STATE OF DELAWARE
         VS.
ANTHONY G ZUPPO
DOB: 05/06/1965
SBI: 00283480

of Correction for 2 year(s) at supervision level 5

  - Suspended after serving 1 year(s)  at supervision level 5

  - For 1 year(s)  supervision level 2

  - Suspended after serving 6 month(s)  at supervision level
2

  - For 6 month(s)  supervision level 1


 Probation is consecutive to criminal action number
IN01092241


 AS TO IN01-09-2227 : TIS
 UNLAW IMPR 1ST

 The defendant is placed in the custody of the Department
of Correction for 1 year(s) at supervision level 5

  - Suspended for 1 year(s)  at supervision  level 2

  - Suspended after serving 6 month(s)  at supervision level
2

  - For 6 month(s)  supervision level 1


 Probation is consecutive to criminal action number
IN01092242


  AS TO IN01-09-2233 : TIS
  ASSAULT 3RD

 The defendant is placed in the custody of the Department
of Correction for 6 month(s) at supervision level 5

  - Suspended for 6 month(s)  at supervision  level 2


 Probation is consecutive to criminal action number

**APPROVED ORDER**    4    June 25, 2002 14:06

A-4

STATE OF DELAWARE
                VS.
ANTHONY G ZUPPO
DOB: 05/06/1965
SBI: 00283480

IN01092227


  AS TO IN01-09-2236 : TIS
  HARASSMENT

  The defendant is to pay a fine in the amount of $100.00
  plus all surcharges and fees (see attachment).


  AS TO IN01-09-2229 : TIS
  OFF TOUCHING

  The defendant is to pay a fine in the amount of $100.00
  plus all surcharges and fees (see attachment).


  AS TO IN01-09-2234 : TIS
  NONC W/CON BOND

  The defendant is placed in the custody of the Department
  of Correction for 1 month(s) at supervision level 5


  AS TO IN01-09-2235 : TIS
  NONC W/CON BOND

  The defendant is placed in the custody of the Department
  of Correction for 1 month(s) at supervision level 5


  AS TO IN01-09-2240 : TIS
  NONC W/CON BOND

  The defendant is placed in the custody of the Department
  of Correction for 1 month(s) at supervision level 5


  AS TO IN01-09-2243 : TIS
  NONC W/CON BOND

  The defendant is placed in the custody of the Department
  of Correction for 1 month(s) at supervision level 5


  AS TO IN01-09-2226 : TIS

**APPROVED ORDER**    5    June 25, 2002 14:06

A-5

STATE OF DELAWARE
         VS.
ANTHONY G ZUPPO
DOB: 05/06/1965
SBI: 00283480

NONC W/CON BOND

The defendant is placed in the custody of the Department
of Correction for 1 month(s) at supervision level 5

SPECIAL CONDITIONS BY ORDER

STATE OF DELAWARE
        VS.
ANTHONY G ZUPPO
DOB: 05/06/1965
SBI: 00283480

CASE NUMBER:
0101004412


Have no direct or indirect contact with Wendy Reynolds.


Defendant shall receive mental health evaluation and comply
with all recommendations for counseling and treatment
deemed appropriate.

NOTES
The no contact order with Wendy Reynolds is a zero
tolerance condition.

The state has 30 days to apply for additional restitution.


_____
JUDGE JAMES T VAUGHN JR.

**37**

1  Q. Of the year 2000.
2  A. The first night we went out, Saturday,
3  basically we seen each other every day since.
4  Q. Did you see her during the month of October
5  or November?
6  A. Yes, I did.
7  Q. 2000?
8  A. Yes, I did.
9  Q. Were you, at September or October, would you
10  then classified yourself as boyfriend/girlfriend or
11  just two people dating?
12  A. Boyfriend and girlfriend.
13  Q. And when was it that she actually considered
14  moving in?
15  A. She only lived about half a mile, maybe a
16  mile away from me on the same side of 13, just a
17  development over, and we went out all the time and we
18  had -- we had an offer to go to Cape Codd with her
19  friends, and from then on, it was actually -- we just
20  felt everything was right at the time. You know how
21  that works out when you meet somebody and everything
22  clicked, and she brought up that it was up on
23  November --

**38**

1  Q. What was up, sir, in August?
2  A. November 1st.
3  Q. What was up in November?
4  A. November 1st was basically a lease, if she
5  signed a lease, but the year was up for her staying
6  with Jason. We went up Cape Codd, end of September,
7  beginning of October, and we just started to discuss
8  it on the ride home. It was a long drive up and back,
9  and we discussed -- she was wondering where she wanted
10  to move. She was thinking of moving to Philly --
11  Q. Did there come a point in November, sir,
12  where she did come into your house?
13  A. Oh, yeah. It was before that. She actually
14  -- basically, she was actually staying there most of
15  the time after we got back from Cape Codd. Unless she
16  came home from Lincoln Tech at --
17  Q. During this period of time, was your son
18  living with you full-time?
19  A. No. I had him for the whole summer, and then
20  I got him usually whenever I wanted him, every
21  weekend. There was a Court Order for every other
22  weekend and five weeks out of the summer, but I
23  usually kept him all summer and got him basically

**39**

1  every weekend, every other weekend, depending on the
2  schedule with him and my ex-wife.
3  Q. And she moved in somewhere in November, early
4  November?
5  A. By November 1st or November 3rd, all her
6  stuff was out.
7  Q. We've heard some testimony about her moving,
8  and your seeing some photographs, and I guess diaries
9  or documents that she had written herself.
10  Can you please tell us about these
11  photographs and documents that she made reference to
12  in her direct examination.
13  A. All day we were packing stuff, moving stuff,
14  basically a lot of computer stuff. She works with
15  computers; moved a box and there were some pictures,
16  and normally she seen pictures I had. We were looking
17  through the pictures, and some questionable pictures,
18  you could say, came up, and I asked about them, and to
19  me, I thought it was a normal question, and she
20  thought -- at the time, and I felt it was strange she
21  was in that predicament for the pictures, and then the
22  journal came up, the diary she had. It was half the
23  size of a Bible, thick-wise, and I just asked her what

**40**

1  it was, and, you know, went to open it, curiosity, and
2  she got all excited and ran over and snatched it from
3  me and ran away, and I'm like what's that about, and
4  she said it's this and that and when I was married,
5  and it's nobody's to see, and it's about things that
6  happened in my past, and at the time we were talking
7  about getting married, and I didn't think there should
8  be secrets between people getting married.
9  Q. And so, you kept pushing the issue, sir?
10  A. You could say that, yes. I asked her about
11  it --
12  Q. What was the result of pushing the issue,
13  sir?
14  A. I got upset. I was -- I told her that we're
15  supposed to be getting married, how do you have things
16  you could be ashamed of, trying to get exactly how it
17  progressed, to get the right idea.
18  I don't recall her exact words. I don't want
19  to testify, but it got to where I got uptight that
20  she couldn't confide in me. So, I was like -- I got
21  upset, said don't even move in. There were other
22  problems in the relationship before that that were
23  overlooked, and I left and went home. I got in the


A-8

**41**

1  car and drove home.
2      At that time she was yelling at me that she
3  was sorry, and there was nothing to be sorry about.
4  She came out with the journal, throwing the pages at
5  the car. The road is from here to the wall way, and
6  she was coming where the prosecution is sitting and
7  tossing papers on the lawn, and while I was driving
8  away.
9      Q. Did there come a point in time where she did
10  move into your house?
11      A. Yes.
12      Q. What address is that?
13      A. 107 Lea Road.
14      Q. And we have heard something about an event
15  there around mid-December, December 18th in
16  particular.
17          There is an allegation there of an assault,
18  Assault Third Degree?
19      A. Yes.
20      Q. Could you please elucidate your recollection
21  of the events around December the 18th, the year 2000.
22      A. My son was playing in the bedroom, his
23  bedroom. I have a three-bedroom house. He was in the

**42**

1  back playing, play station in his room. We were in
2  our bedroom, and a situation that happened, October,
3  and that came up in the bedroom, and I didn't want to
4  discuss it. I didn't want to argue about it. My son
5  was in the other room. I got up, walked out, put on
6  the TV in the living room, sat on the couch. While
7  I'm walking out, she followed me out, asking me why am
8  I quiet, why can't I discuss this.
9          If -- she basically got upset because I
10  didn't want to discuss it, talk about it no more. My
11  kid's in the other room. I'm sitting on the couch and
12  she's standing to right. I sit to the edge of the
13  couch. That's my spot where I lean. She standing
14  right over me and she's nudging at my shoulder,
15  smacking the head a couple of times, and this is going
16  on for a good four or five minutes, not 30, 40
17  seconds. It's four or five minutes, and I'm sitting
18  there, telling her stop, leave me alone, I don't want
19  to discuss it, and I'm getting upset. I'm telling her
20  leave me alone, and I told her, I said I would hit you
21  in the shoulder if you keep hitting me. Stop it, and
22  I didn't expect to hit her, and she's progressing,
23  upset, she wants to discuss this, and the situation

**43**

1  that you didn't ask about yet I didn't want to
2  discuss.
3      She kept going, kept hitting me, and I hit
4  her in the left shoulder with my left arm, not very
5  hard, but left a bruise about like that on her arm,
6  and she bruises very easily, and that was the end of
7  it, and she started asking -- she said, "Why did you
8  do that? It hurt," and I told her I would, and she
9  said, "I didn't think you would," and basically that
10  stopped the argument and we stopped arguing. It
11  wasn't loud. She wasn't screaming. I don't feel my
12  son could hear it, but that's exactly what happened
13  that day.
14      Q. There was some reference to marks on her jaw
15  as a result of events that are alleged there on
16  December the 18th.
17          Could you help us with that, please.
18      A. Never touched her any in her face on the
19  18th; nothing. I don't know how she had marks on her
20  jaw; no.
21      Q. Now, you said something about there was an
22  issue that you didn't want her to discuss,
23  particularly there with your son present. Help us.

**44**

1      A. When she was going to Lincoln Tech, she
2  started in the beginning of August. At the end of
3  August, we got together. Lincoln Tech is also for
4  auto technician. You learn about automobiles.
5      She would work all day. It was hectic for
6  her to do that everyday. In October, when we were
7  seriously together, I was home. It was a Saturday --
8  for lunch. I called her over to the house, "I love
9  you. See you when you get home," hang up the phone.
10  I left, and I figured, let me stop by because it's
11  my -- on my way, give her a kiss hello and go right to
12  work. So, I did.
13      When I got there, there was a car in the
14  driveway with Pennsylvania tags, no big deal, but what
15  made me curious is when I knocked on the door, she
16  came to the door, shut the big door, crossed the
17  screen door and looked nervous, very like nervous
18  about, you know, what was going on, and I was like,
19  'How are you doing?' and I went to kiss her and she
20  gave me a quick kiss, and I asked her what was wrong,
21  and she said, "A friend of mine from Lincoln Tech came
22  down with his brother and they won't leave." They
23  rent a room out in Jason's house. She works with --



A-9

57

1 the Camaro. We -- coming home, and we shouldn't have
2 been, but we were playing back and forth, and she went
3 to the new Walmart. I went home. She shows up 20
4 minutes later, and she forgot her bank book, and she
5 went to Customer Service and all the stuff was on the
6 table, and then I love you and she leaves. That's it
7 for us. That's the last think I know from that point,
8 I remember talking to her, until March 17th.
9     Q. Do you recall the police coming to your house
10 on the 6th of January, sir?
11     A. Yes.
12     Q. And could you -- what's your recollection of
13 those events?
14     A. I was sitting home, watching TV, and the next
15 thing I know it's about --
16     Q. About what time of day?
17     A. I'm trying to think -- she left to go
18 shopping 1:30, quarter of 2, around there.
19     About 4:30, 5:00, some reason I remember
20 hearing the testimony it was 4:30, I thought it was
21 about 5:30, I'm sitting on the couch, a police officer
22 pulled up. It was Officer Eckerd, and another car was
23 there, so I walked out to see what the problem was.

