PLEASE TAKE NOTICE of this ADDENDUM to Argument Twelve, and the 3 Exhibits that back up the Argument.

Another crucial avenue that defense counsel Mr. Bayard failed to argue was about the suicide note that Reynolds left on April, 10 2001 when she overdosed. Mr. Bayard knew of Reynolds suicide note and did't explore this to help the defense. At that time Reynolds believed that she was going to die. Reynolds put in writing the truth of Zuppo's innocents. On cross-exam., Bayard only asks if Reynolds actually tried to commit suicide. Reynolds states yes, then Bayard asks about when, and then the circumstances, but NEVER touches on her suicide note. This note clearly would have gave the jury a different perception, and verdict that would have in favor of the defendant, Zuppo. Mr. Bayard should have had Reynolds read her suicide to the jury and court. This would have gave the jury and the court the true understanding of how Reynolds felt towards Zuppo, and that "IF" Zuppo did what is said, then Reynolds suicide note would have read something totally different, and not stating how much she was in love with him and that she can't live without him! this should have been brought out at trial and this would have shown the jury that Reynolds had to have been coaxed into giving a false testimony against the defendant, Zuppo that she marrys in June, 01 after this aleged crime was supposed to have been committed?!.

Mr. Bayard over & over continues to make errors all threw trial that were so grievous that his performance fell way b low an objective standard or reasonableness, and shows prejudice towards the defendant. 466 U.S. at 687; see Dawson, 673 A.2d at 1190.

Dated: March 27th 2005

FILED
JUL 18 2005
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

ANTHONY ZUPPO  Pro-se
D.C.C. #283480
1181 Paddock rd,
Smyrna, DE 19977

c5- 504

Tony,

I love you more than I've ever thought a person could love. I can't stand to live without you. I'm sorry for everything this horrible state has put you through. I wish I could make it go away but I can't. They don't care. No one does. I will always know in my heart that you are the victim here. I am so sorry. I know that you are innocent. I want you to become everything that we talked about. I want to see you become that incredible attorney and take down this God awful state. I'm dead inside without you. If you're reading this, then I'm probably already dead. I'm sorry that I lack the strength to continue with this life.

All my love,
Wendy

**Page 57**

1 contemplation of suicide; is that a fair statement?
2   A. Yes.
3   Q. Did there come any time in your relationship,
4 from December through August of 2001, that you
5 actually tried to commit suicide?
6   A. Yes.
7   Q. Could you help us understand when, first of
8 all.
9   A. In April.
10   Q. Okay, and under what circumstances, please.
11   A. I overdosed.
12   Q. With?
13   A. Whatever the medicines he had in the house.
14 I took pretty much everything.
15   Q. Was he present during that time?
16   A. No.
17   Q. Would it be safe to say he was incarcerated
18 at that time?
19   A. Yes, he was.
20   MR. BAYARD: One point, and if I may go to
21 get the diary.
22   Your Honor, may I just approach the victim --
23 the defendant -- the --

**Page 58**

1   THE COURT: Yes.
2       ...
3 BY MR. BAYARD:
4   Q. Ma'am, what am I handing to you, please?
5   A. That was the diary that I wrote.
6   Q. And the first entry, please, what's the date?
7   A. On Tuesday, January 2nd.
8   Q. Could you read that over just for a second,
9 please.
10   A. This whole thing?
11   Q. Just the one for your entry for January the
12 2nd, please.
13   A. Okay.
14   Q. No, no, not allowed, just to refresh your
15 recollection.
16   A. Oh, okay.
17   Q. Although the entry says January the 2nd, are
18 we actually referring to one of the issues that's in
19 this trial of December the 18th?
20   A. Yes. That was the December incident.
21   Q. So, although the entry says "January 2,"
22 we're focusing on --
23   A. I don't know why I wrote that on the date for

**Page 59**

1 that.
2   Q. But that date really is not representative of
3 when the event is that you're talking about?
4   A. That would not be the correct date.
5   Q. More correctly, it was December 18th or about
6 then?
7   A. Yes.
8   MR. BAYARD: Thank you, ma'am.
9   Your Honor, if I might just confer briefly,
10 please.
11   THE COURT: Yes.
12       ...
13       (Pause)
14       ...
15 BY MR. BAYARD:
16   Q. Ma'am, you described your relationship with
17 this gentleman, and would it be fair to say that
18 during the course of this relationship it was always
19 an open and honest one, one that where you were
20 guarded, perhaps, and didn't tell all of the truth all
21 the time when you did talk to him?
22   A. I did not tell him the truth about my past
23 relationships and things like that.