58

1 He asked if -- who I was, and I told him, and he's
2 saying -- he told me that "Your fiancee came down
3 saying she wants to move her belongings out of the
4 house," and I said okay.
5     I said, "Where is she," and he said, "Well,
6 we have to detain you because there's going to be
7 three charges brought up against you," and that was
8 it. I sat in the car. They came up with the truck,
9 you know, started unloading the stuff, and that was
10 it.
11     Q. Did you go to the police station that day,
12 sir?
13     A. That night I did. The officer sat in front
14 of my house for two or three hours while they carried
15 the stuff out.
16     Q. At the police station, were you then
17 released?
18     A. Yes.
19     Q. During this period of time up through
20 January, was Miss Reynolds taking medication that you
21 personally knew about, not what you heard, but did you
22 know whether she was taking any medications?
23     A. Yes.

59

1     Actually, when we were back from Cape Codd,
2 that's when I noticed, which was no big deal. I
3 didn't care, but I noticed she had bottles, and she
4 told me it was Prozac from stress from her work, that
5 she was taking it for some time now, and I didn't get
6 into how long. I didn't care. You know, it wasn't no
7 big deal.
8     Q. Did there come a point in time when you
9 insisted that she stop taking the medications, sir?
10     A. There was one time I didn't insist, but I did
11 argue with her about taking it. She -- in -- in the
12 end of November, the Prozac, she was complaining
13 wasn't working anymore. Doctor put her on a different
14 medication, and she started acting -- that's when we
15 started arguing more about the problems we were
16 having, and for some other reason that came up
17 already, and her sex drive did falter, and I didn't
18 even notice that.
19     She went back a week later, talked to the
20 doctor, telling she was having problem with her sex
21 drive. She was edging all the time and having trouble
22 sleeping. She didn't want to take that medication no
23 more. So, he took her off that medication and said he

60

1 wanted her off medication for about a week or two to
2 clear her system out, to get her on something else,
3 and then they started a different kind.
4     Q. When was it that you were released from the
5 police station? Was that on the 6th or the following
6 day, the 7th?
7     A. It was the 6th. That night I got released on
8 bail.
9     Q. Now, moving on to January 7th, 8th, did you
10 have an occasion to receive any medical attention
11 during that period of time?
12     A. From what dates, sir?
13     Q. January 7th into the 8th.
14     A. Yes.
15     Q. Could you help us understand that, please.
16     A. I attempted to commit suicide. Stupid move
17 on my part, yes.
18     Q. After January the 8th into January the 9th,
19 did you receive any other medical attention, sir?
20     A. Yes.
21     Sunday night, I overdosed. They took me to
22 Christiana. I was at Christiana. When I got there, I
23 overdosed on a hundred 20 milligrams of Xanax and

A-10

61

1    Prozac, which you don't remember anything for at least
2    three or four days.
3        When I got there, which I don't recollect, my
4    lawyer at the time, Mr. Longobardi, told me him and
5    his paralegal got me, and I went crazy, ripped out my
6    I.V.s out of my arm, and they restrained me to the
7    bed, and I was restrained until Tuesday afternoon.
8    Then I was released to MeadowWood, and I think my
9    lawyer told me that the police officer took me there
10   because they had a conference with him on the phone
11   that day, him and the -- the doctor.
12       Q. And -- and how long did you stay there at
13   MeadowWood?
14       A. I was there till Friday and released to
15   Delaware State Police for breach of release on the 7th
16   and the 9th, harassment for breach of release on the
17   9th.
18       Q. Now, after the 9th, did you have any more
19   contact with Miss Reynolds until, shall we say,
20   mid-March of 2001?
21       A. No.
22       Q. None?
23       A. None.

62

1        Q. No calls to her work, no calls to her
2    residence?
3        A. No, not at all.
4        Q. We've heard reference to attempted contact on
5    March the 16th.
6        Do you recall being --
7        A. Yeah.
8        Q. -- confronted with that?
9        A. Being confronted with it? Yes, I do.
10       Q. Please tell us what you recall about that
11   event.
12       A. That night? Nothing.
13       Q. March 16th, sir.
14       A. Actually, March the 16th, a lot of the kids
15   in the neighborhood -- I know cause I drag race and
16   they come out and hang in the garage, and we were all
17   in front of Dave's house all night talking, and the
18   young ones, they drink, and that's where we were that
19   night. So, I don't -- what he said happened did not
20   happen that night.
21       Q. And on the 17th, you've heard about your
22   presence at Bankshots. Bankshots, I take it, is a
23   bar?

63

1        A. Yes, on Union Street. We shoot pool,
2    tournament competition every Sunday night.
3        Q. Did you go to Bankshots on March 17th?
4        A. Reluctantly, yes, I did.
5        Q. Did you see Sean there that evening?
6        A. Unfortunately, when I got there, yes. I went
7    reluctantly because I don't drink, and it was St.
8    Patrick's night, and I ended up going so --
9        Q. Now, did you have any contact with Sean when
10   you saw him on the 17th of March?
11       A. Did I have contact? No, I didn't have -- no,
12   I did not go and talk to him. I wanted to, but no, I
13   didn't.
14       Q. On March 17th, at Bankshots, did you see Miss
15   Reynolds?
16       A. At first, no. We were there -- there was
17   three of us all together, and I brought it up. He was
18   there and he was talking with a few people I knew as
19   friends, and we were there a good hour, an hour and
20   a-half, and Sean disappeared, and for some reason I
21   had a feeling -- I told Dave, I said, 'He's going to
22   bring Wendy back to the bar because he knows there's a
23   No Contact and I would have to leave,' and sure

64

1    enough, a-half hour later Sean walked in and Wendy
2    behind him.
3        Q. Did you have contact with Wendy --
4        A. No, I did not, not at the bar. No, I didn't.
5        Q. Did you subsequently leave Bankshots at some
6    point in time on the 17th?
7        A. Probably I would say about three to five
8    minutes after she -- she arrived there, yes, because I
9    had to get my jacket in the beer room. They let me
10   hide it in the back.
11       Q. Did you have any further communication with
12   Miss Reynolds on the 17th, sir?
13       A. Yes, I did.
14       Q. Explain that, please.
15       A. I was depressed after seeing her. I missed
16   her. I didn't know nothing about what I'm here for
17   now, other than the three misdemeanors. So, I left
18   and I went home, and at the time, like I said, when
19   she left Saturday, the only thing I knew was, 'I love
20   you, I'll see you when you get home.' That's the last
21   time I talked to the woman, and I got upset. I wanted
22   to know what she wanted, you know. She hasn't got in
23   touch with me, but there was still too much there that

A-11

65

1 I didn't know about, and I wanted to know, and I went
2 long enough, and after seeing her, I went up the
3 street and I called Wendy, and I didn't even think she
4 would answer the phone. I was going to hang up. I'm
5 not going to lie. She answered the phone, and she
6 said, "Hello," and I said, "Hello."
7         She said, "Hello."
8         I said, "Hello."
9         She said, "Who is this?"
10         I said, "Who is this?" because I didn't know
11 how she was going to respond. I was nervous and I
12 said, "Probably somebody you don't want to talk to,"
13 and she said, "I wouldn't say that," and I said,
14 "Look, I don't want to bother you. I'm not harassing
15 you. I'm not trying to upset you or nothing."
16         I said, "I just got to know if you ever want
17 to see me again. I have to know."
18         I told her it was two months. I said, "I
19 haven't talked to you. What do you want?"
20         Her exact words, I remember, "Where do you
21 want to meet?" and so we picked a place and met at
22 Denny's.
23         Q. While you were at Denny's, did you actually

66

1 go into the restaurant or did you sit in the parking
2 lot?
3         A. When she got there and she pulled in -- I was
4 sitting there waiting. She got there. She pulled
5 alongside of me. She asked me to get out the car.
6 She didn't do that, and I got out, and I have a
7 leather trench coat, and she asked me to open my
8 jacket, and I did, and I'm like why. She said she
9 wanted to make sure I didn't have a gun on me, and
10 that shocked me. I wasn't upset, and I asked her,
11 excuse my language, "Where the hell did that come
12 from?" I asked her, and she said, "Nothing. I just
13 -- I was worried you wanted to hurt me or kill me for
14 what happened," and I got three misdemeanor charges
15 and I -- I wasn't worried about them. We'll go to
16 trial with them.
17         So, it was cold that night, March 17th. It
18 was real cold out, and I got back in my car and we're
19 sitting there, and we kept -- I kept turning on my car
20 for heat and back and forth, and she said, "Why don't
21 you get in so we don't have to yell over top of each
22 other" because a Camaro is low. So, I got in, the
23 whole time she's sitting like she wants to -- me to

67

1 touch her. So, I'm thinking maybe I'm lucky, she
2 wants to get back together. So, we talk, and we're
3 talking about life in general, you know, that I got
4 upset from the lies that I found out about her, and I
5 forgave her for that, and I'll try to forget about
6 them and certain things that happened, and we're
7 trying to reconcile the situation, and a good 45
8 minutes to an hour, and next thing, we're sitting
9 there and we're talking, and she said, "Oh shit,"
10 looking in the mirror," and I was like what? She
11 said, "Sean's here," and yeah, I got upset. I said,
12 "Did you tell him you were coming to meet me?"
13         Q. Did she get out of the car and go back to
14 talk to Sean or did both --
15         A. We both -- when she said, "No, I didn't tell
16 him where I was going," and I said all right, and she
17 opened the door and I opened the door, and she said
18 he's going to yell at me and make me move out of the
19 house, and I wasn't going to let him, I don't think.
20 I only once in my lifetime talked to him, twice on the
21 phone.
22         She went to get out, and I left the door open
23 and I was sitting there, and they were directly behind

68

1 the car about four foot to the right, about the length
2 of the car, back four foot to the right, and I heard
3 him telling her, exactly, "You need to get home. We
4 need to talk. You need to get home. We need to
5 talk," and she's telling -- I couldn't hear what she
6 was saying, but he was upset. He was -- he was upset,
7 not to where -- a man knows these things. He wasn't
8 upset to where he was afraid of her being hurt. He
9 was upset, to my recollection, is that he wasn't
10 having his chance to be back with her. You understand
11 what I mean?
12         He went walking back to the car, and I did
13 approach him at that point, and I told him to stop,
14 and I told him he couldn't cause her any stress, "Do
15 you want her upset? I can't have her upset or
16 anything like that."
17         I did tell him if he did, you know, I would
18 come have another talk with him. Okay, I did do that,
19 and he said, "Well, just don't hurt her," and I don't
20 know nothing of the stuff, the three misdemeanors.
21 "What do you mean don't hurt her?" and I walked away
22 and went back in the car and got in the car.
23         Q. Did there come a time when you two went to a

A-12

**13**

1  A. This is the letter that I wrote to Mr.
2  Wallace. It's dated May 4th, 2001.
3  Q. Why did you write the letter, sir?
4  A. She came in to see me and told me that she
5  had reported that her boyfriend, Mr. Zuppo, had
6  sexually assaulted her, and that the charges were
7  false, that he was being held in jail, that the reason
8  -- and she wanted him to get out of jail, that she
9  felt badly about it and was trying to make it right.
10  That's why she came to see me.
11  Q. Did she elaborate at all as to why -- you
12  know -- what caused her to bring these allegations or
13  why now she wanted to retract the allegations?
14  A. She said that the reason she made the
15  allegations was that they had gotten into a fight and
16  she wanted to move out, and she wanted police to be
17  there when she moved her belongings out of the place
18  where they lived.
19  She told me that -- I said, "How did you lie?
20  What did you say that was untrue?"
21  She said, "I basically told them certain
22  things that were true, but I changed the punch line."
23  She said, "We practiced rough sexual behavior, which

**14**

1  was consensual, and we had sex, and it was usually
2  kind of rough, and I told them that it was not
3  consensual, that he did it to me without my consent,
4  and now they are holding him, and now that I have my
5  stuff out of there, I feel bad that he's still in
6  jail, and, you know, I'd like to correct that."
7  Q. Was this the only thing you did on behalf of
8  Miss Reynolds regarding this matter, sir?
9  A. No.
10  She asked me to appear at a Bail Hearing
11  shortly after that letter was written. So, it might
12  have been the next day, or a couple of days after
13  that, for Mr. Zuppo to advise the judge that would be
14  hearing the bail, that these -- that she was recanting
15  what she had accused him of, to see if the bail could
16  be lowered or removed.
17  Q. And after that service was performed, was
18  there any other services you performed on behalf of
19  Miss Reynolds?
20  A. I don't believe so.
21  MR. BAYARD: Your Honor, may I have just a
22  brief moment, please.
23  THE COURT: Yes.