**Page 60**

1   Q. Is that something that came out as the --
2 your relationship with him went on?
3   A. What he wanted to know, everything from my
4 past, wanted to know things like how many men I had
5 been with and things like that.
6   Q. And those were things that you just weren't
7 candid with him about?
8   A. Yes.
9   Q. And that was a conscious decision on your
10 part you didn't want to share that?
11   A. Yes.
12   MR. BAYARD: Thank you.
13       ...
14       REDIRECT EXAMINATION
15       ...
16 BY MR. WALLACE:
17   Q. Why didn't you want to share that?
18   A. Because he would have been angry.
19   Q. Have you seen the way he reacted when you
20 discussed those types of things?
21   A. Yes.
22   Q. How did he react?
23   A. He'd called me a slut and a skank and a pig.

61

1  Q. Mr. Bayard just asked you questions about
2  whether or not you did, in fact, attempt suicide?
3  A. Yes.
4  Q. And you did, correct?
5  A. Yes.
6  Q. And you did leave, in fact, a note; didn't
7  you?
8  A. Yes.
9  MR. BAYARD: Your Honor, my client and I have
10 had access to these documents before, and there's no
11 objection.
12 MR. WALLACE: I would ask that these one-page
13 notes, which I'll have the witness describe, be marked
14 as the next State exhibits, and then the next,
15 Harassment, by me, by the Attorney General, marked as
16 the exhibit.
17 THE PROTHONOTARY: So marked as State's
18 Exhibits 13 and 14.
19         . . .
20 (Whereupon, letters were marked State's
21 Exhibits Nos. 13 and 14 into evidence.)
22         . . .
23 BY MR. WALLACE:

62

1  Q. Miss Reynolds, I'll show you what's been
2  marked as State's Exhibits 13 and 14.
3  Do you recognize those two documents, ma'am?
4  A. Yes.
5  Q. Did you, in fact, generate the note, for lack
6  of a better term, the suicide note?
7  A. Yes.
8  Q. Is that how you felt at that time?
9  A. Yes.
10 I thought that if I died, then I would be out
11 of the relationship, and he wouldn't be able to
12 threaten me anymore, and that he would go free because
13 of my statement after I'm dead.
14 Q. How about the second note, "Harassment by the
15 Attorney General," how did that come to be generated?
16 A. He told me over the phone that I had to say
17 that the State was harassing him. He said the State
18 was harassing him, and that they -- that I had to say
19 that the State forced me to do all those things.
20 Q. Ma'am, have you ever been forced by the State
21 to say anything?
22 A. No.
23 Q. Have you disagreed with the detective at

63

1  times on what she did or how she acted in the
2  investigation of this case?
3  A. At the time I did.
4  Q. Why did you?
5  A. Well, at the time, I couldn't see that they
6  -- that everyone was looking out for my safety, and at
7  the time I thought that everyone was against me.
8  Q. Did you feel like you would be helped by
9  anyone?
10 A. No.
11 Q. Mr. Bayard asked you a little bit about
12 medications that you're taking now.
13 A. Yes.
14 Q. Was that ever a point of contention between
15 you and the defendant during your relationship about
16 when, or if, you took your medications?
17 A. He didn't want me to take any medication.
18 Q. How did he express that to you?
19 A. He said I couldn't take any medication.
20 Q. Did he ever physically take them from you?
21 A. I can't say that he actually did. I'm not --
22 I don't really remember.
23 Q. Did you ever stop taking medication because

64

1  of him?
2  A. Yes.
3  Q. Why?
4  A. (No response).
5  Q. I guess what brought about that is my
6  question.
7  A. I can't remember why. It seems to me that he
8  didn't like the sexual side effects, because you don't
9  really want to have sex, but I can't swear to that.
10 Q. Did you stop taking them?
11 A. Yes.
12 Q. Attached to one of your letters trying to get
13 him out of trouble, the one that's got the caption,
14 "Wendy Reynolds, April 15th, 2001," State's Exhibit
15 No. 1, do you remember this letter?
16 A. Yes.
17 Q. In fact, you attached a doctor's note there,
18 correct?
19 A. Yes.
20 Q. From a treating doctor that you had?
21 A. Yes.
22 Q. How did that note come about to be made?
23 A. Tony told me I needed to get a note from the