**15**

1  . . .
2  (Pause)
3  . . .
4  MR. BAYARD: Mr. Capone, thank you for your
5  assistance.
6  The State may have some questions.
7  MR. WALLACE: How are you doing, Mr. Capone?
8  . . .
9  CROSS-EXAMINATION
10  . . .
11  BY MR. WALLACE:
12  Q. Sir, after -- Wendy Reynolds was your client?
13  A. That's correct.
14  Q. Have you talked to her since then?
15  A. Since the day of the Bail Hearing?
16  Q. Yeah.
17  A. I've probably seen her in the building and
18  said hello, but have I professionally consulted her?
19  No.
20  Q. The statements were made in the
21  attorney-client privileges?
22  A. Yes.
23  Q. Have you talked to her about waiving the

**16**

1  privilege and saying what you said in your office?
2  A. No.
3  Q. You haven't talked to her?
4  A. No.
5  Q. You came in here and testified without
6  talking to your client about waiving the privilege and
7  allowing you to talk about private conversations you
8  had with her regarding your representation?
9  A. That letter obviously indicates what she told
10  me, so --
11  Q. May I have the letter.
12  Where does it say the stuff about it was just
13  rough sex and they did that on a regular basis or
14  anything like that?
15  A. It says she instructed me to bring her
16  falsehoods to the attention of the Attorney General's
17  Office in writing, with knowledge that her admission
18  could well result in a wrong prosecution." So, I took
19  that as a Waiver of Confidentiality.
20  I advised her not to write that letter. I
21  told her that she was waiving those rights, that she
22  was -- her statement was going to come in in any event
23  under 3507.

A-13

LAW OFFICE
or

# JEROME M. CAPONE

ATTORNEY-AT-LAW

TOWNE CENTER, SUITE 200
4 EAST 8TH STREET
WILMINGTON, DELAWARE 19801

TELEPHONE (302) 654-3260
TELECOPIER (302) 655-5358

May 4, 2001

Paul Wallace, Esq.
Deputy Attorney General
Department of Justice
State Office Building
9th and French Streets
Wilmington, DE 19801

RE: Anthony Zuppo

Dear Paul:

I represent Wendy Reynolds, the complaining witness in your case against Anthony Zuppo. She has retained me to advise you that the charge of Rape and related charges she initiated against her boyfriend, Anthony Zuppo, on January 6, 2001, are false. She told me that she made up this false story in order to obtain police assistance while she moved her personal belongings out of the house she shared with Mr. Zuppo.

She has instructed me to bring her falsehoods to the attention of the Attorney General's Office in writing, with the knowledge that such an admission could well result in her own prosecution. She is also aware of the other serious ramifications this admission could have for her. I have explained to her that her admissions do not necessarily mean that you will drop the charges against Mr. Zuppo, due to the fact that you could try to use her original statement at trial pursuant to 11 Del. C. §3507.

Despite these serious ramifications, she nevertheless wishes to reveal her wrongdoing to the Attorney General's Office in order to try to correct the hardship her actions have caused to Mr. Zuppo. She is willing to meet with you to discuss this matter.

Very truly yours,

Jerome M. Capone

Cc: Wendy Reynolds

A-14

77

1 that she actually wrote to you?
2    A. No.
3    Q. Did you tell her the content of the letters
4 that we've been shown that she wrote to Mr. Wallace,
5 or had written to Mr. Wallace?
6    A. No.
7       She has -- she has read them to me, draped
8 them up on the computer, and she said state the facts,
9 and send it to the man, tell him what happened.
10 That's all I would -- no, I wouldn't tell her. No. I
11 wouldn't say, 'Put this in or put that in.'
12    Q. Did you tell her to go to the doctor's and
13 have the doctor prepare a document to the effect of
14 the medication caused her some mental problems?
15    A. In a way, yes. That's what she was claiming
16 to me that -- she said -- she told me a week before we
17 got back together, on March 17th, that she stopped
18 taking the medication that he prescribed that she
19 started in the beginning of January when she moved
20 out, and then she got the call from the Attorney
21 General's Office saying I was indicted on three new
22 charges, and she told me as the medication was wearing
23 off, she realized what was happening, and that was one

78

1 of the reasons why, other than getting back together,
2 she had to -- she wanted to see me that night on the
3 phone.
4    Q. When actually were you released, sir?
5    A. (No response).
6    Q. After your April incarceration?
7    A. Released on January 8th -- June 8th I left
8 the prison.
9    Q. Who was it that made your bail and made the
10 arrangements for you to get out?
11    A. Wendy did.
12    Q. When you got out, did you meet her there back
13 at 107 Lea Road?
14    A. No, we didn't.
15    Q. Where did you meet her, sir?
16    A. I wanted to -- truthfully, I wanted to go
17 home. I had -- I had been in jail for two months.
18 She didn't want the police to take me away again. I
19 had -- after I got released, the bail bondsman picked
20 me up. She was already ready and packed to go up to
21 PA to stay for a while, and she already had a motel
22 that she found rented by the week out of the phone
23 books, Delaware, Pennsylvania phone books, and I'm

79

1 from Pennsylvania, and we met at the rest stop at the
2 Pennsylvania line to the right, beside the Tri-State
3 Mall. That's where the bail bondsman dropped me off
4 to meet --
5    Q. The bail bondsman took you up to
6 Pennsylvania?
7    A. Yes. I was informed by him that the No
8 Contact Order does not carry out of the state.
9    Q. Did you all reside in Pennsylvania for a
10 period of a week, two weeks after you met her there in
11 June?
12    A. I'm trying to think exactly how long it was.
13       It was a week, because we came back -- we got
14 married on the 20th, which was Wednesday, and we got
15 back that Sunday, so it was 20th, 19th, 18, the 17th
16 we came back home.
17    Q. You indicated you were married in
18 Pennsylvania?
19    A. Yes.
20    Q. Where was that, sir?
21    A. (No response).
22    Q. Where in Pennsylvania?
23    A. Aston, Pennsylvania.

80

1    Q. Was this a denominational wedding or a civil
2 wedding?
3    A. It was non -- we're non-denominational
4 Christians. We're not Catholic, or we're Christian,
5 believe in the Bible.
6    Q. The service itself was a religious service?
7    A. Actually held at Milton Lockwood's church.
8 He has a church --
9    Q. Is the gentleman a minister?
10    A. Not a licensed minister. He does pastor and
11 teach and runs the church every Sunday. His father
12 was a licensed minister --
13    Q. There was an actual marriage certificate
14 issued by the --
15    A. Yes. We were married by the pastor and
16 everything, witnesses, dress, all that.
17    Q. Moving to July, you came back to Delaware at
18 some point in June; am I correct?
19    A. June 17th, a Sunday.
20    Q. Okay.
21       Now, when you came back to Delaware, you were
22 still aware that there was a No Contact Order?
23    A. Yes.





A-
15

**93**

1  me.

2  Q. What types of things was he saying to you at

3  that point?

4  A. Things like how skanky I am and that I'm a

5  piece of shit.

6  THE COURT: Would counsel come forward for a

7  moment, please.

8  (The following sidebar conference was held.)

9  THE COURT: We're talking about things that

10  happened in Pennsylvania? Any of these charges based

11  on --

12  MR. WALLACE: We're coming back to Delaware

13  right now.

14  THE COURT: Okay.

15  MR. WALLACE: I think this happened in

16  Delaware, but I'll --

17  MR. BAYARD: She's specifically said, too, that

18  Delaware --

19  MR. WALLACE: I'm leading up to in Pennsylvania

20  when they got married. And I want them to be able to,

21  the jury, to understand why would you marry this man in

22  these circumstances. It's to explain what was, seems to

23  be really inexplicable behavior.

**94**

1  THE COURT: I think you should move, you know,

2  to the marriage issue. I don't want to, you know, have

3  other bad acts coming in. If you want to -- a sort of

4  instruction or follow up on this later, we can do so.

5  We don't need to do it right now.

6  MR. BAYARD: Thank you.

7  (The sidebar having concluded, examination

8  continued.)

9  BY MR. WALLACE:

10  Q. You said that you stayed up in Pennsylvania for

11  about a week in a hotel?

12  A. Yes.

13  Q. Did you then come back to Delaware?

14  A. Yes.

15  Q. And where were you living then?

16  A. At his house on Lea Road.

17  Q. Did there come a time that you actually got

18  married to the defendant after that?

19  A. Yes.

20  Q. When did that happen?

21  A. June 20th.

22  Q. What caused you to marry the defendant?

23  A. He wanted to get married. And I didn't.

**95**

1  Q. How was your relationship going with him at

2  that point on June 20th?

3  A. I still had a black eye from when he had

4  punched me in the face in the car.

5  Q. So is that a way of saying the relationship was

6  not going well?

7  A. No, it wasn't. I had tried to leave over and

8  over and over again.

9  Q. And what did he do when you tried to leave?

10  A. He either shoved me to the floor or choked me.

11  The incident in the car --

12  Q. I just want to get to the marriage. Why didn't

13  you want to marry him on June 20th?

14  A. I wanted to leave him. I didn't want to be

15  with him anymore.

16  Q. Why did you marry him then?

17  A. He told me that if I didn't do what he wanted

18  me to do and if I embarrassed him in any way, that I

19  would be sorry.

20  Q. Did you go through with the marriage?

21  A. Yes, I did.

22  Q. Did you continue to live with him in that house

23  at 107 Lea Road?

**96**

1  A. Yes, I did.

2  Q. Up to this point now, from the time he's

3  arrested in April until around June 20th, early July,

4  did you have contact with your friends like Sean or

5  Maria?

6  A. Not that I can remember.

7  Q. Did you try to get help from anyone?

8  A. Everyone was very upset with me for going back

9  to him. And no one really wanted to talk to me.

10  Q. Did you feel as if you could go to anyone?

11  A. No, I didn't.

12  Q. Early July, July 1st, did an incident happen at

13  your house there on 107 Lea Road?

14  A. Yes.

15  Q. Could you describe what happened in the early

16  evening hours there?

17  A. I was making meat loaf for dinner. And I was

18  cutting carrots. Everything was fine. He wasn't upset

19  with me. He bent down maybe about five feet away from

20  me to get something out of the lower cabinet. And while

21  he was there, he just flipped out. He started --

22  Q. What do you mean he flipped out?

23  A. He started to yell at me and called me a slut

May 21, 2003

To whom this may concern:

This letter is in regards to Anthony Zuppo and Wendy Reynolds. My name is Dr. William A. Roe. I am an ordained minister and a professor of Ethics and Philosophy at Neumann College.

Recently I was contacted by Mr. Zuppo and was informed of the events that transpired after the wedding in June of 2001. He asked me to recall the events of the original interview and the wedding itself.

First of all: the initial interview. When I interviewed this couple in March of 2001, both the bride and the groom seemed quite intent on entering into marriage. I cannot recall any appearance of anyone being forced into the marriage relationship. We also met for a second time on April 2, 2001, with no problems cited.

Second: the wedding. The wedding took place at Beechwood Park Chapel in Aston, PA on June 20, 2001. There was absolutely no sign of the bride (Wendy Reynolds) having a black eye or any other marks of battering. Both the bride and the groom seemed happy and fully prepared to commit to one another in marriage.

I pray that this information helps clear up some of the issues.

Yours truly,

DR William Roe
Dr. William A. Roe

WAR/kls
enc.

Sworn and subscribed before me on this

22 day of MAY 2003

Notarial Seal
John Anthony Rim, Notary Public
Lower Chichester Twp., Delaware County
My Commission Expires Jan. 28, 2006

Member, Pennsylvania Association of Notaries

A-17

# MARRIAGE LICENSE

No.2001-1214

### VOID AFTER SIXTY DAYS FROM DATE

### THIS LICENSE VALID ONLY IN THE STATE OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA, } ss:
COUNTY OF DELAWARE

*To any person authorized by law to solemnize marriage:*

You are hereby authorized to join together in the holy state of matrimony according to the laws of the

Commonwealth of Pennsylvania.

..... ANTHONY GEORGE ZUPPO .................... and ......... WENDY ANN REYNOLDS ..............
OF LEGAL AGE                                                      OF LEGAL AGE
MARRIED ONCE BEFORE                                   MARRIED ONCE BEFORE
DISSOLVED BY DIVORCE ........................ DISSOLVED BY DIVORCE ..............
DIV. #94-
079110                                                                DIV. #99-
NEW                                                                    392990
CASTLE   Given under my hand and seal of the Orphans' Court Division of said County of Delaware at
CO.                                                                     NEW CASTLE
                                                                              CO.
Media, this .... 20ᵗʰ ............. day of ..... JUN 2 ............ A.D. 2001

X *[signature]*                                            MICHAEL F.X. GILLIN, ESQUIRE
          TO BE RETURNED TO
CLERK OF ORPHANS' COURT DIVISION
          IF NOT USED 15                               ...................................................
                                                                    Clerk of Orphans' Court Division, Delaware County, Pa.
X *[signature]* Laura Rockwood
officiating: DR. Will *[signature]*

*[signature]* Michael F.X. Gillin

A-▪18

**Page 1**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,

v.                          ID
                            No. 0101004412
ANTHONY G. ZUPPO,

                            Defendant.

BEFORE:    HON. JAMES T. VAUGHN, J. AND JURY
           - - - - - -

           - - - - - -
           TRANSCRIPT OF CLOSING ARGUMENTS AND
           JURY CHARGE
           - - - - - -

COPY

- - - - - - - - - - - - - - - - - - - - - - -
           JOHN P. DONNELLY, RPR
           SUPERIOR COURT REPORTERS
1020 N. KING STREET   WILMINGTON, DELAWARE 19801
                (302) 577-2400

**Page 2**

February 4, 2002
Courtroom No. 102
10:00 a.m.

PAUL R. WALLACE, ESQUIRE
DEPARTMENT OF JUSTICE
   820 N. French Street
   Wilmington, Delaware 19801
   for State of Delaware

JAMES A. BAYARD, ESQUIRE
PUBLIC DEFENDERS' OFFICE
   820 N. French Street
   Wilmington, Delaware 19801
   for Defendant

**Page 3**

1  THE COURT: Good morning. You have both had an
2  opportunity to at least scan the instructions, I think.
3  MR. WALLACE: Yes. Thank you.
4  MR. BAYARD: Yes. Thank you, Your Honor.
5  THE COURT: I concluded that the judgement of
6  acquittal should be granted on Count 4, kidnapping. I
7  concluded that there was not any evidence of kidnapping
8  as to that apart from the alleged rape itself.
9  MR. BAYARD: Thank you, Your Honor.
10 Appreciated.
11 THE COURT: That will not affect of renumbering
12 of attempted rape first to second or attempted rape
13 second, and the rape first to rape second. Now, I only
14 made one correction since the draft that you have was
15 done. That is in the aggravated intimidation charges
16 the count numbers were corrected to correspond with, you
17 know, the current numbers. Anything to address before
18 we proceed?
19 MR. BAYARD: Your Honor, Mr. Zuppo is going to
20 address the Court.
21 THE DEFENDANT: Yes, Your Honor. I am not
22 familiar with this. I don't know how this trial goes I
23 am learning as I am here. I am not a lawyer. Both

**Page 4**

1  sides rested, apparently, Friday. There was some
2  evidence that I went over and I also mentioned to
3  Mr. Bayard on Thursday about a couple instances that
4  prove without a doubt that lies on the stand that was
5  written down from the police officer. I don't know if
6  it could still be entered. Sean Hackett, who was on the
7  stand tells him that I said his days are numbered. He
8  said watch your back in the police report on two
9  different occasions. On the first page has nothing
10 about watch your back. Says your days are numbered
11 where the police officer got and he typed it up.
12 He is the gentleman that called and says your
13 days are numbered, nothing about watch your back. That
14 wasn't entered into evidence for them, for the jury to
15 see. I did mention it, said it can be a typo. I don't
16 think that could be a typo, typo would be if you had
17 didn't and it was did, instead you know what I mean?
18 Also with the January 16 police statement Sean
19 Hackett types it up at the very front point my fiance
20 states on his police report Mr. Bayard says it could be
21 a typo. I don't understand you had to put it about
22 fucked her both no matter I couldn't a not that I penetrated
23 could penetrated her, and that is fabricated over her

5

1  back. She was on her litorach.
2          THE COURT:  Is what it said in the police
3  report.
4          THE DEFENDANT:  That is impossible to be a
5  typo.  A month later Detective O'Sullivan gets in touch
6  with her, tells her what happened.  It is that is not
7  on that police report.  And it also on the journal that
8  he wrote for what happened.  It is not there either,
9  plus the paper is totally different than what Detective
10  O'Sullivan typed out to give to the Grand Jury to indict
11  me on, that was she had with Wendy.
12          And one other quick thing I was asking for you
13  to do, if possible; could we also have the tape from my
14  preliminary entered into evidence, also, of the night
15  because on there stating it was not intentional, could
16  go both ways.  What my wife did testify on the stand
17  makes it seem like it was real intentional that in fact
18  did not happen, saying I charged at her, threw her
19  against a wall.  That is reckless big time.  That did
20  not occur at that time.
21          There are things, we rested.  I didn't know
22  what was going on.  I was hoping maybe allow this to
23  come back in, put it in so the jury could read over it,

6

1  you know, when they are looking all this, you know.
2          THE COURT:  There is two issues now, Mr. Zuppo,
3  is you know whether the Court would allow the defense to
4  reopen its case after it rested.  That is one issue.
5  The second issue is if I did so, you know, is there
6  admissible evidence that could be introduced.
7          THE DEFENDANT:  Not to waste anymore time, I
8  heard back up try to blow out 400 cases this month, I
9  don't mean to waste time.  There is a paper there we
10  have is factual, that is what the police wrote down what
11  she stated to him that night.  The journal is totally
12  different.  Statement they give Detective O'Sullivan is
13  totally different.  Also Sean Hackett on the stand,
14  Mr. Wallace is a great prosecutor, maybe looks like an
15  idiot stating I am not lying.  They are all lying.  But
16  this also will prove that some of them were lying,
17  either Sean Hackett did lie.  Here is the police report
18  this night is fresh in his head.  He did not state
19  nothing where I said watch your back because it was not
20  said.  Then he said your days are numbered.
21          Okay, which wasn't said, this is what he was
22  saying was said the night it happened, but then 6, 7, 8,
23  nine months later, almost or nine months later, 11

7

1  months later he is stating he knows for sure, watch your
2  back.
3          THE COURT:  I am going to defer to counsel in a
4  moment here, give counsel an opportunity to speak.  If
5  they wish with respect to Sean, Sean Hackett, there be
6  an issue there or whether or not the contents of the
7  police report themselves are admissible evidence.  He
8  has given his testimony.  He is gone.  The issue would
9  be what witnesses, you know would, be called.  He may be
10  able to address that point.
11          THE DEFENDANT:  I don't think there would be
12  actually need a witness, I mean, we have the gentleman's
13  testimony.  We also have documents that are factual from
14  the police officer.  There wouldn't need a witness for
15  cross examination on that.
16          THE COURT:  There is procedure for admitting
17  documents into evidence.  You can't just hold it up and
18  say this is evidence.  So that is an issue.  As to your
19  comment about Mrs. Reynolds' description of how this
20  alleged rape occurred where the pants being taken down,
21  I caught that as part of your comment.
22          THE DEFENDANT:  That is a big issue.
23          THE COURT:  She testified.  She was cross

8

1  examined, you know, on I think the first day of trial
2  when evidence was taken.  She has been thoroughly
3  examined, and given her account, examined.  She has been
4  released, as well.
5          THE DEFENDANT:  The big issue on that is that,
6  you know, she lied.  She did not lie.  She lied, then
7  she did not lie.  That is where that comes in because
8  when we got back together she got in touch with me,
9  informed me on charges, everything that went down.  She
10  wanted to recant her statement because it did not
11  happen.  Now, I mean, like was wondering where she was
12  on medication after a year of this saying now it did
13  happen.  And this way let the jury see that she may be
14  unstable.  What she said on the police officers first
15  journal is totally opposite and then also the testimony
16  she give on tape is different.
17          THE COURT:  Well, the journal is an easy one.
18  Journal has been admitted.
19          THE DEFENDANT:  I know that.
20          THE COURT:  That is in evidence.
21          THE DEFENDANT:  I didn't understand why the
22  other two wouldn't have been when he did that either, so
23  they could see the three.


A-20

9

THE COURT: We have rules of evidence and those
are the rules under which decisions are made as to
whether this particular document or that particular
document is admittable. I may have misspoke, I don't
know whether Ms. Reynolds is still available to be
called or not. I am going to, at this point, to defer
to counsel to see whether they wish to address those
points that the defendant is bringing up.

MR. WALLACE: Your Honor, the State, both sides
have rested, and certainly Mr. Zuppo may read certain
things. He did not read everything. He reads selected
bits and pieces. For instance, Mr. Reynolds' account of
what happened on the first day, if you recall the very
question I asked Detective O'Sullivan was who has more
time to sit down and talk to her and make sure
everything is right. Who taped the statement, things
like that. Most probably -- I don't speak for
Mr. Bayard, he can speak for himself -- she went over --
Detective O'Sullivan went over those very things with
her during the taped statement, said wait a minute
police report said there no. He must have written that
down incorrectly. Certainly Mr. Bayard being the long
term attorney that he is knows what is helpful to him

10

and what may hurt him.

You know, what seems to be inconsistency to
Mr. Zuppo may be explained earlier in the case and
Mr. Bayard didn't waste his time on that. We will go
through a great waste of his time. Mrs. Reynolds is not
available any longer. She has gone back out of state.
I released her when they closed evidence. He kept her
here just in case we had rebuttal until Friday
afternoon.

Secondly, we would have to call a couple
witnesses, call patrolman Eckard, say it is possible
that I made a mistake, call Detective O'Sullivan to
explain that again, go through the taped statement she
took from Mrs. Reynolds.

Mr. Zuppo wants to complain that certain things
were not done. Certainly, from the perspective of the
State everything has been done that Mr. Bayard could do
up to this point. Something that he hasn't done, he
probably has great reason for and to attempt to open
that case back up simply to satisfy Mr. Zuppo, the State
would be greatly prejudiced by this. We can't call
those witnesses back.

MR. BAYARD: Your Honor, again, the trial

11

attorney does have the responsibility of asking
decisions as to how case is going to be run. And having
the information in front of myself, having looked at it,
having talked to Mr. Zuppo, having had a chance to speak
to Mr. Wallace in this matter, I think what was
presented is what I was hoping the jury would hear
clearly during the course of the trial. There may be
disagreement between counsel and client as to what
should or should not have been presented. Ultimately
this is the attorney's responsibility to make those
decisions as to what would be presented.

I think what has been presented is appropriate.
To start going off in the finite detail that Mr. Zuppo
is looking at, I don't see to be productive for him in
the long run. It is the long run for this gentleman is
the objective of, you know, his reputation here.

THE DEFENDANT: I can understand Mr. Bayard's
point, especially Mr. Wallace wants a conviction. I can
understand that. I hope he would want the truth. He
said that in the statement could have given different to
Mrs. O'Sullivan, to the police officer when
Mrs. O'Sullivan's statements speak with Wendy. I mean,
how different can you get. The woman is raped. She is

12

going to show she is on her -- not to be ignorant -- on
her back or stomach when she is raped. I mean, the
State what Officer Eckard wrote down Wendy said she was
thrown down on her stomach, held down, pants were pulled
off. While she is still on her stomach nothing about
any toy other thing into, on or to her anything then you
know was supposedly insert myself, then ejaculate all
over her back. That is totally different than
everything else, first thing she gave.

Also in what I can read, what I overlook
Mr. Bayard stated in one of them statements that I get
all the evidence to be able to look at to this evidence.
That I didn't see. I requested to hear both statements
that were given from my wife. You know, I would like to
hear them, see if they are different. The only person
that heard them would be three gentleman, two gentleman
and a lady. Right now I don't know how they -- what is
on there. I don't know what is different. I don't know
if I am just looking at something that are totally
different than what is down. We want the truth to come
out.

We have the first statement from the police she
gave to them then you have second statement she gave to


A-21

13

1  Detective O'Sullivan. Then you have the journal. All
2  three are different, specifically the difference. They
3  wind up going to the Attorney General's office, indict
4  me on the charges. Itis like a story. That is got all
5  three into one, and exaggerates with which is I don't
6  know that is not saying that is something wrong with
7  that when it is out on the other end of the line. It
8  scares heck out of you.
9      Also in her journal on the Fifth, not in
10  evidence states in, Your Honor, all we did we fought all
11  night. There was nothing stated on the stand if she is
12  write down in her home a diary of what happened. that
13  has to be the facts. What if the other stuff is not
14  true either. All of this is clashing with everything
15  else said by the State, if you understand what I am
16  saying.
17      Also the tape from the preliminary hearing. I
18  feel that shouldn't be too much trouble entered into
19  evidence. We have Detective O'Sullivan, the one that
20  spoke on the tape. She could be cross examined if she
21  had to about it. That is something they can hear also
22  for the -- I mean, like I said, not scared of the
23  possession. I am little bit -- I never did touch a

14

1  knife. I told Mr. Bayard supposedly cut my throat on
2  the stand everything. Everything, one thing I am liar.
3  said something smart to start an argument, my wife got
4  cut by it. I am not happy. I am willing to take the
5  charge possession. I did not do -- I didn't want to get
6  in trouble for something I did not do.
7      Tape also does state, they state Wendy said
8  that I did try to take the knife from her, never stated
9  if I got the knife, didn't say that I walked away with
10  the knife. Just states that I tried to, if I did.
11  Didn't say anything with I threw her against the wall.
12  Like I said, also states that, if I recall correctly,
13  this time that wasn't intentional for a woman to say
14  sitting down and talking to the detective in her stating
15  wasn't intentional. That witness stood up on the stand
16  say he rammed into me, threw me up against the wall, had
17  a knife. That is two different sides of the spectrum.
18  That is something I hope the jury, you know, would at
19  least be able to see that, if not anything, at least
20  that.
21      THE COURT: Well --
22      MR. BAYARD: Your Honor, I think the record
23  should be made there was two taped statements made by

15

1  Mrs. Reynolds and one by Mr. Zuppo. The prison does not
2  allow tape recorders there to be brought into the
3  prison. If I sat, I listened to it, I took notes. Those
4  notes were viewed with the gentleman. So he did not
5  hear the actual words, but he was certainly the contents
6  were shared with him.
7      THE COURT: All right. First of all, in
8  response to Mr. Zuppo I don't see anything. I would
9  like to just state for the record I see absolutely
10  nothing wrong at all with the facts that the State told
11  Mrs. Reynolds to go on back to wherever she lives
12  because on Friday someday both sides had rested.
13  Nothing wrong with that at all. As to that other issues
14  you are raising, like I say, the journal is in evidence.
15  Mrs. Reynolds was examined and cross examined. You gave
16  your statement and were cross examined. I don't think
17  that there is sufficient cause shown to reopen your case
18  even if your attorney asked for that.
19      So to the extent that you are asking to reopen
20  the case to present additional evidence on your own
21  and -- well, I am just going to say you have not shown
22  sufficient cause. I am --
23      THE DEFENDANT: Nothing for the statement, for

16

1  Sean's police report --
2      THE COURT: You have shown insufficient cause
3  to allow you to reopen your case. I am not going to do
4  that. I will follow up on one thing when I came into
5  the courtroom this morning, the attorneys could see that
6  I had ruled on this kidnapping issue. You know from the
7  one that corresponded with the alleged rape. I also
8  came in here intending to inform the attorneys that I,
9  when I was making that decision, I also did decide to
10  reserve decision on that possession of a firearm during
11  the commission of a felony. I'm going to reserve
12  decision on that count, going to submit that to the
13  jury.
14      I will, you know, that will be a reserved part
15  of the motion for motion of judgement of acquittal. All
16  other aspects for the judgement are decided as they have
17  either been approved or reserved. I am also going to
18  inform counsel I am going to file a brief written order
19  on Count 4, kidnapping charge which you will both
20  receive, will be after, you know, we are done today.
21  Anything further?
22      THE DEFENDANT: Apologize for taking your time.
23      THE COURT: That is all right.


A-  22

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

. . . . . .

STATE OF DELAWARE       : I.D. No. 0101004412
      vs.                :
ANTHONY G. ZUPPO,        :
      Defendant.         : (Trial beginning
                           January 29, 2002)

BEFORE:

THE HONORABLE JAMES T. VAUGHN, JR., JUDGE and a Jury

. . . . . .

APPEARANCES:

      PAUL R. WALLACE, ESQ.
      Deputy Attorney General
      for The State

      JAMES A. BAYARD, JR., ESQ.
      Assistant Public Defender
      for Defendant

      . . .

      TRIAL TRANSCRIPT
      JANUARY 31, 2002

[stamp: RECEIVED MAY 2002 BY: DD]

---

**2**

I N D E X

| WITNESS | DI | CR | REDIR | RECR |
|---|---|---|---|---|
| Wendy Reynolds | | 46 | 60 | 69 |
| | | | 71 | |
| Jean Lee | 73 | 81 | | |
| Officer Rogers | 83 | 86 | | |
| Herno Rivera | 89 | 96 | 102 | |
| Sean Hackett | 110 | 134 | | |
| Cherelyn Homlish | 146 | 161 | | |
| Maria Maldonado | 163 | 177 | 183 | |
| Corporal Mayberry | 188 | 192 | 197 | |
| Detective O'Sullivan | 198 | 221 | 224 | |
| Milton Lockwood | 229 | 232 | 234 | |
| Robert Buvall | 235 | | | |

. . .

E X H I B I T S

. . .

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| State's Exhibits 13 & 14 | Letters | 62 |



*A-23*

---

**3**

1  Courtroom 103
2  9:45 a.m.
3                    . . .
4        THE COURT: Good morning.
5        MR. WALLACE: Two housekeeping matters, if we
6  could take care of those first.
7        Count XXI, the State and the defendant have
8  agreed, and put in writing, a stipulation of fact as
9  to Mr. Zuppo's being a person prohibited. Basically,
10 the stipulation reads that we hereby stipulate the
11 defendant was convicted in the Superior Court of the
12 State of Delaware, in and for New Castle County, of
13 the charge which is a felony, on or about July 6th,
14 1999. We specifically took the name of the crime out
15 because it was Aggravated Harassment.
16       I'm also moving to amend the indictment, so
17 the indictment does not go back to the jury, and to
18 remove 'Aggravated Harassment' and put in, instead, 'a
19 felony'. Certainly, the State has to name the crime
20 in the indictment, but if the defendant is stipulating
21 he has such a conviction, there's no need for the jury
22 to know the name of the crime.
23       MR. BAYARD: This was explained to Mr. Zuppo,

---

**4**

1  and he read and signed the stipulation, and we're
2  asking the Court's permission to make the change.
3        MR. WALLACE: I'll move this as the next
4  State's exhibit so it could go back to the jury.
5        THE COURT: All right.
6        I was noticing that Count XXI -- are both the
7  State and the defendant content to have that
8  adjudicated in this case?
9        MR. WALLACE: Yes, Your Honor.
10       MR. BAYARD: Obviously, we would love to have
11 it nolle prossed, if that's the question.
12       THE COURT: That's not my question.
13       MR. BAYARD: As far as the modification made
14 by the State, I think the State is being fair to my
15 client, inasmuch as they are not going to know about a
16 prior Aggravated Harassment.
17       THE COURT: Any motion filed to severe that?
18       MR. BAYARD: No, there was not, Your Honor.
19       If the Court is asking would the Court
20 entertain such a motion, yes, I'd be happy to make a
21 motion that the matter be severed, that it eliminates
22 all concerns regarding prejudice regarding the client.
23       THE COURT: There's been no mention of -- you

5

1  know -- to this point in the trial, there was no
2  mention of the prior conviction.
3      MR. WALLACE: But the State's case is not --
4  severance is not a fait accompli because you're
5  charged with other crimes, and in the interest of
6  judicial economy, when you're taking together all of
7  the factors, the Court can see that this is a very
8  complicated case.
9      If we had to sever the person prohibited
10  charge and then retry it in this matter, so that the
11  jury understood the entire matter, we would basically
12  have to bring Ms. Reynolds back. She's no longer
13  living in this state, and I would suggest that,
14  at this point, the State is greatly prejudiced because
15  we prepared for one trial, prepared to go forward and
16  made a reasonable compromise to ensure -- to limit the
17  prejudice as much as possible, and, in fact, have
18  changed, when asked to amend the indictment, and so
19  that we can't bring in extraneous information about
20  his prior conviction.
21      Unfortunately, I don't have all the cases on
22  severance, but sometimes it's severed and sometimes
23  it's not, and it depends on all the factors of the

6

1  case.
2      In this case it would be quite a feat to try
3  to retry the simple charge of person prohibited later
4  at some other trial, and I would suggest, as the Court
5  can see how this case has progressed, that, in fact,
6  that would be very difficult to do, and as opposed to
7  a pretrial motion where you're getting how difficult
8  it might be, the Court knows how it might be, and this
9  eliminates the possible prejudice to the defendant.
10      THE COURT: All right.
11      MR. BAYARD: It may limit it, and certainly
12  I'm not being unappreciative of what Mr. Wallace put
13  on the table this morning. We obviously signed it,
14  the stipulation to the fact that the phrase would be
15  removed from Count XXI, but I have been in cases in
16  the past where Possession of a Deadly Weapon by a
17  Person Prohibited has been severed and then the State
18  reevaluates even if it wants to go forward, depending
19  on what the result in the case in chief was. It may
20  be an academic point and it may be an important point,
21  depending on the jury's decision here, but we don't
22  know that right now.
23      The Court has brought this issue up. We're

7

1  certainly asking the Court to consider further the
2  application of having Count XXI severed at this time
3  and go forward.
4      THE COURT: I'm inclined to severe it. Now,
5  if -- you know, if I had focused on the fact that that
6  -- that a possession by a person prohibited was in the
7  indictment before we started the trial, you know, I
8  would have brought it up and asked about it. It's
9  frequently the subject of motions to severe, which are
10  usually granted, at least based on my experience, and
11  there's been -- fortunately, there's been no mention
12  of it at all in the opening or the evidence, so my
13  inclination is to severe that one. I think it may
14  create prejudice towards the defendant to have that in
15  this case, so I'll severe it. That can be tried
16  later, if you get that far.
17      MR. WALLACE: That's fine, Your Honor. I
18  guess that should not be moved as the next State's
19  exhibit, and perhaps I should take that back to make
20  sure that the prothonotary doesn't have it and it goes
21  back.
22      THE COURT: By the way, on the exhibits, you
23  know, I'm very appreciative of the fact you pre-marked

8

1  them all, but have we actually made a record of what
2  the exhibits are?
3      THE PROTHONOTARY: I usually wait for the
4  attorneys, and when they represent to the witness,
5  they usually say, "Previously marked as State's
6  Exhibit" --
7      THE COURT: So, we'll let the record show it
8  item by item.
9      MR. WALLACE: I have been doing that, and I
10  mention it as I give it to the witnesses.
11      THE COURT: All those marked as exhibits by
12  agreement of the parties, they are all admitted and
13  nothing further. That will take care of that.
14      MR. WALLACE: Thank you.
15      MR. BAYARD: Your Honor, in speaking to Mr.
16  Zuppo this morning, he asked if he could address the
17  Court directly before the Court begins today and the
18  trial restarts at this point.
19      THE COURT: All right.
20      THE DEFENDANT: Yes.
21      I was told to ask for a private meeting with
22  counsel and the judge.
23      THE COURT: Run that by me.

**9**

1    THE DEFENDANT: I was told it would be proper
2 to ask for a private meeting with counsel and the
3 judge, if there was a possibility, or I don't know --
4    THE COURT: No, any -- any meeting that I'm
5 involved in, Mr. Zuppo, is going to take place right
6 here in the courtroom.
7    THE DEFENDANT: I have a lot of conflicting
8 interests with my counsel at the time. I stuck a
9 motion -- presented a motion on the 12th of December
10 for change of counsel. Apparently, they never reached
11 Mr. Bayard, Mr. Wallace or the Attorney General's
12 Office. I talked to another private attorney that
13 can't get involved because it's conflicting interests
14 with me and my wife, and he told me to bring it up to
15 you and ask if there was a possibility of getting new
16 counsel. I have notes that he told me to keep as we
17 were going through the meetings before trial and in
18 trial, in case it got worse, that I could let -- I
19 know what has been going on -- so I could prove it's
20 ineffective counsel, and this is to keep from getting
21 a mistrial at the end of the trial --
22    THE COURT: What exactly are you asking me to
23 do?

**10**

1    THE DEFENDANT: Reassign counsel.
2    THE COURT: Reassign counsel?
3    THE DEFENDANT: This is a class one trial.
4 I've got a public defender, and every -- everything
5 I've brought up that -- also private attorney told me
6 to get the transcripts of all the times my wife showed
7 up at trial, to straighten this matter out, all the
8 times -- every -- certain things I needed, this
9 gentleman says it doesn't matter, certain things.
10    The trial, now as we were going on
11 cross-examination, questions I wanted to ask, this
12 gentleman, he doesn't see any valid reason to bring it
13 in when a private attorney sees that's a very strong
14 part of the case, to prove the woman is lying on the
15 stand.
16    What else? I'm nervous. There's certain
17 people being subpoenaed. Arlen Mekler and Jerome
18 Capone and my fiance at the time went to have him draw
19 up the sworn affidavit to admit into the courts for
20 us. I was stating she gave a false police report, and
21 Arlen Mekler, she went and got him, and both of those
22 attorneys are credible, and they know what she told
23 them. That's a big thing, to have them subpoenaed,

**11**

1 and he told me why. I asked him, 'Could you have this
2 subpoenaed,' and he asked me, 'Why would that matter
3 with the trial,' and he knew the factors of when he
4 did proceed, and she retained Mr. Mekler for me and
5 Jerome Capone for herself.
6    So many factors. This morning we're
7 downstairs and I asked him a big thing of her
8 testimony yesterday was that when we got back together
9 on the 17th, she said it was a week or two later she
10 told me of the big charges I was going to be indicted
11 on. It was, in fact, that night, that Monday. We
12 were in a lawyer's office discussing it with them, and
13 also, she testified that this lawyer said he wouldn't
14 take the case because he wouldn't be able to win it,
15 and she told him the truth. Last night, on the phone,
16 this gentleman told me that this is not what she is
17 testifying she told him, and he said yeah, you were
18 there the 19th of March, that morning, asking what we
19 could do about that, because how she lied, and now I'm
20 in all this trouble, and Arlen Mekler -- Mr. Bayard, I
21 asked him could we have him subpoenaed. I know it's
22 the end of the trial, but this is a crucial witness
23 now we could get in here to testify she's lying on

**12**

1 certain occasions. As it goes on, I will be able to
2 prove she's lying on many occasions, and he doesn't
3 see any relevance in allowing that to happen.
4    If you would like, I have so many things that
5 happened through the times we were having meeting. We
6 got into heated discussions --
7    THE COURT: We're in the middle of your trial
8 right now.
9    THE DEFENDANT: And I'm fighting for 15 to
10 life twice.
11    THE COURT: I know, but I'm not going to
12 delay your trial. We're in the middle of your trial.
13 We're underway. I'm not going to delay your trial.
14    THE DEFENDANT: I understand that.
15    THE COURT: I'm not going to appoint a second
16 or new lawyer for you. So, if your request is, you
17 know, that I somehow appoint another lawyer for you,
18 I'm going to have to deny that request.
19    THE DEFENDANT: Okay.
20    THE COURT: Do you have any further requests?
21    THE DEFENDANT: Only thing I could see from
22 there is to have -- to proceed as my own lawyer and
23 have him as assisting counsel. That's the only thing

13

1  I can say, because I know everything that happened
2  from day one to day two. All the facts are there. I
3  lived it with the woman. I mean, he's never asked me
4  how about this. I went through situations of what
5  actually happened. I mean, this morning he couldn't
6  even recall what she said about not testifying about
7  she didn't tell me that about the new charges that
8  night. She told me a week or two later, and she
9  couldn't clarify that, you know, or remember that she
10  told Joseph Longobardi, she told him the truth, but he
11  wouldn't take the case because he wasn't going to be
12  able to win it. I don't think no lawyer is going to
13  talk like that either.
14       THE COURT: Do you want to discuss --
15       MR. BAYARD: I would like to make a record.
16  I listened to enough, and if this is what the man
17  wants to tell the Court, he's allowed to do that.
18       Mr. Mekler and Mr. Capone are subpoenaed.
19  They are going to be here. I spoke to Mr. Capone
20  again today. As far as Mr. Longobardi is concerned, I
21  spoke to him face-to-face on the 3rd Floor after
22  talking to Mr. Zuppo earlier this morning. He
23  indicated to me he did not want to testify. He felt

14

1  there were certain questions that would clearly be
2  detrimental to Mr. Zuppo's position, and after hearing
3  what he had to say, I agree with him. He could be
4  lethal, Mr. Longobardi, if he testified, to this
5  gentleman's case.
6       So, you know, the rest of his complaints,
7  they are trial-strategy decisions. That is the
8  attorney's position. That is his role, his job. You
9  know, I accept that, and I accept the responsibility
10  for the decisions made, and the client may not always
11  appreciate it or understand it because the client
12  doesn't have the background or the experience, but I'm
13  going to make those decisions because that's what is
14  expected of me, and if he doesn't appreciate it, I'm
15  sorry, but I stand by them.
16       THE COURT: Well, do you want --
17       MR. BAYARD: If he wants to represent
18  himself, Your Honor, I ask the Court to make inquiries
19  to see if he's confident to do it.
20       THE COURT: Are you sure you don't want to
21  discuss this with him a little bit more?
22       THE DEFENDANT: That's fine with me, Your
23  Honor.

15

1       When I come up with certain questions, he
2  looks away and gets disgusted. He's the lawyer.
3  That's why I'm asking questions. If I feel a question
4  to cross-examine my wife with is detrimental to my
5  cross-examination, and I have, like I said, I have a
6  private attorney who thinks that would be a good
7  question too, he's saying it's not.
8       When Mr. Wallace wants to bring up in the
9  middle of the cross-examination the main witness of
10  the whole trial, let somebody come in for 15 minutes
11  so the jury has in their head the bad testimony or the
12  prosecutor testimony, and in between that and the
13  cross-examination they have the testimony of, you
14  know, the therapist for 15 minutes, and we were at
15  4:30 at the time, that was not even close. That
16  should have been objected by the defense.
17       THE COURT: Well, if you do request of me to
18  take over the representation of yourself, that's a
19  request that I should consider, but I think what I'm
20  going to do is recess for 15 minutes and let the two
21  of you talk, and just see what, you know, what you
22  want to do.
23       MR. BAYARD: Thank you, Your Honor.

16

1       MR. WALLACE: Your Honor, I would ask in the
2  meantime if the Court could get the proper inquiries,
3  there are 13 inquiries, to make before this man goes
4  pro se, and he'd have to make it through those before
5  he could do so. There's certain questions about
6  whether he's familiar with the rules before we simply
7  say you can represent yourself.
8       THE COURT: That is a concern. You didn't
9  come here prepared to represent yourself. You know,
10  that's a concern, but I'm going to let the two of you
11  -- how much time have you had to talk this morning?
12       THE DEFENDANT: Five minutes.
13       THE COURT: I'll give you all a little bit
14  more time to talk and try to work this out.
15       So, I'll recess for 15 minutes.
16             ' ' '
17       (Court recessed at 10:03 a.m.)
18             ' ' '
19       (Court reconvened at 10:23 a.m.)
20             ' ' '
21       THE COURT: All right. So, what have you
22  decided?
23       THE DEFENDANT: I'm really scared. I'm going

A-26

17

1  to go ahead myself and have -- if it's possible with
2  the Court -- to have Mr. Bayard as helping counsel,
3  assisting counsel.
4      MR. BAYARD: Your Honor, during the recess
5  the Court kindly provided, it was explained to the
6  gentleman that I didn't think it was in his best
7  interest to go forward without counsel, but it is his
8  decision.
9      A copy of the document entitled "Waiver of
10  Counsel Form" has been presented to him. He's had a
11  chance to review it while we were on recess, and I
12  guess the 13 questions there. Perhaps the Court has a
13  copy of that also. If not, I think there's a blank
14  copy that the State has that could be shared.
15      I believe the gentleman is prepared to sign
16  the document.
17      THE COURT: I would like to see it so I could
18  compare it to my own.
19      MR. BAYARD: Your Honor, may I approach.
20      THE COURT: Yes.
21      MR. BAYARD: Thank you.
22      THE COURT: All right.
23      One thing I want to cover before we get to

19

1      THE DEFENDANT: Yes. If I'm found guilty of
2  Possession of a Deadly Weapon, if Mr. Wallace wants to
3  pursue --
4      THE COURT: Regardless of what happens in
5  this trial; do you understand that?
6      THE DEFENDANT: Yes.
7      THE COURT: Do you agree to that?
8      THE DEFENDANT: Yes.
9      THE COURT: Okay.
10      Now, how serious are you about wanting to
11  represent yourself?
12      THE DEFENDANT: To explain it, very, because
13  I know I lived it. I know the facts back and front,
14  and there's enough that Mr. Bayard doesn't know, a
15  lot, but I'm just scared to death.
16      This is my life.
17      THE COURT: All right.
18      Now, do you understand that that
19  representation is in either one of two ways, either
20  Mr. Bayard represents you, or you represent yourself?
21      THE DEFENDANT: Yes.
22      THE COURT: It's not a split representation.
23      THE DEFENDANT: Yes, I know that.

18

1  this, and that is, on Count XXI, the Possession by a
2  Person Prohibited, I am willing to severe that. I do
3  want to make one thing clear, that, if I do so, if I
4  continue to do so, the defendant has to waive any
5  double jeopardy on any other issues.
6      In other words, if I severe it, you know, I
7  began by asking whether or not the defendant wanted to
8  have that charge adjudicated as part of this trial or
9  not, and if the defendant, you know, would like to
10  have that severed, I will do that, but the defendant
11  has to waive any double jeopardy on any other issues
12  that arise, since it's coming up at this time.
13      MR. BAYARD: May I have a moment to explain
14  what the Court just said.
15      THE COURT: Right, right.
16          ' ' '
17      (Pause)
18          ' ' '
19      THE DEFENDANT: Yes, Your Honor, that is
20  fine. I will sign the plea to -- you know --
21      THE COURT: All right, and you agree that
22  they can proceed against you on that charge at a later
23  trial?

20

1      THE COURT: It's not where he represents you
2  on something and you represent yourself on something
3  else; do you understand that?
4      THE DEFENDANT: Yes, Your Honor.
5      THE COURT: All right.
6      Well, the first question, of course, is do
7  you understand, you know, what, you know, the offenses
8  that you're charged with are? You been over the
9  indictment --
10      THE DEFENDANT: For six months every day;
11  yes, sir.
12      THE COURT: Right, okay.
13      Do you understand how much possible time you
14  could get on these charges?
15      THE DEFENDANT: Yes.
16      THE COURT: Tell me.
17      THE DEFENDANT: Basically, from what Mr.
18  Bayard said, I could get convicted of 15 to life on
19  two charges, twice.
20      THE COURT: Is that correct, Mr. Bayard?
21      MR. BAYARD: Yes, for the two Rape First, and
22  there's a mandatory 2 to 20.
23      THE COURT: Do you understand that?

21

1  THE DEFENDANT: Yes, Your Honor.
2  THE COURT: Do you understand all these other
3  charges have other sentences that go with them?
4  THE DEFENDANT: Yes.
5  THE COURT: Do you believe that you're
6  competent to represent yourself?
7  THE DEFENDANT: Competent, yes, sir.
8  THE COURT: What makes you think you're
9  competent to represent yourself?
10  THE DEFENDANT: I'm not a nut. I been over
11  this and over this for I don't know how many months
12  now. It's in my head. There's no lashing out -- I
13  feel I'm competent to do it; yes.
14  THE COURT: What's the level of your
15  education?
16  THE DEFENDANT: Graduation, graduated high
17  school.
18  THE COURT: All right.
19  Have you ever participated in a trial before?
20  THE DEFENDANT: Yes. As my lawyer or been in
21  a trial?
22  THE COURT: Either.
23  THE DEFENDANT: I been in one trial that I

22

1  actually represented myself for a misdemeanor.
2  THE COURT: All right.
3  THE DEFENDANT: That was -- that was nothing
4  like that. There was no jury or nothing; no.
5  THE COURT: How many trials have you
6  participated in, either as representing yourself or as
7  a client?
8  THE DEFENDANT: That's the only one I can
9  remember.
10  THE COURT: All right.
11  Have you had previous experience in the
12  Criminal Justice System?
13  THE DEFENDANT: As being in trouble or --
14  yes.
15  THE COURT: What experience have you had?
16  THE DEFENDANT: A lot of driving tickets I
17  been charged with. I been to court on my own, and Mr.
18  Longobardi represented them, and basically, that's it,
19  not -- nothing of this caliber ever.
20  THE COURT: All right.
21  MR. WALLACE: Your Honor, I don't think
22  that's a wholly truthful answer. He has a conviction
23  for Aggravated Harassment, conviction for Assault in

23

1  the Third Degree, Reckless Endangering Second Degree.
2  If he's not going to be truthful to the Court, we're
3  not going to get far in this process. He's had
4  much --
5  THE DEFENDANT: I must be misunderstanding
6  your questions. I think I'm saying -- I'm trying to
7  show you things that I've done to represent myself in
8  trial. He's bringing up where plea bargains that were
9  thrown at me and you just sign and that was it. There
10  was no trial. There was no -- you know what I'm
11  saying?
12  I misunderstood what you were saying.
13  THE COURT: All right.
14  Do you understand that you do have an
15  absolute right to be represented by an attorney?
16  THE DEFENDANT: Yes, I do, Your Honor.
17  THE COURT: Do you understand that the
18  overwhelming number of criminal defendants elect to be
19  represented by a lawyer?
20  THE DEFENDANT: Yes, Your Honor.
21  THE COURT: Do you understand that a lawyer
22  would be knowledgeable as to court proceedings, Rules
23  of Evidence and the law that governs your trial?

24

1  Do you understand that if this case is tried,
2  there may be technical issues which would make it very
3  difficult for you as a non-lawyer to assess?
4  THE DEFENDANT: Yes.
5  THE COURT: 'Yes' to both questions?
6  THE DEFENDANT: Yes, Your Honor.
7  THE COURT: Now, Mr. Zuppo, I explain these
8  things to you not to frighten you, but draw your
9  attention to the substantial risks that you are
10  subject to.
11  Do you understand that?
12  THE DEFENDANT: Yes, I do, Your Honor.
13  THE COURT: Do you understand that even if
14  you did have training in the law, the objective used
15  as a third person with professional experience and
16  training may be something that you wish to take into
17  consideration?
18  THE DEFENDANT: As in having an assistant --
19  THE COURT: That's not what I'm talking
20  about.
21  Even if you were -- even if you had legal
22  training, even if you were a lawyer --
23  THE DEFENDANT: Uh-huh.

25

1    THE COURT: -- that the objective views of a
2 third person, that is, you know, in this case, Mr.
3 Bayard, the objective views of a lawyer may be
4 something that you would, you know, wish to take into
5 consideration, that they would have objective views,
6 rather than your personal involvement.
7    THE DEFENDANT: Yes, I understand that.
8    THE COURT: Do you understand that?
9    THE DEFENDANT: Yes; like now I understand
10 what you were saying. I understand the question now.
11    THE COURT: Do you understand that the trial
12 does take place according to the established laws and
13 rules of the court, and Rules of Procedure?
14    THE DEFENDANT: Yes.
15    THE COURT: Have you familiarized yourself
16 with the Rules of Procedure?
17    THE DEFENDANT: No, I haven't, as of this
18 present time, Your Honor, basically, other than what
19 Mr. Bayard informed me and what has to be done and
20 what can't be done, and I discussed it with Mr.
21 Longobardi, and the only question I had, when
22 cross-examining, how do I refer to myself, because I'm
23 the defendant?

26

1    Do I do it as a third party or do I ask the
2 questions has the defendant done this? That's the
3 only thing I was confused with.
4    THE COURT: Well, do you understand that you
5 do not -- you do not have the right to receive any
6 personal instruction from me on courtroom procedure?
7    THE DEFENDANT: Yes, Your Honor.
8    THE COURT: Do you understand that you do not
9 have the right to have a trial judge take over the
10 chores for you that would normally be attended to by a
11 trained lawyer?
12    THE DEFENDANT: Yes, Your Honor. I
13 understand that question.
14    THE COURT: Do you understand that in the
15 event you became confused or frustrated, that that
16 would not be a basis for interrupting the trial, nor
17 would it be a license for you to interrupt the trial
18 with improper representations --
19    THE DEFENDANT: Yes, I do, Your Honor.
20    THE COURT: Do you understand that if you
21 fail to conduct yourself with due respect for the laws
22 and rules, are disruptive, the Court may revoke any
23 permission which it may give for you to represent

27

1 yourself?
2    THE DEFENDANT: Yes, Your Honor.
3    THE COURT: Anybody have any additional
4 questions?
5    MR. WALLACE: I don't, Your Honor.
6    There is one case that I -- I just asked that
7 it be pulled. We're in mid-trial here, and whether or
8 not to allow Mr. Zuppo to proceed at this point is
9 discretionary than it is before trial. I have a great
10 concern because just getting through the -- I don't
11 know how many times he said, "I don't understand that,
12 I don't understand that question." We're going to be
13 calling an expert witness, who I've given Mr. Bayard
14 all the discovery on. They are very technical rules
15 how you deal with expert witnesses, and there are a
16 lot of other technical aspects that he hasn't prepared
17 for. He's saying right here "I don't know" or "I
18 haven't really -- I'm not familiar with that." He
19 wasn't even familiar with the difference between a
20 plea bargain or a trial, or what those things were
21 when he was asked, and so I'd ask for 10 minutes to
22 take a look at this case, because it's <u>Pitts versus</u>
23 <u>Redman</u>, and it discusses about the timeliness of

28

1 mid-trial pro se proceedings, because if the Court has
2 the discretion, we are in a different posture, and the
3 State can be greatly prejudiced by changing horses at
4 this point, especially with somebody who says, "I
5 don't understand" and things like this, and in the
6 end, I'm the one that has to do the appeal if he's
7 convicted, and that's a great problem, and you know,
8 <u>Snowden</u> (ph) and other cases have been reversed on
9 this very, very question about whether somebody should
10 be permitted to go pro se or not, and so this was just
11 brought up. I haven't had a chance to look at any
12 cases, and I know the generalities, and I never dealt
13 with it mid-trial, and I ask we take the time to look
14 at the trial that I think is on point in this before
15 any decision is made.
16    THE COURT: That's fine.
17    THE DEFENDANT: Your Honor, to go by what he
18 was saying, I don't know or I wasn't understanding
19 what you were saying is I'm being asked questions to
20 proceed as my own lawyer, okay? So, you're asking me
21 questions. I'm feeling you want to know if I did
22 trials, seen how it works. That's why I wasn't sure.
23    Yes, I had a couple of Harassments, Reckless

A-29

29

1  Endangerment. I pled to it because I was guilty of
2  it. I haven't had any trial experience, except the
3  one when -- that's why you were asking this, and he
4  said I was lying. I wasn't lying. I didn't
5  understand. I thought you wanted to know if I had
6  experience as being a lawyer or if I witnessed it
7  enough. That's why I'm saying I wasn't sure how you
8  were coming -- I'm not dumb like I don't know nothing.
9  No. I know what is, you know, true. I do know what
10 should be brought out in the trial, should be brought
11 to light that isn't being brought to light, that the
12 jurors should have to know, and I don't see it coming
13 up, and I'd like to, you know.
14     THE COURT: Do you have a --
15     MR. WALLACE: No. That was something else
16 coming in.
17     THE COURT: We will take a recess.
18     How much time do you need?
19     MR. WALLACE: As much time as it takes me to
20 get up to the library and find the case.
21     THE COURT: We'll take 15 minutes.
22     MR. WALLACE: Thank you.
23            ' ' '

30

1     (Court recessed at 10:40 a.m.)
2            ' ' '
3     (Court reconvened at 10:58 a.m.)
4            ' ' '
5     THE COURT: All right.
6     Do you want to address --
7     MR. WALLACE: Yes, Your Honor.
8     During the break, I had provided to the Court
9  and opposing counsel a copy of Pitts versus Redman at
10 -- where I left my copy of it I can't find it right
11 now. I got it. 776 F. Supp. 914, in which Judge
12 Roth, then of the Delaware District Court, gave very
13 long treatment as to how waivers of jury trials should
14 be treated in Delaware, but not just in Delaware, but
15 in the Third Circuit and the across the circuits, and
16 the one main concern the State has is the timeliness
17 of this request to go pro se and the disruption it may
18 have on the proceedings.
19     It's clear that Mr. Zuppo waited to bring to
20 the Court's attention his request to go pro se at the
21 second day of trial after one witness fully testified
22 and a second witness was almost finished
23 cross-examination. Clearly, under this case, it's an

31

1  untimely request, and therefore, it goes to the
2  discretion of the Court.
3     The things I would suggest the Court should
4  look to in exercising its discretion, is one, whether
5  or not his right to proceed pro se overcomes the
6  obvious problems we will have in switching gears to do
7  that and the disruption of the proceedings,
8  especially, as the Court saw in the colloquy this
9  morning, Mr. Zuppo isn't able to articulate some of
10 the basic questions the Court had asked. How can he
11 be expected to go forward not having prepared to go
12 pro se, to know all the applicable rules to deal with
13 the technical aspects of the law without causing major
14 disruption to the case at this point?
15     I would suggest that, therefore, his
16 application to proceed pro se should be denied, and we
17 should move forward with Mr. Bayard.
18     Mr. Zuppo, I understand, had discussed,
19 pretrial, going pro se, but never made that clear, and
20 we must assume, because Mr. Bayard is here, whatever
21 those difficulties were, he decided to go forward with
22 Mr. Bayard. Going two days into a trial and then
23 changing your mind, the right to proceed pro se has

32

1  been waived once he does that, or at least it's
2  compromised. It's not as absolute as it is pretrial,
3  and I suggest we move forward with counsel at this
4  point.
5     THE COURT: Do you want to say anything about
6  that?
7     THE DEFENDANT: I understand saying in the
8  beginning wanting to go pro se and then staying with
9  Mr. Bayard is all well and fine and I can understand
10 Mr. Wallace's point 100%, but as the trial was going
11 on, honestly, I'm sitting there as another person, I
12 do not feel he has my best interest at heart. There's
13 situations in the trial that have to be brought up
14 that Mr. Bayard, last night, down in the chambers,
15 downstairs talking in the jail, he's -- he has the
16 last say of everything, but my life is on the line,
17 and I feel strongly this stuff should be brought up to
18 the jurors, and he's just no. I don't feel he's got
19 any interest, my best interest at heart for the
20 situation. That's why now I'm worried.
21     I been thinking about it since we -- I would
22 say from the morning when it first started, seeing how
23 Mr. Bayard was reacting in trial, and I just did not

**33**

1  feel -- the main thing was I brought up when we wanted
2  to -- actually allow Wendy to step off the stand when
3  we were in the cross-examination, after recess, and
4  bring up their -- her therapist to give 15 minutes of
5  most of that, as Mr. Bayard put it, to get her out of
6  the way, because she couldn't be here today and bring
7  Wendy back at 4:30, and we wouldn't even be able to
8  start getting anything accomplished when we stop at 5
9  anyway, and he had no objection to that, and I don't
10  see -- that right there is relevance that -- that's a
11  big objection right there, and he had no problem with
12  it, cause you have -- the jurors got it in their mind.
13  They have the opening statement from her from when Mr.
14  Wallace was questioning her, so -- to make me the bad
15  person, which is fine. We start cross-examination so
16  they got to weigh either, but when you bring somebody
17  else on the stand, it's going to, batter stuff, but
18  they get to the real questions for the
19  cross-examination.
20         THE COURT: Well, you say there are some
21  things that you think ought to be brought up, but you
22  also told me you don't know the Rules of Evidence.
23  How do you know that the things you want brought up

**34**

1  are even admissible? I don't want you to tell me what
2  the things are.
3         THE DEFENDANT: There's no evidence being
4  brought in. What it is is the truth. It's questions
5  that are facts that will be asked upon the witnesses,
6  and basically, that's it.
7         I was told the proper way of -- I can't lead.
8  I know I can't lead a witness. There was things that
9  I was told. You have to stick with facts that is --
10  it -- and you can't use it -- there's -- I'm nervous.
11         There's ways you can't do it. I understand
12  how to cross-examine somebody. I know that part, but
13  I don't if I'll get a chance or not.
14         THE COURT: Well, I'm sure Mr. -- well, I
15  can't -- I'm going to go even more than that to say
16  I'm sure, because I saw it in the courtroom, Mr.
17  Bayard has been very careful about when he's getting
18  near the end of an examination, he comes and obviously
19  asks you whether there are other points to go over.
20         THE DEFENDANT: Yes. I have some written
21  down, a mess of it written down when he comes back,
22  and certain parts of the testimony that she's given,
23  there are so many parts that should be touched on that

**35**

1  hasn't come close and points he hasn't -- I was
2  wondering when I come back and I'm wondering, how
3  would this affect me in a bad way, the question I
4  really wanted to come out to prove things about the
5  defendant -- I mean the alleged victim, and there's
6  nothing that would hurt me in any way. If anything,
7  it would help. That's when I did ask another lawyer,
8  private lawyer, Mr. Longobardi. He told me that would
9  be something you would want to bring up in trial. I
10  do not want to give this jury any more feelings of
11  sorrow for the alleged victim than they have. If
12  she's lying, it doesn't matter. You want that to come
13  to light. They know the whole story of everything.
14  They can make a true story of what is going on with
15  the situation.
16         I mean, if you leave things out, they are not
17  going to get 100% picture of the whole thing.
18         THE COURT: I guess there have been some
19  possible agreements about what witnesses should be
20  called; is that correct, Mr. Bayard?
21         MR. BAYARD: No. He made representation to
22  the Court earlier this morning, Your Honor, he wanted
23  two attorneys, Mr. Mekler and Mr. Capone subpoenaed,

**36**

1  and I made a representation to the Court they have --
2         THE DEFENDANT: On that, let me answer to
3  that. I didn't question him.
4         When I -- I told him -- actually I told you
5  this morning when I asked him to please subpoena them
6  two gentlemen, his, you know, answer to me was why. I
7  feel when he knew when Wendy had been going to both of
8  them and getting a lawyer from me and telling the
9  story of what happened and telling Mr. Capone that she
10  needed an affidavit presented to the Court at the
11  arraignment of mine to try to get this resolved, he
12  knew all this, and he -- the question of why do you
13  want to subpoena them two gentlemen, I don't think
14  that came out of his mouth. He shouldn't have had to
15  ask. He should have known. They are two big
16  witnesses for us.
17         THE COURT: Well, you do understand he's
18  supposed to exercise his professional judgment on
19  what's -- on, you know, what's best and what is not
20  best. You do understand that; don't you?
21         THE DEFENDANT: Yes, I do. He's the lawyer,
22  I'm the client or, you know, the person the State
23  appointed for my defense. Why would he ask me why?

A-31

37

1  He should know. If I'm asking him to subpoena them,
2  he should know why I'm asking.
3      There were other lawyers -- and it gets
4  dirty, but this is my life. I don't care. I need
5  people in here to testify to what actually happened
6  when this woman wasn't on medication, and now she's on
7  it again. This happened a year ago, and, you know,
8  the situation that -- I can't get into it, but there's
9  points I have to bring up, okay, that I know he
10 doesn't want to, that it's -- it's ridiculous.
11     I'm sorry.
12     THE COURT: Did you ever hear the saying a
13 person that represents himself has a fool for a
14 client?
15     THE DEFENDANT: That's how I feel, but I
16 strongly feel there's a lot of things that need to be
17 brought out.
18     I told him what I'm guilty of, and I'll plea
19 in a heartbeat, but the things I'm being charged with,
20 no. That's why I feel it has to come out, and if the
21 12 people in the jury box over there, if they hear the
22 truth, if they feel I'm guilty, fine, I'm guilty. If
23 that's what they feel, you know, if that's their

38

1  opinion, and what they see, everything presented in
2  front of them, that's fine, but right now, I'm -- I
3  have my life in this man's hands, and when you're
4  sitting with the gentleman and he's making derogatory
5  comments to you -- we get into arguments.
6      He goes to leave last night and I said, "I
7  want to apologize. I'm scared," and he jumps on me,
8  "You're not scared for a G.. D... thing," and, You're
9  just concerned about yourself," and, "You sure as hell
10 should be," and he walks out and leaves. That's not
11 counsel to me.
12     THE COURT: Do you understand that I think
13 you're making a serious mistake by even asking to
14 represent yourself?
15     THE DEFENDANT: Yes, Your Honor. I feel it
16 too, but, I mean, there's a lot of -- you know --
17     THE COURT: I feel you're making a serious
18 mistake to even ask to represent yourself.
19     THE DEFENDANT: I'm not. I actually feel a
20 lot that comes out will be helpful in my case to prove
21 what is true and isn't true.
22     In turn, I'm not a lawyer. I didn't go
23 through six or eight years of college for it. I

39

1  haven't been in a courtroom every day for the last 25
2  years or 18 years, however Mr. Bayard has been doing
3  it. I haven't. That's why I'm thinking I'm not too
4  bright right now, but I've lived what is going on. I
5  know the dates, times, everything from the day we met
6  until present, and there's just too much that has
7  to -- I feel that should be brought out that he
8  doesn't feel is necessary.
9      THE COURT: Do you want to say anything about
10 that, Mr. Bayard?
11     MR. BAYARD: Your Honor, I think I made my
12 point earlier that there are certain discretionary
13 issues with counsel as to how the trial strategy
14 should be played and granted. Mr. Zuppo and I have
15 not always agreed on what the appropriate trial
16 strategy is. My goal -- aim is to get him an
17 acquittal. His goal is also an acquittal, but he
18 wants to have things brought in that I don't think are
19 going to serve him well. I think they could be
20 detrimental to him. We disagree on these points. I
21 have told him that quite frankly I am the one that
22 will make the decisions as far as the trial stategy,
23 and that no bones about it, and that hasn't been well

40

1  received.
2      THE DEFENDANT: What is hurting me, I've got
3  notes with respect to Mr. Bayard, because he's a
4  public defender, but I have, you know, a private
5  attorney that has his own firm that is telling me
6  things that should be brought up to light to help me,
7  and then I have Mr. Bayard saying that's not going to
8  help, like the transcripts, all the times she's
9  appeared in court preliminaries and everything, and
10 talking to the judges and trying to let them see I'm
11 innocent of this, and, you know, I'm getting pulled
12 both ways. I'm being told this is what should be
13 done, and I'm referring it to Mr. Bayard, and maybe
14 he's telling me they are no good, and I'm wondering
15 how he could think they are no good, which he's got to
16 know, but another lawyer says she should be good. You
17 know what I'm saying? I'm nervous.
18     He doesn't have my best interest at heart.
19 The best thing to do is, I'm thinking, is to be able
20 to cross-examine, do this, get the truth out as it
21 could be, and then let --
22     THE COURT: Do you want to say anything else?
23     MR. WALLACE: Your Honor, again I think what

A-32

41

1  is abundantly clear at this point is the disruption
2  that this would cause would overcome anything else,
3  and I think based on the case -- the consistent cases
4  that -- that requests to go pro se at this stage of
5  the proceedings is untimely.
6      It's abundantly clear Mr. Zuppo is not able
7  to represent himself effectively, and the fact that he
8  is taking some advice from someone who doesn't have
9  the entire case file, has not prepared for his trial,
10 and he's the filter for what should I do when he
11 doesn't understand the basic questions the Court asked
12 him this morning, can tell you that we will go nowhere
13 fast in this case.
14     I'm worried about the prejudice of a major
15 disruption at this point in this case, and I think
16 that the defendant certainly is not prejudiced when he
17 has made an untimely request, when he no longer has
18 that right, to stick with an attorney who is
19 well-experienced, who has reviewed his case fully, as
20 the Court can see, who listens to him, may disagree
21 with trial strategy, who knows what the Rules of
22 Evidence are and may not articulate to Mr. Zuppo's
23 satisfaction that that is not a proper or admissible

1  lawyer has been telling me, I feel like a lot of the
2  questions that should be brought up that he says h
3  shouldn't, there's a conflict, and there's just, you
4  know, I don't see the big disruption that would be
5  caused by it, and if there is, that's because I'm not
6  a lawyer, because right now, it would just go on as
7  normal.
8      THE COURT: Mr. Zuppo, you know, I have
9  granted, you know, the request from the defendant
10 before, you know, to represent themselves. In this
11 particular case, it troubles me that, you know, you
12 don't know the Rules of Evidence.
13     You know, when you came to court this
14 morning, you came prepared to ask me to assign a
15 lawyer for you, not to represent yourself. It was
16 only when I said I would not appoint another lawye
17 for you that you then said, "Well, then I want to
18 represent myself." You haven't come here this mo
19 prepared to represent yourself. You don't understa
20 the Rules of Evidence. You're -- if you don't
21 understand the Rules of Evidence, I don't see how
22 could know whether the things you want to bring up
23 even admissible.

42

1  question or whatever, but that Mr. Bayard is fully
2  doing his job.
3      THE DEFENDANT: To counter that, all I got to
4  say, he's talking about how much disruption, this
5  would be like the Twin Towers getting hit or
6  something, but I understand for the special expert
7  witness coming in they were prepared for that and
8  there's a certain way you cross-examine. If he's
9  going to be my assistant counsel, she's testifying
10 basically to how a person acts when they are battered
11 and the things that -- how they proceed (sic) in
12 themselves, really enough to cross-examine, that in
13 every answer you -- if I have a problem, if there's
14 something wrong, if I need to confer with Mr. Bayard
15 and he says you can't do this or that, or everything
16 is fine, I don't see a problem with that disruption,
17 and I apologize for taking this much time of the
18 Court's time in prolonging this. Except for doing it
19 this late in time, it's not like I wanted to do this
20 and then delay the time.
21     A lawyer is the best way to go, it's true,
22 but the conflicts we're having, the things that I feel
23 that need to be brought up, not from what another

1      I think you're upset. I think this decision
2  on your part has been one that was only made this
3  morning, or you may have been thinking about it af
4  yesterday. You know, you've heard the evidence
5  that's, you know, been coming in from this witness
6  I think it upset you.
7      I have absolutely no reason to infer that Mr.
8  Bayard is not providing good, competent representa
9  for you. I frankly do not think that you are making a
10 knowing and intelligent decision to represent
11 yourself, and I'm inclined to deny your request.
12     THE DEFENDANT: I can't argue with you if
13 denied it, right? I've taken up enough time.
14     THE COURT: Does anybody want to put an
15 on the record?
16     MR. WALLACE: I guess I would only ask th
17 Court to address what Judge Roth set out, that it is
18 discretionary decision at this point, and that not
19 only would he get less-effective representation, whi
20 is something the Court could consider, but it would
21 have detrimental impact on the proceedings at this
22 time because it is an untimely request.
23     THE COURT: Well, our -- our -- you know o

A-33