IN THE SUPREME COURT OF THE STATE OF DELAWARE

ANTHONY ZUPPO
      Defendant-below,
      Appellant,

v.

STATE OF DELAWARE,
      Plaintiff-below,
      Appellee.

)
)
)
)
)
)
)
)
)
)
)
)



FILED

JUL 18 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

5 - 50

---

ON APPEAL FROM THE SUPERIOR COURT OF THE STATE OF DELAWARE IN AND
FOR NEW CASTLE COUNTY

---

<u>APPENDIX TO APPELLANT'S OPENING BRIEF</u>

Dated: *March 27*th 2005

ANTHONY ZUPPO, Pro-se
Delaware Correction Center
1181 Paddock rd.
Smyrna, DE 19977
Appellant

## TABLE OF CONTENTS

SUPERIOR COURT DOCKET . . . . . . . . . . . . . A-1

SUPREME COURT DOCKET . . . . . . . . . . . . A-11

EXHIBITS FOR STATEMENT OF FACTS . . . . . . . A-12 thru A-26

EXHIBITS FOR ARGUMENT THIRTEEN . . . . . . . A-23 thru A-26

POST-CONVICTION RELIEF, RULE 61 . . . . . . . A-27 thru A-76

EXHIBITS FOR POST-CONVICTION RELIEF, RULE 61 . . . . AA-0 thru AA-58

DECISION TO DEFENDANT'S POST-CONVICTION RELIEF, RULE 61 . A-77 thru A-79

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    1
                        ( as of  01/03/2005 )

State of Delaware v.  ANTHONY G ZUPPO                      DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.         AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.              ANTHONY ZUPPO



Assigned Judge:


Charges:
Count    DUC#        Crim.Action#    Description      Dispo.   Dispo. Date
-------------------------------------------------------------------------
 002    0101004412   IN01030994      TERROR THREAT    NOLP     04/23/2001
 003    0101004412   IN01030995      OFF TOUCHING     NOLP     04/23/2001
 004    0101004412   IN01030998      ATT. RAPE 1ST C  NOLP     04/23/2001
 005    0101004412   IN01030996      ASSAULT 3RD      NOLP     04/23/2001
 006    0101004412   IN01030997      RAPE 1ST INJURY  NOLP     04/23/2001
 007    0101004412   IN01031000      KIDNAP 2ND       NOLP     04/23/2001
 008    0101004412   IN01031001      KIDNAP 2ND       NOLP     04/23/2001
 009    0101004412   IN01041810      KIDNAP 2ND       NOLP     04/23/2001
 010    0101004412   IN01041874      TERROR THREAT    NOLP     04/23/2001
 011    0101004412   IN01041875      OFF TOUCHING     NOLP     04/23/2001
 012    0101004412   IN01041876      KIDNAP 2ND       NOLP     04/23/2001
 013    0101004412   IN01041811      ATT. RAPE 1ST C  NOLP     04/23/2001
 014    0101004412   IN01041812      RAPE 1ST CRIME   NOLP     04/23/2001
 015    0101004412   IN01041813      ASSAULT 3RD      NOLP     09/24/2001
 016    0101004412   IN01041818      NONC W/CON BOND  NOLP     09/24/2001
 017    0101004412   IN01041819      NONC W/CON BOND  NOLP     09/24/2001
 018    0101004412   IN01041827      HARASSMENT       NOLP     09/24/2001
 019    0101004412   IN01041820      NONC W/CON BOND  NOLP     09/24/2001
 020    0101004412   IN01041815      AGG.ACT/INTIMI.  NOLP     09/24/2001
 021    0101004412   IN01041821      NONC W/CON BOND  NOLP     09/24/2001
 022    0101004412   IN01041822      NONC W/CON BOND  NOLP     09/24/2001
 023    0101004412   IN01041816      AGG.ACT/INTIMI.  NOLP     09/24/2001
 024    0101004412   IN01041817      AGG.ACT/INTIMI.  NOLP     09/24/2001
 025    0101004412   IN01041823      NONC W/CON BOND  NOLP     09/24/2001
 027    0101004412   N01041828       COND OF RELEASE  NOLP     09/24/2001
 028    0101004412   N01041829       NON COMP BOND    NOLP     09/24/2001
 029    0101004412   IN01081606      PDWDCF           TNG      02/04/2002
 030    0101004412   IN01081607R1    ASSAULT 1ST      TG       02/04/2002
 031    0101004412   IN01081608      NONC W/CON BOND  NOLP     02/04/2002
 032    0101004412   N01041830       NON COMP BOND    NOLP     02/04/2002
 033    0101004412   N01041831       NON COMP BOND    NOLP     02/04/2002
 034    0101004412   N01041383       AGG.ACT/INTIMI.  NOLP     06/20/2001
 035    0101004412   IN01092227R1    UNLAW IMPR 1ST   TGLI     02/04/2002
 036    0101004412   IN01092228      TERROR THREAT    TNG      02/04/2002
 037    0101004412   IN01092229R1    OFF TOUCHING     TG       02/04/2002
 038    0101004412   IN01092230      KIDNAP 2ND       ACQT     02/04/2002
 039    0101004412   IN01092231R1    ATT. FELONY A    TG       02/04/2002
 040    0101004412   IN01092232R1    RAPE 1ST CRIME   TG       02/04/2002
 041    0101004412   IN01092233R1    ASSAULT 3RD      TG       02/04/2002
 042    0101004412   IN01092234R1    NON COMP BOND    TG       02/04/2002
 043    0101004412   IN01092235R1    NON COMP BOND    TG       02/04/2002
 044    0101004412   IN01092236R1    HARASSMENT       TG       02/04/2002
 045    0101004412   IN01092237      NONC W/CON BOND  NOLP     02/04/2002
```

A-1

```
046   0101004412   IN01092238R1   AGG.ACT/INTIMI.   TG     02/04/2002
047   0101004412   IN01092239     NONC W/CON BOND   NOLP   02/04/2002
048   0101004412   IN01092240R1   NON COMP BOND     TG     02/04/2002
049   0101004412   IN01092241R1   AGG.ACT/INTIMI.   TG     02/04/2002
050   0101004412   IN01092242R1   AGG.ACT/INTIMI.   TG     02/04/2002
051   0101004412   IN01092243R1   NON COMP BOND     TG     02/04/2002
052   0101004412   IN01092226R1   NON COMP BOND     TG     02/04/2002
055   0101004412   IN01092225     PDWBPP            SEV    02/04/2002
```

```
        Event
No.     Date       Event                              Judge
-----------------------------------------------------------------------------
1    03/12/2001
       INDICTMENT, TRUE BILL FILED.NO 164
       ARRAIGNMENT AND BAIL REPRESENTATION 04/05/01 AT 08:30
       CASE REVIEW 04/30/01 AT 1:45
2    03/26/2001
       SUMMONS MAILED.
       04/05/2001                            REYNOLDS MICHAEL P.
       ARRAIGNMENT, BAIL STATUS & CONTROL FOR REPRESENTATION CONTINUED.
       NEW DATE SET 041001.
3    04/10/2001                              REYNOLDS MICHAEL P.
       ARRAIGNMENT CALENDAR, CONTINUED.
       042001
4    04/16/2001                              REYNOLDS MICHAEL P.
       BAIL HEARING HELD.
       BAIL SET:
       HELD ON SECURED BAIL  43000.00   100
       COND: NO CONTACT, DIRECT OR INDIRECT WITH VICTIM
       ARR 5/2/01 AT 9:30 A.M.
8    04/23/2001
       REINDICTMENT - TRUE BILL FILED.
5    05/01/2001                              REYNOLDS MICHAEL P.
       ARRAIGNMENT CALENDAR, CONTINUED.
       050801
6    05/01/2001
       NOTICE OF SERVICE & ACKNOWLEDGEMENT OF RECEIPT OF DISCOVERY.
       05/08/2001                            REYNOLDS MICHAEL P.
       ARRAIGNMENT CALENDAR - CONTROL FOR REPRESENTATION CONTINUED.  NEW DATE
       SET. 051501
       05/15/2001                            REYNOLDS MICHAEL P.
       BAIL MODIFIED.  BAIL NOW SET AT
       HELD ON SECURED BAIL            73000.00 100
       NO CONTACT W/VICTIM.
       MTN.REDUSED BAIL - DENIED.
7    05/15/2001
       ARRAIGNMENT CALENDAR, ARRAIGNED.
11   05/15/2001
       NOTICE OF SERVICE & ACKNOWLEDGEMENT OF RECEIPT OF DISCOVERY.
       L. ARLEN MEKLER
9    06/05/2001
       BAIL POSTED IN THE AMOUNT OF $43000.00 BY BOVELL & LOWINGER
```

A-2

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    3
                       ( as of  01/03/2005 )

State of Delaware v.  ANTHONY G ZUPPO                        DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.        AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.             ANTHONY ZUPPO


      Event
No.   Date          Event                              Judge
------------------------------------------------------------------------------
      NEXT DUE BACK AT 1:45 ON 6/18/01
      06/18/2001                              TOLIVER CHARLES H. IV
      CASE REVIEW CALENDAR:  SET FOR FINAL CASE REVIEW.
      072301.
10    06/20/2001
      NOLLE PROSEQUI FILED BY ATTORNEY GENERAL.
      1383, RSN: DISP.ON OTHER CHRGS.
12    07/02/2001
      MOTION TO WITHDRAW AS COUNSEL FILED.
      ARLEN MEKLER
      SCHEDULED 7/9/01.
      07/09/2001                              JURDEN JAN R.
      MOTION TO WITHDRAW AS COUNSEL GRANTED. COUNSEL TO PROVIDE DEFENDANT
      WITH COPY OF SIGNED ORDER BY REGISTERED MAIL.
13    07/09/2001                              JURDEN JAN R.
      ORDER: AND NOW THIS 9THD AY OF JULY, 2001 UPON CONSIDERATION OF THE
      MOTION TO WITHDRAW FILED BY DEFENSE COUNSEL COUNSEL ARLEN MEKLER, IT
      IS HEREBY ORDERED THAT SAID MOTION IS GRANTED.
15    07/16/2001
      LETTER FROM ARLEN MECKLER                   TO MR. ZUPPO
      RE: ENCLOSING A COPY OF THE COURT'S ORDER PERMITTING MR. MECKLER
      TO WITHDRAW AS COUNSEL IN THE CASE.
      07/23/2001                              GEBELEIN RICHARD S.
      FINAL CASE REVIEW:  TRIAL DATE TO BE SET.
      REFERRED TO TTPEND CALENDAR FOR TRIAL DATE SELECTION.
      NO ATTY. / PUT ON THE CONTROL CALENDAR 08/23/01
14    07/25/2001
      LETTER FROM L. ARLEN MEKLER, ESQ    TO MR. ZUPPO
      RE: THE COURT'S ORDER PERMITTING MR. MEKLER TO WITHDRAW AS COUNSEL.
      ATTACHED CERTIFICATE OF SERVICE -SENT CERTIFIED MAIL. PER COURT'S
      ORDER.
17    08/02/2001
      MOTION TO BE RELIEVED AS BONDSPERSON FILED.
      BY ROBERT BOVELL OF DELAWARE BAIL BONDS
      SCHEDULED 8/13
16    08/06/2001
      SUBPOENA(S) MAILED.
18    08/13/2001                              JURDEN JAN R.
      MOTION TO BE RELIEVED AS BONDSPERSON GRANTED.
20    09/24/2001
      REINDICTMENT - TRUE BILL FILED.  #142 (PROBLEM)
19    09/28/2001
```

A-3

```
                   SUPERIOR COURT CRIMINAL DOCKET              Page    4
                     ( as of  01/03/2005 )

State of Delaware v.  ANTHONY G ZUPPO                     DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.       AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.            ANTHONY ZUPPO


      Event
No.  Date           Event                          Judge
----------------------------------------------------------------------------
      NOTICE OF SERVICE - DISCOVERY REQUEST._JAMES BAYARD.
21   11/02/2001
      ORDER SCHEDULING TRIAL FILED.
      TRIAL DATE:_1/29/02
      CASE CATEGORY:_____1
      ASSIGNED JUDGE (CATEGORY 1 CASES ONLY): JRS
      UNLESS THE COURT IS ADVISED WITHIN 2 WEEKS OF THE UNAVAILABILITY
      OF NECESSARY WITNESSES, THE COURT WILL CONSIDER THE MATTER READY
      FOR TRIAL.  ABSENT EXCEPTIONAL CIRCUMSTANCES, RESCHEDULING OR
      CONTINUANCE REQUESTS WILL BE DENIED.
22   01/04/2002
      SUBPOENA(S) MAILED.
23   01/25/2002
      STATE'S WITNESS SUBPOENA ISSUED ON 01/17/02 TRIAL 01/29/02
      DAG: WALLACE
      WENDY REYNOLDS
      SEAN HACKETT
      DET O'SULLIVAN NCCPD
      OFFICER ECKERD NCCPD
      OFFICER ESTERLING WPD
      CPL MAYBERRY DSP T1
      PTLM ROGERS WPD
      MARIA MALDONADO
      JOANNE KRATZ
      HERMO RIVERA
      LANCE EVANS
24   01/29/2002                                VAUGHN JAMES T. JR.
      TRIAL CALENDAR- WENT TO TRIAL JURY
25   02/04/2002
      ORDER: THE MOTION FOR JUDGMENT OF AQUITTAL GRANTED AS TO COUNT IV,
      KIDNAPPING SECOND DEGREE.
      SINCE THE KIDNAPING CHARGE WAS ALSO THE UNDERLYING FELONY WHICH
      ELEVATED THE ATTEMPTED RAPE AND RAPE CHARGES TO FIRST DEGREE, THEY
      ARE NOW REDUCED TO ATTEMPTED RAPE IN THE SECOND DEGREE AND RAPE IN
      THE SECOND DEGREE, RESPECTIVELY.
      IT IS SO ORDERED.
26   02/04/2002                                VAUGHN JAMES T. JR.
      JURY TRIAL HELD.
      JUDGE VAUGHN AND JUDGE GEBELEIN (VERDICT ONLY)
      COURT CLERK: C. MILSOM
      COURT REPORTER: VERECHIA, MORGANO, FARRELL, AND DONNELLY
      DEFENSE ATTY: JAMES BAYARD
```

A-4

```
                    SUPERIOR COURT CRIMINAL DOCKET                 Page    5
                        ( as of  01/03/2005 )

State of Delaware v.  ANTHONY G ZUPPO                       DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.        AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.             ANTHONY ZUPPO


        Event
No.    Date          Event                          Judge
-------------------------------------------------------------------------------
       STATE'S ATTY: PAUL WALLACE
       MOTIONS: 1. DEFT'S MTN TO SEVER COUNT 21 OF INDICTMENT. DECISION:
       GRANTED. 2. DEFT ZUPPO'S MTN FOR NEW COUNSEL. DECISION: DENIED. 3.
       DEFT ZUPPO'S MTN TO REPRESENT HIMSELF. DECISION: DENIED. 4. DEFT'S MTN
       FOR JUDGEMENT OF ACQUITTAL. DECISION: DENIED. 5. DEFT'S MTN FOR
       ACQUITTAL ON COUNT 4. DECISION: GRANTED.
       DEFT WAIVED HIS RIGHT TO DOUBLE JEPORDY.
       TRIAL DATES: 01/29/02, 01/30/02, 01/31/02, 02/01/02, AND 02/04/02.
       PSI ORDERED. SENTENCING DATE 04/05/02. BAIL REVOKED.
       JURY FOUND DEFT GUILTY OF UNLAWFUL IMPRIS. 1ST DEGREE (LIO)(2227),
       OFF TOUCHING (2229), ATTEMPTED RAPE 2ND DEGREE (2231), RAPE 2ND DEGREE
       (2232), ASSAULT 3RD DEGREE (2233), NON COMP W/ BOND COND (2234), NON
       COMP W/ BOND COND (2235), HARASSMENT (2236), AGG ACT OF INTIMIDATION
       (2238), NON COMP W/ BOND COND (2240), AGG ACT OF INTIMIDATION (2241),
       AGG ACT OF INTIMIDATION (2242), NON COMP W/ BOND COND (2243), NON
       COMP W/ BOND COND (2226), AND ASSAULT 2ND DEGREE (1607). JURY FOUND
       DEFT NOT GUILTY OF TERROR THREAT (2228) AND PDWDCF (1606). JUDGE
       SEVERED PDW AND/ OR AMMUNITION (2225). STATE NP NON COMP W/ BOND COND
       (2237), NON COMP W/ BOND COND (2239), AND NON COMP W/ BOND COND (1608)
       KIDNAPPING 2ND DEGREE (2230) WAS ACQUITTED. EXHIBITS GIVEN TO
       CRIMINAL DEPUTY EDGAR JOHNSON TO BE PUT IN VAULT.
27     02/04/2002                              VAUGHN JAMES T. JR.
       CHARGE TO THE JURY FILED.
28     02/28/2002
       STATE'S SUPPLEMENT SUBMISSION FOR SENTENCING FILED.
       FILED BY PAUL WALLACE, DAG
       04/11/2002                              VAUGHN JAMES T. JR.
       SENTENCING CALENDAR: DEFENDANT SENTENCED.
32     04/11/2002                              VAUGHN JAMES T. JR.
       SENTENCE: ASOP ORDER SIGNED AND FILED.
29     04/15/2002
       STATE'S SUUPLEMENT SUBMISSION FOR SENTENCING.
       FILED BY PAUL WALLACE, DAG.
30     04/19/2002
       LETTER FROM SUPREME COURT TO KATHLEEN FELDMAN, COURT REPORTER
       RE: THE NOTICE OF APPEAL WAS FILED IN THE ABOVE CAPTIONED MATTER
       ON APRIL 15, 2002. THE TRANSCRIPT IS DUE TO BE FILED WITH THE
       PROTHONOTARY NO LATER THAN MAY 28, 2002.
       208, 2002
31     04/29/2002
       TRANSCRIPT FILED.
       SENTENCING TRANSCRIPT. APRIL 11, 2002.
```

A-5

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    6
                       ( as of  01/03/2005 )

State of Delaware v.  ANTHONY G ZUPPO                      DOB: 05/06/1965.
State's Atty: PAUL R WALLACE , Esq.          AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.               ANTHONY ZUPPO

       Event
No.    Date         Event                              Judge
-----------------------------------------------------------------------------
       BEFORE JUDGE VAUGHN.
36     05/01/2002
       LETTER FROM PAUL WALLACE, DEPUTY ATTORENEY GENERAL TO JUDGE VAUGHN
       RE: THIS MATTER WAS BEFORE THE COURT FOR SENTENCING ON APRIL 11, 2002.
       AT THAT TIME THE STATE WAS GRANTED 30-DAY LEAVE TO RESOLVE ANY
       FURTHER ISSUES. OUR OFFICE HAS CONTACTED THE VICTIM, MS. REYNOLDS, AND
       SHE IS REQUESTING NO DIRECT RESTITUTION IN THIS MATTER. I BELIEVE IT
       IS SIMPLY HER HOPE TO SEVER ALL TIES WITH THE DEFENDANT AND THEREFORE
       IS WILLING TO FOREGO ANY RESTITUTION WHICH MAY BE OWNED TO HER. THUS,
       THE ONLY RESTITUTION NECESSARY IS THAT TO THE VIOLENT CRIMES COMPEN-
       SATION BOARD AS SET FORTH IN THE PRE-SENTENCE REPORT. THE STATE WOULD
       REQUEST THAT THE COURT ORDER SUCH RESTITUTION.
33     05/09/2002
       TRANSCRIPT FILED.
       TRIAL TRANSCRIPT. JANUARY 31, 2002.
       BEFORE JUDGE VAUGHN.
34     05/09/2002
       TRANSCRIPT FILED.
       TRIAL TRANSCRIPT. FEBRUARY 1, 2002.
       BEFORE JUDGE VAUGHN.
35     05/10/2002
       TRANSCRIPT FILED.
       TRIAL TRANSCRIPT. JANUARY 30, 2002.
       BEFORE JUDGE VAUGHN.
37     05/28/2002
       TRANSCRIPT FILED.
       TRANSCRIPT OF CLOSING ARGUMENTS AND JURY CHARGE. FEBRUARY 4, 2002.
       BEFORE JUDGE VAUGHN.
42     06/03/2002
       LETTER FROM:ANTHONY ZUPPO                       TO:PROTHONOTARY
       MR. ZUPPO ASKED THAT PROTHONOTARY MAKE A COPY OF HIS LETTER &
       SENTENCING ORDER & REQUESTED THAT HIS INFORMATION BE FORWARD TO MR.
       BAYARD, PUBLIC DEFENDER. LETTER WAS SENT TO MR. BAYARD ON 7/15/02.
38     06/04/2002
       RECORDS SENT TO SUPREME COURT.
39     06/04/2002
       RECEIPT_FROM SUPREME COURT ACKNOWLEDGING RECORD.
40     06/05/2002
       LETTER FROM SUPREME COURT TO SHARON AGNEW, PROTHONOTARY
       RE: THE COURT REPORTER'S NOTICE OF THE FILING OF THE FINAL
       TRANSCRIPT WAS FILED WITH THE PROTHONOTARY ON MAY 28, 2002.
       THE RECORD AND TRANSCRIPT MUST BE FILED WITH THIS OFFICE
```

A-6

```
                   SUPERIOR COURT CRIMINAL DOCKET              Page    7.
                     ( as of  01/03/2005 )

State of Delaware v.  ANTHONY G ZUPPO                      DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.        AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.             ANTHONY ZUPPO


      Event
No.   Date            Event                           Judge
-------------------------------------------------------------------------
      NO LATER THAN JUNE 10, 2002.
      208, 2002
      (SENT 06/04/02)
41    06/10/2002
      DEFENDANT'S LETTER FILED.
      RE: COPY OF MOTION FOR TRANSCRIPT OF RECORD SENT TO PD. AND ATTORNEY
      GENERAL'S OFFICE
43    06/20/2002
      LETTER FROM: ANTHONY ZUPPO TO: MR. BAYARD
      RE:TRIAL TRANSCRIPTS
44    07/29/2002
      LETTER FROM:ANTHONY ZUPPO  TO: MR.BAYARD
      RE: TRIAL TRANSCRIPTS AND RULE 16
45    08/14/2002
      DEFENDANT'S LETTER FILED.
      TO: JAMES BAYARD
      REPLY TO THE STATES ANSWERING BRIEF.
      COPY OF LETTER SENT TO MR. BAYARD.
46    10/24/2002
      MANDATE FILED FROM SUPREME COURT:  SUPERIOR COURT JUDGMENT AFFIRMED.
      SUPREME COURT CASE NO: 208, 2002
      SUBMITTED: SEPTMEBER 10, 2002
      DECIDED: OCTOBER 4, 2002
      BEFORE VEASEY, CHIEF JUSTICE, HOLLAND AND STEELE.
48    03/28/2003
      DEFENDANT'S LETTER FILED.
      RE: DEFT IS REQUESTING DOCUMENTS FROM DEFENSE ATTY
47    05/23/2003
      DEFENDANT'S LETTER FILED. COPY TO COURT. LETTER TO JUDGE VAUGH ADDRESS
      ING DISATISFACTION WITH DEFENSE COUNSEL.
49    07/21/2003
      DEFENDANT'S LETTER FILED.
      TO: J. BAYARD
50    07/21/2003
      MOTION FOR TRANSCRIPT FILED PROSE.  REFERRED TO JUDGE SCOTT
52    08/20/2003
      DEFENDANT'S LETTER FILED.
51    09/22/2003                              ABLEMAN PEGGY L.
      ORDER: HE COURT IS IN RECEIPT OF YOUR 7/18/03 LETTER REQUESTING
      PREPARATION OF TRANSCRIPTS AT STATE'S EXPENSE.  PLEASE BE ADVISED THAT
      A DEFENDANT IS NOT ENTITLED TO A TRANSCRIPT AT STATE EXPENSE EXCEPT ON
      DIRECT APPEAL OF A CONVICTION.  SINCE YOUR APPEAL IS FROM THE DENIAL
```

A-7

SUPERIOR COURT CRIMINAL DOCKET                Page    8
( as of  01/03/2005 )

State of Delaware v.  ANTHONY G ZUPPO                    DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.         AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.              ANTHONY ZUPPO


       Event
No.   Date          Event                          Judge
-------------------------------------------------------------------------
      OF A RULE 35 MOTION FOR MODIFICATION OF YOUR SENTENCE, YOUR REQUEST IS
      HEREBY DENIED.
64   09/26/2003
      MOTION FOR POSTCONVICTION RELIEF FILED (PRO SE).
65   09/26/2003
      MEMORANDUM OF LAW AND APPENDIX IN SUPPORT OF MOTION FOR POSTCONVICTION
      RELIEF FILED (PRO SE).
53   10/24/2003                               VAUGHN JAMES T. JR.
      ORDER ON APPLICATION TO PROCEED IN FORMA PAUPERIS (INMATE) GRANTED, NO
      FEE OR COURT COST TO BE PAID.
54   10/24/2003                               VAUGHN JAMES T. JR.
      ORDER: IT IS ORDERED THAT: 1.DEFENDANT PRIOR COUNSEL, JAMES A. BAYNARD
      , ESQ SHALL FILE AN AFFIDAVIT WITH THE PROTHONOTARY RESPONDING TO
      FACTUAL ALLEGATIONS OF THE INEFFECTIVE-ASSISTANCE-OF-COUNSEL CLAIM(S)
      PURSUANT TO RULE 61(G)(2) ON OR BEFORE MONDAY, NOVEMBER 24, 2003,
      SERVING THE AFFIDAVIT ON THE STATE AND THE MOVANT.
      2. THE DEPT. OF JUSTICE SHALL FILE A LEGAL MEMORANDUM WITH THE
      PROTHONOTARY IN RESPONSE TO THE MOTION, TAKING INTO ACCOUNT THE
      FACTUAL ASSERTIONS IN BOTH THE MOTION AND TRIAL COUNSEL'S RESPONSE,
      PURSUANT TO RULE 61(F) ON OR BEFORE WED. DEC. 24, 2003. 3) ANY REPLY
      BY THE MOVANT TO THE ABOVE AFFIDAVIT OR PRIOR COUNSEL AND TO THE
      STATE'S RESPONSE SHALL BE FILED WITH THE PROTHONOTARY BY MON. JANUARY
      26, 2003
55   11/21/2003
      MEMORANDUM IN RESPONSE TO THE COURT'S ORDER TO RESPOND TO THE
      ALLEGATIONS OF INEFFECTIVENESS OF COUNSEL CLAIM(S) PURSUANT TO RULE 61
      (G)(2). FILED BY JAMES BAYARD, ESQ
58   12/04/2003
      LETTER FROM PAUL R. WALLACE, DAG.              TO JUDGE VAUGHN
      RE: STATE'S REVIEW OF THE DEFENDANT'S PRO SE MOTION FOR POST-
      CONVICTION RELIEF.
      *SEE FULL LETTER IN FILE.
56   12/12/2003
      LETTER FROM PAUL WALLACE (DAG)  TO JUDGE VAUGHN
      DEFENDANT'S PRO SE MOTION FOR POSTCONVICTION RELIEF. THE STATE
      REQUESTS THAT THE STATE'S LEGAL MEMORANDUM IN RESPONSE BE DUE ON OR
      BEFORE FEBRUARY 6, 2004. BECAUSE THE DEFENDANT IS PRO SE AND
      INCARCERATED I HAVE NOT OBTAINED HIS POSITION AS TO THIS REQUEST BUT
      ASSUME HIS OPPOSITION TO SUCH.
57   01/05/2004
      DEFENDANT'S LETTER FILED.
      TO: JUDGE VAUGHN

A-8

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    9
                       ( as of  01/03/2005 )

State of Delaware v.  ANTHONY G ZUPPO                      DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.        AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.             ANTHONY ZUPPO

         Event
No.      Date          Event                            Judge
------------------------------------------------------------------------
         RE: WANTS TO BE INFORMED IF THE STATE CONTINUANCE IS GRANTED, IF SO
         WHEN IS HIS DEADLINE TO RESPOND.
59    01/27/2004
      DEFENDANT'S RESPONSE FILED.
      TO: JUDGE VAUGHN
      MEMORANDUM IN RESPONSE TO MR. BAYARD'S RESPONSE TO ALLIGATIONS OF
      INEFFECTIVE ASSISTANCE OF COUNSEL.
60    02/09/2004
      STATE'S RESPONSE TO DEFENDANT'S MOTION FOR POSTCONVICTION RELIEF.
      FILED BY ELIZABETH MCFARLA, DAG
      COPY SENT TO JUDGE VAUGHN.
61    02/19/2004                            VAUGHN JAMES T. JR.
      ORDER: IT IS SO ORDERED THT THE DEFENDANT'S MOTION FOR POSTCONVICTION
      RELIEF PURSUANT TO SUPERIOR COURT RULE 61 IS REFERRED TO SUPERIOR
      COURT COMM. ANDREA MAYBEE FREUD FOR PROPOSED FINDINGS AND
      RECOMMENDATIONS PURSUANT TO 10 DEL.C.SEC.512(B) AND SUPERIOR COURT
      RULE 62.
62    03/10/2004
      DEFENDANT'S RESPONSE TO THE STATE'S RESPONSE TO DEFENDANT'S POST-CONVI
      CTION RELIEF MOTION.
      FILED BY ANTHONY ZUPPO
      REFERRED TO JUDGE VAUGHN.
63    03/10/2004
      DEFENDANT'S RESPONSE TO AFFIDAVIT OF JAMES BAYARD, ESQUIRE, IN
      RESPONSE TO MOTION FOR POSTCONVICTION RELIEF (PRO SE).
66    03/18/2004
      MEMORANDUM FILED FROM PARALEGAL OFFICE, KENT COUNTY, TO COMMISSIONER
      ANDREA MAYBEE FREUD RE: MTNPCR HAS COMPLETED BRIEFING AND APPEARS
      READY FOR YOUR HONOR'S REPORT AND RECOMMENDATIONS.
67    08/09/2004                            FREUD ANDREA MAYBEE
      COMMISSIONER'S REPORT AND RECOMMENDATIONS FILED UPON DEFENDANT'S
      MOTION FOR POSTCONVICTION RELIEF PURSUANT TO SUPERIOR COURT CRIMINAL
      RULE 61. RECOMMENDATION THAT ZUPPO'S POSTCONVICTION MOTION BE DENIED
      AS PROCEDURALLY BARRED BY RULE 61(I)(3) FOR FAILURE TO PROVE CAUSE AND
      PREJUDICE.
68    08/18/2004
      APPEAL FILED FROM COMMISSIONER'S REPORT AND RECOMMENDATION (PRO SE).
69    08/19/2004
      LETTER FROM PAMELA QUAIL-BRUMMELL, KENT COUNTY PARALEGAL, TO ELIZABETH
      MCFARLAN, ESQUIRE, RE: DEFENDANT HAS FILED APPEAL OF COMMISSIONER'S
      REPORT AND RECOMMENDATIONS. STATE HAS 10 DAYS TO RESPOND.
70    08/19/2004
```

A-9

```
                  SUPERIOR COURT CRIMINAL DOCKET              Page   10
                     ( as of  01/03/2005 )

State of Delaware v.  ANTHONY G ZUPPO                    DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.       AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.            ANTHONY ZUPPO

        Event
No.   Date            Event                            Judge
----------------------------------------------------------------------------
      DEFENDANT'S MEMORANDUM IN RESPONSE TO THE COMMISSIONERS REPORT AND
      RECOMMENDATION OF POST-CONVICTION RELIEF.
      FILED IN KENT & NEW CASTLE COUNTIES.
71    08/24/2004
      STATE'S RESPONSE TO DEFENDANT'S APPEAL FROM COMMISSIONER'S REPORT AND
      RECOMMENDATIONS.
      FILED BY ELIZABETH MCFARLAN,DAG
      FAXED TO KENT COUNTY.
72    10/08/2004
      LETTER FROM PARALEGAL OFFICE TO ANTHONY ZUPPO
      RE: PROCEDURE FOR OBTAINING TRANSCRIPTS.
73    11/05/2004
      MOTION FOR TRANSCRIPTS FILED (PRO SE).
74    11/05/2004
      AFFIDAVIT IN SUPPORT OF APPLICATION TO PROCEED IN FORMA PAUPERIS
      (PRO SE).

           *** END OF DOCKET LISTING AS OF  01/03/2005 ***
                 PRINTED BY: CSCSNAP
```

A-10

IN THE SUPREME COURT OF THE STATE OF DELAWARE

087 , 2005

PRO SE                          ANTHONY ZUPPO,
(DCC - #283480)                    Defendant Below,
                                   Appellant,
                                v.

L. C. MEYERS                    STATE OF DELAWARE,
                                   Plaintiff Below,
                                   Appellee.


 DF $ 00.00

 2005

1    Mar  07    Notice of appeal from the Opinion dated 2/28/05 in the
                Superior Court in and for New Castle County, by
                President Judge Vaughn in Cr. ID No. 0101004412, Cr. A.
                Nos. IN01-08-1607, IN01-09-2226 through -2229, IN01-
                09-2231 through -2236, IN01-09-2238, and IN01-09-2240
                through -2243-R1, with designation of no transcript
                (served by mail 3/4/05) (afb).

2    Mar  07    Motion to proceed in forma pauperis by appellant (no
                service shown; copy sent) (afb).

3    Mar  07    Order dated 3/7/05 by Assistant Clerk, appellant's
                motion to proceed in forma pauperis is GRANTED, limited
                only to waiver of the docketing deposit (afb).

4    Mar  07    Brief schedule issued (opening brief due 4/21/05) (afb)

5    Mar  07    Letter dated 3/7/05 from Assistant Clerk to
                Prothonotary, record is due to be filed by 3/30/05
                (afb).

A-11

**37**

1  Q. Of the year 2000.
2  A. The first night we went out, Saturday,
3  basically we seen each other every day since.
4  Q. Did you see her during the month of October
5  or November?
6  A. Yes, I did.
7  Q. 2000?
8  A. Yes, I did.
9  Q. Were you, at September or October, would you
10 then classified yourself as boyfriend/girlfriend or
11 just two people dating?
12 A. Boyfriend and girlfriend.
13 Q. And when was it that she actually considered
14 moving in?
15 A. She only lived about half a mile, maybe a
16 mile away from me on the same side of 13, just a
17 development over, and we went out all the time and we
18 had -- we had an offer to go to Cape Codd with her
19 friends, and from then on, it was actually -- we just
20 felt everything was right at the time. You know how
21 that works out when you meet somebody and everything
22 clicked, and she brought up that it was up on
23 November --

**38**

1  Q. What was up, sir, in August?
2  A. November 1st.
3  Q. What was up in November?
4  A. November 1st was basically a lease, if she
5  signed a lease, but the year was up for her staying
6  with Jason. We went up Cape Codd, end of September,
7  beginning of October, and we just started to discuss
8  it on the ride home. It was a long drive up and back,
9  and we discussed -- she was wondering where she wanted
10 to move. She was thinking of moving to Philly --
11 Q. Did there come a point in November, sir,
12 where she did come into your house?
13 A. Oh, yeah. It was before that. She actually
14 -- basically, she was actually staying there most of
15 the time after we got back from Cape Codd. Unless she
16 came home from Lincoln Tech at --
17 Q. During this period of time, was your son
18 living with you full-time?
19 A. No. I had him for the whole summer, and then
20 I got him usually whenever I wanted him, every
21 weekend. There was a Court Order for every other
22 weekend and five weeks out of the summer, but I
23 usually kept him all summer and got him basically

**39**

1  every weekend, every other weekend, depending on the
2  schedule with him and my ex-wife.
3  Q. And she moved in somewhere in November, early
4  November?
5  A. By November 1st or November 3rd, all her
6  stuff was out.
7  Q. We've heard some testimony about her moving,
8  and your seeing some photographs, and I guess diaries
9  or documents that she had written herself.
10 Can you please tell us about these
11 photographs and documents that she made reference to
12 in her direct examination.
13 A. All day we were packing stuff, moving stuff,
14 basically a lot of computer stuff. She works with
15 computers; moved a box and there were some pictures,
16 and normally she seen pictures I had. We were looking
17 through the pictures, and some questionable pictures,
18 you could say, came up, and I asked about them, and to
19 me, I thought it was a normal question, and she
20 thought -- at the time, and I felt it was strange she
21 was in that predicament for the pictures, and then the
22 journal came up, the diary she had. It was half the
23 size of a Bible, thick-wise, and I just asked her what

**40**

1  it was, and, you know, went to open it, curiosity, and
2  she got all excited and ran over and snatched it from
3  me and ran away, and I'm like what's that about, and
4  she said it's this and that and when I was married,
5  and it's nobody's to see, and it's about things that
6  happened in my past, and at the time we were talking
7  about getting married, and I didn't think there should
8  be secrets between people getting married.
9  Q. And so, you kept pushing the issue, sir?
10 A. You could say that, yes. I asked her about
11 it --
12 Q. What was the result of pushing the issue,
13 sir?
14 A. I got upset. I was -- I told her that we're
15 supposed to be getting married, how do you have things
16 you could be ashamed of, trying to get exactly how it
17 progressed, to get the right idea.
18 I don't recall her exact words. I don't want
19 to testify, but it got to where I got uptight that
20 she couldn't confide in me. So, I was like -- I got
21 upset, said don't even move in. There were other
22 problems in the relationship before that that were
23 overlooked, and I left and went home. I got in the

A-12

41

1  car and drove home.
2       At that time she was yelling at me that she
3  was sorry, and there was nothing to be sorry about.
4  She came out with the journal, throwing the pages at
5  the car. The road is from here to the wall way, and
6  she was coming where the prosecution is sitting and
7  tossing papers on the lawn, and while I was driving
8  away.
9       Q. Did there come a point in time where she did
10  move into your house?
11       A. Yes.
12       Q. What address is that?
13       A. 107 Lea Road.
14       Q. And we have heard something about an event
15  there around mid-December, December 18th in
16  particular.
17       There is an allegation there of an assault,
18  Assault Third Degree?
19       A. Yes.
20       Q. Could you please elucidate your recollection
21  of the events around December the 18th, the year 2000.
22       A. My son was playing in the bedroom, his
23  bedroom. I have a three-bedroom house. He was in the

42

1  back playing, play station in his room. We were in
2  our bedroom, and a situation that happened, October,
3  and that came up in the bedroom, and I didn't want to
4  discuss it. I didn't want to argue about it. My son
5  was in the other room. I got up, walked out, put on
6  the TV in the living room, sat on the couch. While
7  I'm walking out, she followed me out, asking me why am
8  I quiet, why can't I discuss this.
9       If -- she basically got upset because I
10  didn't want to discuss it, talk about it no more. My
11  kid's in the other room. I'm sitting on the couch and
12  she's standing to right. I sit to the edge of the
13  couch. That's my spot where I lean. She standing
14  right over me and she's nudging at my shoulder,
15  smacking the head a couple of times, and this is going
16  on for a good four or five minutes, not 30, 40
17  seconds. It's four or five minutes, and I'm sitting
18  there, telling her stop, leave me alone, I don't want
19  to discuss it, and I'm getting upset. I'm telling her
20  leave me alone, and I told her, I said I would hit you
21  in the shoulder if you keep hitting me. Stop it, and
22  I didn't expect to hit her, and she's progressing,
23  upset, she wants to discuss this, and the situation

A-13

43

1  that you didn't ask about yet I didn't want to
2  discuss.
3       She kept going, kept hitting me, and I hit
4  her in the left shoulder with my left arm, not very
5  hard, but left a bruise about like that on her arm,
6  and she bruises very easily, and that was the end of
7  it, and she started asking -- she said, "Why did you
8  do that? It hurt," and I told her I would, and she
9  said, "I didn't think you would," and basically that
10  stopped the argument and we stopped arguing. It
11  wasn't loud. She wasn't screaming. I don't feel my
12  son could hear it, but that's exactly what happened
13  that day.
14       Q. There was some reference to marks on her jaw
15  as a result of events that are alleged there on
16  December the 18th.
17       Could you help us with that, please.
18       A. Never touched her any in her face on the
19  18th; nothing. I don't know how she had marks on her
20  jaw; no.
21       Q. Now, you said something about there was an
22  issue that you didn't want her to discuss,
23  particularly there with your son present. Help us.

44

1       A. When she was going to Lincoln Tech, she
2  started in the beginning of August. At the end of
3  August, we got together. Lincoln Tech is also for
4  auto technician. You learn about automobiles.
5       She would work all day. It was hectic for
6  her to do that everyday. In October, when we were
7  seriously together, I was home. It was a Saturday --
8  for lunch. I called her over to the house, "I love
9  you. See you when you get home," hang up the phone.
10  I left, and I figured, let me stop by because it's
11  my -- on my way, give her a kiss hello and go right to
12  work. So, I did.
13       When I got there, there was a car in the
14  driveway with Pennsylvania tags, no big deal, but what
15  made me curious is when I knocked on the door, she
16  came to the door, shut the big door, crossed the
17  screen door and looked nervous, very like nervous
18  about, you know, what was going on, and I was like,
19  "How are you doing?" and I went to kiss her and she
20  gave me a quick kiss, and I asked her what was wrong,
21  and she said, "A friend of mine from Lincoln Tech came
22  down with his brother and they won't leave." They
23  rent a room out in Jason's house. She works with --

57

1  the Camaro. We -- coming home, and we shouldn't have
2  been, but we were playing back and forth, and she went
3  to the new Walmart. I went home. She shows up 20
4  minutes later, and she forgot her bank book, and she
5  went to Customer Service and all the stuff was on the
6  table, and then I love you and she leaves. That's it
7  for us. That's the last think I know from that point,
8  I remember talking to her, until March 17th.
9      Q. Do you recall the police coming to your house
10  on the 6th of January, sir?
11     A. Yes.
12     Q. And could you -- what's your recollection of
13  those events?
14     A. I was sitting home, watching TV, and the next
15  thing I know it's about --
16     Q. About what time of day?
17     A. I'm trying to think -- she left to go
18  shopping 1:30, quarter of 2, around there.
19        About 4:30, 5:00, some reason I remember
20  hearing the testimony it was 4:30, I thought it was
21  about 5:30, I'm sitting on the couch, a police officer
22  pulled up. It was Officer Eckerd, and another car was
23  there, so I walked out to see what the problem was.

58

1  He asked if -- who I was, and I told him, and he's
2  saying -- he told me that 'Your fiancee came down
3  saying she wants to move her belongings out of the
4  house,' and I said okay.
5        I said, 'Where is she,' and he said, 'Well,
6  we have to detain you because there's going to be
7  three charges brought up against you,' and that was
8  it. I sat in the car. They came up with the truck,
9  you know, started unloading the stuff, and that was
10  it.
11     Q. Did you go to the police station that day,
12  sir?
13     A. That night I did. The officer sat in front
14  of my house for two or three hours while they carried
15  the stuff out.
16     Q. At the police station, were you then
17  released?
18     A. Yes.
19     Q. During this period of time up through
20  January, was Miss Reynolds taking medication that you
21  personally knew about, not what you heard, but did you
22  know whether she was taking any medications?
23     A. Yes.

59

1      Actually, when we were back from Cape Codd,
2  that's when I noticed, which was no big deal. I
3  didn't care, but I noticed she had bottles, and she
4  told me it was Prozac from stress from her work, that
5  she was taking it for some time now, and I didn't get
6  into how long. I didn't care. You know, it wasn't no
7  big deal.
8      Q. Did there come a point in time when you
9  insisted that she stop taking the medications, sir?
10     A. There was one time I didn't insist, but I did
11  argue with her about taking it. She -- in -- in the
12  end of November, the Prozac, she was complaining
13  wasn't working anymore. Doctor put her on a different
14  medication, and she started acting -- that's when we
15  started arguing more about the problems we were
16  having, and for some other reason that came up
17  already, and her sex drive did falter, and I didn't
18  even notice that.
19        She went back a week later, talked to the
20  doctor, telling she was having problem with her sex
21  drive. She was edging all the time and having trouble
22  sleeping. She didn't want to take that medication no
23  more. So, he took her off that medication and said he

60

1  wanted her off medication for about a week or two to
2  clear her system out, to get her on something else,
3  and then they started a different kind.
4      Q. When was it that you were released from the
5  police station? Was that on the 6th or the following
6  day, the 7th?
7      A. It was the 6th. That night I got released on
8  bail.
9      Q. Now, moving on to January 7th, 8th, did you
10  have an occasion to receive any medical attention
11  during that period of time?
12     A. From what dates, sir?
13     Q. January 7th into the 8th.
14     A. Yes.
15     Q. Could you help us understand that, please.
16     A. I attempted to commit suicide. Stupid move
17  on my part, yes.
18     Q. After January the 8th into January the 9th,
19  did you receive any other medical attention, sir?
20     A. Yes.
21        Sunday night, I overdosed. They took me to
22  Christiana. I was at Christiana. When I got there, I
23  overdosed on a hundred 20 milligrams of Xanax and

A-14

61

1 Prozac, which you don't remember anything for at least
2 three or four days.
3     When I got there, which I don't recollect, my
4 lawyer at the time, Mr. Longobardi, told me him and
5 his paralegal got me, and I went crazy, ripped out my
6 I.V.s out of my arm, and they restrained me to the
7 bed, and I was restrained until Tuesday afternoon.
8 Then I was released to MeadowWood, and I think my
9 lawyer told me that the police officer took me there
10 because they had a conference with him on the phone
11 that day, him and the -- the doctor.
12     Q. And -- and how long did you stay there at
13 MeadowWood?
14     A. I was there till Friday and released to
15 Delaware State Police for breach of release on the 7th
16 and the 9th, harassment for breach of release on the
17 9th.
18     Q. Now, after the 9th, did you have any more
19 contact with Miss Reynolds until, shall we say,
20 mid-March of 2001?
21     A. No.
22     Q. None?
23     A. None.

62

1     Q. No calls to her work, no calls to her
2 residence?
3     A. No, not at all.
4     Q. We've heard reference to attempted contact on
5 March 16th.
6     Do you recall being --
7     A. Yeah.
8     Q. -- confronted with that?
9     A. Being confronted with it? Yes, I do.
10     Q. Please tell us what you recall about that
11 event.
12     A. That night? Nothing.
13     Q. March 16th, sir.
14     A. Actually, March the 16th, a lot of the kids
15 in the neighborhood -- I know cause I drag race and
16 they come out and hang in the garage, and we were all
17 in front of Dave's house all night talking, and the
18 young ones, they drink, and that's where we were that
19 night. So, I don't -- what he said happened did not
20 happen that night.
21     Q. And on the 17th, you've heard about your
22 presence at Bankshots. Bankshots, I take it, is a
23 bar?

63

1     A. Yes, on Union Street. We shoot pool,
2 tournament competition every Sunday night.
3     Q. Did you go to Bankshots on March 17th?
4     A. Reluctantly, yes, I did.
5     Q. Did you see Sean there that evening?
6     A. Unfortunately, when I got there, yes. I went
7 reluctantly because I don't drink, and it was St.
8 Patrick's night, and I ended up going so --
9     Q. Now, did you have any contact with Sean when
10 you saw him on the 17th of March?
11     A. Did I have contact? No, I didn't have -- no,
12 I did not go and talk to him. I wanted to, but no, I
13 didn't.
14     Q. On March 17th, at Bankshots, did you see Miss
15 Reynolds?
16     A. At first, no. We were there -- there was
17 three of us all together, and I brought it up. He was
18 there and he was talking with a few people I knew as
19 friends, and we were there a good hour, an hour and
20 a-half, and Sean disappeared, and for some reason I
21 had a feeling -- I told Dave, I said, "He's going to
22 bring Wendy back to the bar because he knows there's a
23 No Contact and I would have to leave," and sure

64

1 enough, a-half hour later Sean walked in and Wendy
2 behind him.
3     Q. Did you have contact with Wendy --
4     A. No, I did not, not at the bar. No, I didn't.
5     Q. Did you subsequently leave Bankshots at some
6 point in time on the 17th?
7     A. Probably I would say about three to five
8 minutes after she -- she arrived there, yes, because I
9 had to get my jacket in the beer room. They let me
10 hide it in the back.
11     Q. Did you have any further communication with
12 Miss Reynolds on the 17th, sir?
13     A. Yes, I did.
14     Q. Explain that, please.
15     A. I was depressed after seeing her. I missed
16 her. I didn't know nothing about what I'm here for
17 now, other than the three misdemeanors. So, I left
18 and I went home, and at the time, like I said, when
19 she left Saturday, the only thing I knew was, "I love
20 you, I'll see you when you get home." That's the last
21 time I talked to the woman, and I got upset. I wanted
22 to know what she wanted, you know. She hasn't got in
23 touch with me, but there was still too much there that

A-15

65

1  I didn't know about, and I wanted to know, and I went
2  long enough, and after seeing her, I went up the
3  street and I called Wendy, and I didn't even think she
4  would answer the phone. I was going to hang up. I'm
5  not going to lie. She answered the phone, and she
6  said, "Hello," and I said, "Hello."
7         She said, "Hello."
8         I said, "Hello."
9         She said, "Who is this?"
10        I said, "Who is this?" because I didn't know
11 how she was going to respond. I was nervous and I
12 said, "Probably somebody you don't want to talk to,"
13 and she said, "I wouldn't say that," and I said,
14 "Look, I don't want to bother you. I'm not harassing
15 you. I'm not trying to upset you or nothing."
16        I said, "I just got to know if you ever want
17 to see me again. I have to know."
18        I told her it was two months. I said, "I
19 haven't talked to you. What do you want?"
20        Her exact words, I remember, "Where do you
21 want to meet?" and so we picked a place and met at
22 Denny's.
23        Q. While you were at Denny's, did you actually

66

1  go into the restaurant or did you sit in the parking
2  lot?
3         A. When she got there and she pulled in -- I was
4  sitting there waiting. She got there. She pulled
5  alongside of me. She asked me to get out the car.
6  She didn't do that, and I got out, and I have a
7  leather trench coat, and she asked me to open my
8  jacket, and I did, and I'm like why. She said she
9  wanted to make sure I didn't have a gun on me, and
10 that shocked me. I wasn't upset, and I asked her,
11 excuse my language, "Where the hell did that come
12 from?" I asked her, and she said, "Nothing. I just
13 -- I was worried you wanted to hurt me or kill me for
14 what happened," and I got three misdemeanor charges
15 and I -- I wasn't worried about them. We'll go to
16 trial with them.
17        So, it was cold that night, March 17th. It
18 was real cold out, and I got back in my car and we're
19 sitting there, and we kept -- I kept turning on my car
20 for heat and back and forth, and she said, "Why don't
21 you get in so we don't have to yell over top of each
22 other" because a Camaro is low. So, I got in, the
23 whole time she's sitting like she wants to -- me to

67

1  touch her. So, I'm thinking maybe I'm lucky, she
2  wants to get back together. So, we talk, and we're
3  talking about life in general, you know, that I got
4  upset from the lies that I found out about her, and I
5  forgave her for that, and I'll try to forget about
6  them and certain things that happened, and we're
7  trying to reconcile the situation, and a good 45
8  minutes to an hour, and next thing, we're sitting
9  there and we're talking, and she said, "Oh shit,"
10 looking in the mirror," and I was like what? She
11 said, "Sean's here," and yeah, I got upset. I said,
12 "Did you tell him you were coming to meet me?"
13        Q. Did she get out of the car and go back
14 to talk to Sean or did both --
15        A. We both -- when she said, "No, I didn't tell
16 him where I was going," and I said all right, and she
17 opened the door and I opened the door, and she said
18 he's going to yell at me and make me move out of the
19 house, and I wasn't going to let him, I don't think.
20 I only once in my lifetime talked to him, twice on the
21 phone.
22        She went to get out, and I left the door open
23 and I was sitting there, and they were directly behind

68

1  the car about four foot to the right, about the length
2  of the car, back four foot to the right, and I heard
3  him telling her, exactly, "You need to get home. We
4  need to talk. You need to get home. We need to
5  talk," and she's telling -- I couldn't hear what she
6  was saying, but he was upset. He was -- he was upset,
7  not to where -- a man knows these things. He wasn't
8  upset to where he was afraid of her being hurt. He
9  was upset, to my recollection, is that he wasn't
10 having his chance to be back with her. You understand
11 what I mean?
12        He went walking back to the car, and I did
13 approach him at that point, and I told him to stop,
14 and I told him he couldn't cause her any stress, "Do
15 you want her upset? I can't have her upset or
16 anything like that."
17        I did tell him if he did, you know, I would
18 come have another talk with him. Okay, I did do that,
19 and he said, "Well, just don't hurt her," and I don't
20 know nothing of the stuff, the three misdemeanors.
21 "What do you mean don't hurt her?" and I walked away
22 and went back in the car and got in the car.
23        Q. Did there come a time when you two went to a

A-16

13

1  A. This is the letter that I wrote to Mr.
2  Wallace. It's dated May 4th, 2001.
3  Q. Why did you write the letter, sir?
4  A. She came in to see me and told me that she
5  had reported that her boyfriend, Mr. Zuppo, had
6  sexually assaulted her, and that the charges were
7  false, that he was being held in jail, that the reason
8  -- and she wanted him to get out of jail, that she
9  felt badly about it and was trying to make it right.
10  That's why she came to see me.
11  Q. Did she elaborate at all as to why -- you
12  know -- what caused her to bring these allegations or
13  why now she wanted to retract the allegations?
14  A. She said that the reason she made the
15  allegations was that they had gotten into a fight and
16  she wanted to move out, and she wanted police to be
17  there when she moved her belongings out of the place
18  where they lived.
19  She told me that -- I said, "How did you lie?
20  What did you say that was untrue?"
21  She said, "I basically told them certain
22  things that were true, but I changed the punch line."
23  She said, "We practiced rough sexual behavior, which

14

1  was consensual, and we had sex, and it was usually
2  kind of rough, and I told them that it was not
3  consensual, that he did it to me without my consent,
4  and now they are holding him, and now that I have my
5  stuff out of there, I feel bad that he's still in
6  jail, and you know, I'd like to correct that."
7  Q. Was this the only thing you did on behalf of
8  Miss Reynolds regarding this matter, sir?
9  A. No.
10  She asked me to appear at a Bail Hearing
11  shortly after that letter was written. So, it might
12  have been the next day, or a couple of days after
13  that, for Mr. Zuppo to advise the judge that would be
14  hearing the bail, that these -- that she was recanting
15  what she had accused him of, to see if the bail could
16  be lowered or removed.
17  Q. And after that service was performed, was
18  there any other services you performed on behalf of
19  Miss Reynolds?
20  A. I don't believe so.
21  MR. BAYARD: Your Honor, may I have just a
22  brief moment, please.
23  THE COURT: Yes.

15

1  . . .
2  (Pause)
3  . . .
4  MR. BAYARD: Mr. Capone, thank you for your
5  assistance.
6  The State may have some questions.
7  MR. WALLACE: How are you doing, Mr. Capone?
8  . . .
9  CROSS-EXAMINATION
10  . . .
11  BY MR. WALLACE:
12  Q. Sir, after -- Wendy Reynolds was your client?
13  A. That's correct.
14  Q. Have you talked to her since then?
15  A. Since the day of the Bail Hearing?
16  Q. Yeah.
17  A. I've probably seen her in the building and
18  said hello, but have I professionally consulted her?
19  No.
20  Q. The statements were made in the
21  attorney-client privileges?
22  A. Yes.
23  Q. Have you talked to her about waiving the

16

1  privilege and saying what you said in your office?
2  A. No.
3  Q. You haven't talked to her?
4  A. No.
5  Q. You came in here and testified without
6  talking to your client about waiving the privilege and
7  allowing you to talk about private conversations you
8  had with her regarding your representation?
9  A. That letter obviously indicates what she told
10  me, so --
11  Q. May I have the letter.
12  Where does it say the stuff about it was just
13  rough sex and they did that on a regular basis or
14  anything like that?
15  A. It says she instructed me to bring her
16  falsehoods to the attention of the Attorney General's
17  Office in writing, with knowledge that her admission
18  could well result in a wrong prosecution." So, I took
19  that as a Waiver of Confidentiality.
20  I advised her not to write that letter. I
21  told her that she was waiving those rights, that she
22  was -- her statement was going to come in in any event
23  under 3507.

A-17

LAW OFFICE
*of*

## JEROME M. CAPONE

ATTORNEY-AT-LAW

TOWNE CENTER, SUITE 200
4 EAST 8TH STREET
WILMINGTON, DELAWARE 19801

TELEPHONE (302) 654-3260
TELECOPIER (302) 655-5358

May 4, 2001

Paul Wallace, Esq.
Deputy Attorney General
Department of Justice
State Office Building
9th and French Streets
Wilmington, DE 19801

RE: Anthony Zuppo

Dear Paul:

I represent Wendy Reynolds, the complaining witness in your case against Anthony Zuppo. She has retained me to advise you that the charge of Rape and related charges she initiated against her boyfriend, Anthony Zuppo, on January 6, 2001, are false. She told me that she made up this false story in order to obtain police assistance while she moved her personal belongings out of the house she shared with Mr. Zuppo.

She has instructed me to bring her falsehoods to the attention of the Attorney General's Office in writing, with the knowledge that such an admission could well result in her own prosecution. She is also aware of the other serious ramifications this admission could have for her. I have explained to her that her admissions do not necessarily mean that you will drop the charges against Mr. Zuppo, due to the fact that you could try to use her original statement at trial pursuant to 11 Del. C. §3507.

Despite these serious ramifications, she nevertheless wishes to reveal her wrongdoing to the Attorney General's Office in order to try to correct the hardship her actions have caused to Mr. Zuppo. She is willing to meet with you to discuss this matter.

Very truly yours,

Jerome M. Capone

Cc: Wendy Reynolds

A-18

**77**

1    that she actually wrote to you?
2    A. No.
3    Q. Did you tell her the content of the letters
4    that we've been shown that she wrote to Mr. Wallace,
5    or had written to Mr. Wallace?
6    A. No.
7    She has -- she has read them to me, draped
8    them up on the computer, and she said state the facts,
9    and send it to the man, tell him what happened.
10    That's all I would -- no, I wouldn't tell her. No. I
11    wouldn't say, "Put this in or put that in."
12    Q. Did you tell her to go to the doctor's and
13    have the doctor prepare a document to the effect of
14    the medication caused her some mental problems?
15    A. In a way, yes. That's what she was claiming
16    to me that -- she said -- she told me a week before we
17    got back together, on March 17th, that she stopped
18    taking the medication that he prescribed that she
19    started in the beginning of January when she moved
20    out, and then she got the call from the Attorney
21    General's Office saying I was indicted on three new
22    charges, and she told me as the medication was wearing
23    off, she realized what was happening, and that was one

**78**

1    of the reasons why, other than getting back together,
2    she had to -- she wanted to see me that night on the
3    phone.
4    Q. When actually were you released, sir?
5    A. (No response).
6    Q. After your April incarceration?
7    A. Released on January 8th -- June 8th I left
8    the prison.
9    Q. Who was it that made your bail and made the
10    arrangements for you to get out?
11    A. Wendy did.
12    Q. When you got out, did you meet her there back
13    at 107 Lea Road?
14    A. No, we didn't.
15    Q. Where did you meet her, sir?
16    A. I wanted to -- truthfully, I wanted to go
17    home. I had -- I had been in jail for two months.
18    She didn't want the police to take me away again. I
19    had -- after I got released, the bail bondsman picked
20    me up. She was already ready and packed to go up to
21    PA to stay for a while, and she already had a motel
22    that she found rented by the week out of the phone
23    books, Delaware, Pennsylvania phone books, and I'm

**79**

1    from Pennsylvania, and we met at the rest stop at the
2    Pennsylvania line to the right, beside the Tri-State
3    Mall. That's where the bail bondsman dropped me off
4    to meet --
5    Q. The bail bondsman took you up to
6    Pennsylvania?
7    A. Yes. I was informed by him that the No
8    Contact Order does not carry out of the state.
9    Q. Did you all reside in Pennsylvania for a
10    period of a week, two weeks after you met her there in
11    June?
12    A. I'm trying to think exactly how long it was.
13    It was a week, because we came back -- we got
14    married on the 20th, which was Wednesday, and we got
15    back that Sunday, so it was 20th, 19th, 18, the 17th
16    we came back home.
17    Q. You indicated you were married in
18    Pennsylvania?
19    A. Yes.
20    Q. Where was that, sir?
21    A. (No response).
22    Q. Where in Pennsylvania?
23    A. Aston, Pennsylvania.

**80**

1    Q. Was this a denominational wedding or a civil
2    wedding?
3    A. It was non -- we're non-denominational
4    Christians. We're not Catholic, or we're Christian,
5    believe in the Bible.
6    Q. The service itself was a religious service?
7    A. Actually held at Milton Lockwood's church.
8    He has a church --
9    Q. Is the gentleman a minister?
10    A. Not a licensed minister. He does pastor and
11    teach and runs the church every Sunday. His father
12    was a licensed minister --
13    Q. There was an actual marriage certificate
14    issued by the --
15    A. Yes. We were married by the pastor and
16    everything, witnesses, dress, all that.
17    Q. Moving to July, you came back to Delaware at
18    some point in June; am I correct?
19    A. June 17th, a Sunday.
20    Q. Okay.
21    Now, when you came back to Delaware, you were
22    still aware that there was a No Contact Order?
23    A. Yes.

A-19

93

```
1   me?
2        Q. What types of things was he saying to you at
3   that point?
4        A. Things like how skanky I am and that I'm a
5   piece of shit.
6        THE COURT:  Would counsel come forward for a
7   moment, please.
8        (The following sidebar conference was held.)
9        THE COURT:  We're talking about things that
10  happened in Pennsylvania.  Any of these charges based
11  on --
12       MR. WALLACE:  We're coming back to Delaware
13  right now.
14       THE COURT:  Okay.
15       MR. WALLACE:  I think this happened in
16  Delaware, but I'll --
17       MR. BAYARD:  She's specifically said, too, that
18  Delaware --
19       MR. WALLACE:  I'm leading up to in Pennsylvania
20  when they got married.  And I want them to be able to,
21  the jury, to understand why would you marry this man in
22  these circumstances.  It's to explain what was, seems to
23  be really inexplicable behavior.
```

94

```
1        THE COURT:  I think you should move, you know,
2   to the marriage issue.  I don't want to, you know, have
3   other bad acts coming in.  If you want to -- a sort of
4   instruction or follow up on this later, we can do so.
5   We don't need to do it right now.
6        MR. BAYARD:  Thank you.
7        (The sidebar having concluded, examination
8   continued.)
9   BY MR. WALLACE:
10       Q. You said that you stayed up in Pennsylvania for
11  about a week in a hotel?
12       A. Yes.
13       Q. Did you then come back to Delaware?
14       A. Yes.
15       Q. And where were you living then?
16       A. At his house on Lea Road.
17       Q. Did there come a time that you actually got
18  married to the defendant after that?
19       A. Yes.
20       Q. When did that happen?
21       A. June 20th.
22       Q. What caused you to marry the defendant?
23       A. He wanted to get married.  And I didn't.
```

95

```
1        Q. How was your relationship going with him at
2   that point on June 20th?
3        A. I still had a black eye from when he had
4   punched me in the face in the car.
5        Q. So is that a way of saying the relationship was
6   not going well?
7        A. No, it wasn't.  I had tried to leave over and
8   over and over again.
9        Q. And what did he do when you tried to leave?
10       A. He either shoved me to the floor or choked me.
11  The incident in the car --
12       Q. I just want to get to the marriage.  Why didn't
13  you want to marry him on June 20th?
14       A. I wanted to leave him.  I didn't want to be
15  with him anymore.
16       Q. Why did you marry him then?
17       A. He told me that if I didn't do what he wanted
18  me to do and if I embarrassed him in any way, that I
19  would be sorry.
20       Q. Did you go through with the marriage?
21       A. Yes, I did.
22       Q. Did you continue to live with him in that house
23  at 107 Lea Road?
```

96

```
1        A. Yes, I did.
2        Q. Up to this point now, from the time he's
3   arrested in April until around June 20th, early July,
4   did you have contact with your friends like Sean or
5   Maria?
6        A. Not that I can remember.
7        Q. Did you try to get help from anyone?
8        A. Everyone was very upset with me for going back
9   to him.  And no one really wanted to talk to me.
10       Q. Did you feel as if you could go to anyone?
11       A. No, I didn't.
12       Q. Early July, July 1st, did an incident happen at
13  your house there on 107 Lea Road?
14       A. Yes.
15       Q. Could you describe what happened in the early
16  evening hours there?
17       A. I was making meat loaf for dinner.  And I was
18  cutting carrots.  Everything was fine.  He wasn't upset
19  with me.  He bent down maybe about five feet away from
20  me to get something out of the lower cabinet.  And while
21  he was there, he just flipped out.  He started --
22       Q. What do you mean he flipped out?
23       A. He started to yell at me and called me a slut
```

May 21, 2003

To whom this may concern:

This letter is in regards to Anthony Zuppo and Wendy Reynolds. My name is Dr. William A. Roe. I am an ordained minister and a professor of Ethics and Philosophy at Neumann College.

Recently I was contacted by Mr. Zuppo and was informed of the events that transpired after the wedding in June of 2001. He asked me to recall the events of the original interview and the wedding itself.

First of all: the initial interview. When I interviewed this couple in March of 2001, both the bride and the groom seemed quite intent on entering into marriage. I cannot recall any appearance of anyone being forced into the marriage relationship. We also met for a second time on April 2, 2001, with no problems cited.

Second: the wedding. The wedding took place at Beechwood Park Chapel in Aston, PA on June 20, 2001. There was absolutely no sign of the bride (Wendy Reynolds) having a black eye or any other marks of battering. Both the bride and the groom seemed happy and fully prepared to commit to one another in marriage.

I pray that this information helps clear up some of the issues.

Yours truly,

DR William Roe
Dr. William A. Roe

WAR/kls
enc.

Sworn and subscribed before me on this

22 day of MAY 2003

Notarial Seal
John Anthony Rim, Notary Public
Lower Chichester Twp., Delaware County
My Commission Expires Jan. 28, 2006
Member, Pennsylvania Association of Notaries

A-21

# MARRIAGE LICENSE

No.2001-1214

## VOID AFTER SIXTY DAYS FROM DATE

### THIS LICENSE VALID ONLY IN THE STATE OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,  } ss:
COUNTY OF DELAWARE

*To any person authorized by law to solemnize marriage:*

You are hereby authorized to join together in the holy state of matrimony according to the laws of the

Commonwealth of Pennsylvania,

..... ANTHONY GEORGE ZUPPO ................... and ......... WENDY ANN REYNOLDS ...............
OF LEGAL AGE                                      OF LEGAL AGE
MARRIED ONCE BEFORE                               MARRIED ONCE BEFORE
..... DISSOLVED BY DIVORCE .......................DISSOLVED BY DIVORCE ..............
DIV. #94-
07911☐                                            DIV. #99-
..... NEW ...........................................  39299☐

CASTLE Given under my hand and seal of the Orphans' Court Division of said County of Delaware at
CO.                                               NEW CASTLE
                                                  CO.
Media, this ..... 20ᵗʰ ................. day of .... JUNE ............. A.D. 2001

X *[signature]*                                   MICHAEL F.X. GILLIN, ESQUIRE
'TO BE RETURNED TO
CLERK OF ORPHANS' COURT DIVISION
IF NOT USED 15                                    ...............................................
                                                  Clerk of Orphans' Court Division, Delaware County, Pa.
X *[signature]*
Officiating: DR. Will...                           *[signature]*

A-22

```
                                                      1                                                           3
 1   IN THE SUPERIOR COURT OF THE STATE OF DELAWARE        1        THE COURT:  Good morning.  You have both had an
 2       IN AND FOR NEW CASTLE COUNTY                       2   opportunity to at least scan the instructions, I think.
 3   STATE OF DELAWARE,                                     3        MR. WALLACE:  Yes.  Thank you.
 4                                                          4        MR. BAYARD:  Yes.  Thank you, Your Honor.
 5       v.              ID                                 5        THE COURT:  I concluded that the judgement of
 6                      No. 0101004412                      6   acquittal should be granted on Count 4, kidnapping.  I
 7   ANTHONY G. ZUPPO,                                      7   concluded that there was not any evidence of kidnapping
 8                                                          8   as to that apart from the alleged rape itself.
 9       Defendant.                                         9        MR. BAYARD:  Thank you, Your Honor.
10   BEFORE:    HON. JAMES T. VAUGHN, J. AND JURY          10   Appreciated.
11       - - - - - -                                       11        THE COURT:  That will not affect of renumbering
12                                                         12   of attempted rape first to second or attempted rape
13                                                         13   second, and the rape first to rape second.  Now, I only
14       TRANSCRIPT OF CLOSING ARGUMENTS AND:              14   made one correction since the draft that you have was
15       JURY CHARGE                                       15   done.  That is in the aggravated intimidation charges
16       - - - - - -                                       16   the count numbers were corrected to correspond with, you
17                                                         17   know, the current numbers.  Anything to address before
18              COPY                                       18   we proceed?
19                                                         19        MR. BAYARD:  Your Honor, Mr. Zuppo is going to
20                                                         20   address the Court.
21   . . . . . . . . . . . . . . . . . . . . .             21        THE DEFENDANT:  Yes, Your Honor.  I am not
22       JOHN P. DONNELLY, RPR                             22   familiar with this.  I don't know how this trial goes I
23       SUPERIOR COURT REPORTERS                          23   am learning as I am here.  I am not a lawyer.  Both
     1020 N. KING STREET   WILMINGTON, DELAWARE 19801
            (302) 577-2400
```

```
                                                      2                                                           4
 1          February 4, 2002                               1   sides rested, apparently, Friday.  There was some
 2          Courtroom No. 102                              2   evidence that I went over and I also mentioned to
 3          10:00 a.m.                                     3   Mr. Bayard on Thursday about a couple instances that
 4                                                         4   prove without a doubt that lies on the stand that was
 5                                                         5   written down from the police officer.  I don't know if
 6   PAUL R. WALLACE, ESQUIRE                              6   it could still be entered.  Sean Hackett, who was on the
 7   DEPARTMENT OF JUSTICE                                 7   stand tells him that I said his days are numbered.  He
 8      820 N. French Street                               8   said watch your back in the police report on two
 9      Wilmington, Delaware 19801                         9   different occasions.  On the first page has nothing
10      for State of Delaware                             10   about watch your back.  Says your days are numbered, go
11                                                        11   where the police officer got back and he typed it up.
12   JAMES A. BAYARD, ESQUIRE                             12   He is the gentleman that called and says your
13   PUBLIC DEFENDERS' OFFICE                             13   days are numbered, nothing about watch your back.  That
14      820 N. French Street                              14   wasn't entered into evidence for them, for the jury to
15      Wilmington, Delaware 19801                        15   see.  I did mention it, said it can be a typo.  I don't
16      for Defendant                                     16   think that could be a typo, typo would be if you had
17                                                        17   didn't and it was did, instead you know what I mean?
18                                                        18   Also with the January 6 police statement Sean
19                                                        19   Hackett, my ex-wife at the time right now my fiance
20                                                        20   states on his police report Mr. Bayard says it could be
21                                                        21   a typo.  I don't understand you had to put it out I
22                                                        22   pushed her down on her stomach, I pulled her pants
23                                                        23   down, penetrated her, and then I just turn it over her
```

SUPERIOR COURT REPORTERS    (302)577-2400 EXT 419    Page 1 to Page 4

A-23

5

1  back. She was on her for ach.
2      THE COURT:  Is what it said in the police
3  report.
4      THE DEFENDANT:  That is impossible to be a
5  typo.  A month later Detective O'Sullivan gets in touch
6  with her, tells her what happened.  It is  that is not
7  on that police report. And it also on the journal that
8  he wrote for what happened.  It is not there either,
9  plus the paper is totally different than what Detective
10  O'Sullivan typed out to give to the Grand Jury to indict
11  me on, that was she had with Wendy.
12      And one other quick thing I was asking for you
13  to do, if possible; could we also have the tape from my
14  preliminary entered into evidence, also, of the night
15  because on there stating it was not intentional, could
16  go both ways.  What my wife did testify on the stand
17  makes it seem like it was real intentional that in fact
18  did not happen, saying I charged at her, threw her
19  against a wall.  That is reckless big time.  That did
20  not occur at that time.
21      There are things, we rested.  I didn't know
22  what was going on.  I was hoping maybe allow this to
23  come back in, put it in so the jury could read over it,

6

1  you know, when they are looking all this, you know.
2      THE COURT:  There is two issues now, Mr. Zuppo,
3  is you know whether the Court would allow the defense to
4  reopen its case after it rested.  That is one issue.
5  The second issue is if I did so, you know, is there
6  admissable evidence that could be introduced.
7      THE DEFENDANT:  Not to waste anymore time, I
8  heard back up try to blow out 400 cases this month, I
9  don't mean to waste time.  There is a paper there we
10  have is factual, that is what the police wrote down what
11  she stated to him that night.  The journal is totally
12  different.  Statement they give Detective O'Sullivan is
13  totally different.  Also Sean Hackett on the stand,
14  Mr. Wallace is a great prosecutor, maybe looks like an
15  idiot stating I am not lying.  They are all lying.  But
16  this also will prove that some of them were lying,
17  either Sean Hackett did lie.  There is the police report
18  this night is fresh in his head. He did not state
19  nothing where she and watch your back because it was not
20  said.  Then she said your days are numbered.
21      Okay, which wasn't said, this is what he was
22  saying was said the night it happened, but then 6, 7, 8,
23  nine months later, almost or nine months later, 11

7

1  months later he is stating he knows for sure, watch your
2  back.
3      THE COURT:  I am going to defer to counsel in a
4  moment here, give counsel an opportunity to speak.  If
5  they wish with respect to Sean, Sean Hackett, there be
6  an issue there or whether or not the contents of the
7  police report themselves are admissable evidence.  He
8  has given his testimony.  He is gone.  The issue would
9  be what witnesses, you know would, be called.  He may be
10  able to address that point.
11      THE DEFENDANT:  I don't think there would be
12  actually need a witness, I mean, we have the gentleman's
13  testimony.  We also have documents that are factual from
14  the police officer.  There wouldn't need a witness for
15  cross examination on that.
16      THE COURT:  There is procedure for admitting
17  documents into evidence.  You can't just hold it up and
18  say this is evidence.  So that is an issue.  As to your
19  comment about Mrs. Reynolds' description of how this
20  alleged rape occurred where the pants being taken down,
21  I caught that as part of your comment.
22      THE DEFENDANT:  That is a big issue.
23      THE COURT:  She testified.  She was cross

8

1  examined, you know, on I think the first day of trial
2  when evidence was taken.  She has been thoroughly
3  examined, and given her account, examined.  She has been
4  released, as well.
5      THE DEFENDANT:  The big issue on that is that,
6  you know, she lied.  She did not lie.  She lied, then
7  she did not lie.  That is where that comes in because
8  when we got back together she got in touch with me,
9  informed me on charges, everything that went down.  She
10  wanted to recant her statement because it did not
11  happen.  Now, I mean, like was wondering where she was
12  on medication after a year of this saying now it did
13  happen.  And this way let the jury see that she may be
14  unstable.  That is what is said on the police officer's first
15  journal is totally opposite and then also the testimony
16  she give on tape is different.
17      THE COURT:  Well, the journal is an easy one.
18  Journal has been admitted.
19      THE DEFENDANT:  I know that.
20      THE COURT:  That is in evidence.
21      THE DEFENDANT:  I didn't understand why the
22  other two wouldn't have been when he did that either, so
23  they could see the three.

A-24

**9**

THE COURT: We have rules of evidence and those are the rules under which decisions are made as to whether this particular document or that particular document is admittable. I may have misspoke, I don't know whether Ms. Reynolds is still available to be called or not. I am going to, at this point, to defer to counsel to see whether they wish to address those points that the defendant is bringing up.

MR. WALLACE: Your Honor, the State, both sides have rested, and certainly Mr. Zuppo may read certain things. He did not read everything. He reads selected bits and pieces. For instance, Mr. Reynolds' account of what happened on the first day, if you recall the very question I asked Detective O'Sullivan was who has more time to sit down and talk to her and make sure everything is right. Who taped the statement, things like that. Most probably -- I don't speak for Mr. Bayard, he can speak for himself -- she went over -- Detective O'Sullivan went over those very things with her during the taped statement, said wait a minute police report said there no. He must have written that down incorrectly. Certainly Mr. Bayard being the long term attorney that he is knows what is helpful to him

**10**

and what may hurt him.

You know, what seems to be inconsistency to Mr. Zuppo may be explained earlier in the case and Mr. Bayard didn't waste his time on that. We will go through a great waste of time. Mrs. Reynolds is not available any longer. She has gone back out of state. I released her when they closed evidence. He kept her here just in case we had rebuttal until Friday afternoon.

Secondly, we would have to call a couple witnesses, call patrolman Eckerd, say it is possible that I made a mistake, call Detective O'Sullivan to explain that again, go through the taped statement she took from Mrs. Reynolds.

Mr. Zuppo wants to complain that certain things were not done. Certainly, from the perspective of the State everything has been done that Mr. Bayard could do up to this point. Something that he hasn't done, he probably has great reason for and to attempt to open that case back up simply to satisfy Mr. Zuppo, the State would be greatly prejudiced by this. We can't call those witnesses back.

MR. BAYARD: Your Honor, again, the trial

**11**

attorney does have the responsibility of making decisions as to how case is going to be run. And having the information in front of myself, having looked at it, having talked to Mr. Zuppo, having had a chance to speak to Mr. Wallace in this matter, I think what was presented is what I was hoping the jury would hear clearly during the course of the trial. There may be disagreement between counsel and client as to what should or should not have been presented. Ultimately this is the attorney's responsibility to make those decisions as to what would be presented.

I think what has been presented is appropriate. To start going off in the finite detail that Mr. Zuppo is looking at, I don't see to be productive for him in the long run. It is the long run for this gentleman is the objective of, you know, his reputation here.

THE DEFENDANT: I can understand Mr. Bayard's point, especially Mr. Wallace wants a conviction. I can understand that. I hope he would want the truth. He said that in the statement could have given different to Mrs. O'Sullivan, to the police officer than Mrs. O'Sullivan's statements speak with Wendy. I mean, how different can you get. The woman is raped. She is

**12**

going to show she is on her -- not to be ignorant -- on her back or stomach when she is raped. I mean, the State what Officer Eckerd wrote down Wendy said she was thrown down on her stomach, held down, pants were pulled off. While she is still on her stomach nothing about any toy other thing into, on or to her anything then you know was supposedly insert myself, then ejaculate all over her back. That is totally different than everything else, first thing she gave.

Also in what I can read, what I overlook Mr. Bayard stated in one of them statements that I get all the evidence to be able to look at to this evidence. That I didn't see. I requested to hear both statements that were given from my wife. You know, I would like to hear then, see if they are different. The only person that heard these would be three gentleman, two gentleman and a lady. Right now I don't know how they -- what is on there. I don't know what is different. I don't know if I am just looking at something that are totally different than what is down. We want the truth to come out.

We have the first statement from the police she gave to them then you have second statement she gave to

A-25

13

1  Detective O'Sullivan. Then you have the journal. All
2  three are different, specifically the difference. They
3  wind up going to the Attorney General's office, indict
4  me on the charges. It is like a story. That is got all
5  three into one, and exaggerates with which is I don't
6  know that is not saying that is something wrong with
7  that when it is out on the other end of the line. It
8  scares heck out of you.
9       Also in her journal on the Fifth, not in
10  evidence states in, Your Honor, all we did we fought all
11  night. There was nothing stated on the stand if she is
12  write down in her hoos a diary of what happened, that
13  has to be the facts. What if the other stuff is not
14  true either. All of this is clashing with everything
15  else said by the State, if you understand what I am
16  saying.
17       Also the tape from the preliminary hearing. I
18  feel that shouldn't be too much trouble entered into
19  evidence. We have Detective O'Sullivan, the one that
20  spoke on the tape. She could be cross examined if she
21  had to about it. That is something they can hear also
22  for the -- I mean, like I said, not scared of the
23  possession. I am little bit -- I never did touch a

14

1  knife. I told Mr. Bayard supposedly cut my throat on
2  the stand everything. Everything, one thing I am liar
3  said something smart to start an argument, my wife got
4  cut by it. I am not happy. I am willing to take the
5  charge possession. I did not do -- I didn't want to get
6  in trouble for something I did not do.
7       Tape also does state, they state Wendy said
8  that I did try to take the knife from her, never stated
9  if I got the knife, didn't say that I walked away with
10  the knife. Just states that I tried to, if I did.
11  Didn't say anything with I threw her against the wall.
12  Like I said, also states that, if I recall correctly,
13  this time that wasn't intentional for a woman to say
14  sitting down and talking to the detective in her stating
15  wasn't intentional. That witness stood up on the stand
16  say he rammed into me, threw me up against the wall, had
17  a knife. That is two different sides of the spectrum.
18  That is something I hope the jury, you know, would at
19  least be able to see that, if not anything, at least
20  that.
21       THE COURT: Well --
22       MR. BAYARD: Your Honor, I think the record
23  should be made there was two taped statements made by

15

1  Mrs. Reynolds and one by Mr. Zuppo. The prison does not
2  allow tape recorders there to be brought into the
3  prison as I sat, I listened to it, I took notes. Those
4  notes were viewed with the gentleman. So he did not
5  hear the actual words, but he was certainly the contents
6  were shared with him.
7       THE COURT: All right. First of all, in
8  response to Mr. Zuppo I don't see anything. I would
9  like to just state for the record I see absolutely
10  nothing wrong at all with the facts that the State told
11  Mrs. Reynolds to go on back to wherever she lives
12  because on Friday someday both sides had rested.
13  Nothing wrong with that at all. As to that other issues
14  you are raising, like I say, the journal is in evidence.
15  Mrs. Reynolds was examined and cross examined. You gave
16  your statement and were cross examined. I don't think
17  that there is sufficient cause shown to reopen your case
18  even if your attorney asked for that.
19       So to the extent that you are asking to reopen
20  the case to present additional evidence on your own
21  and -- well, I am just going to say you have not shown
22  sufficient cause. I am --
23       THE DEFENDANT: Nothing for the statement, for

16

1  Sean's police report --
2       THE COURT: You have shown insufficient cause
3  to allow you to reopen your case. I am not going to do
4  that. I will follow up on one thing when I came into
5  the courtroom this morning, the attorneys could see that
6  I had ruled on this kidnapping issue. You know from the
7  one that corresponded with the alleged rape. I also
8  came in here intending to inform the attorneys that I,
9  when I was making that decision, I also did decide to
10  reserve decision on that possession of a firearm during
11  the commission of a felony. I'm going to reserve
12  decision on that count, going to submit that to the
13  jury.
14       I will, you know, that will be a reserved part
15  of the motion for motion of judgement of acquittal. All
16  other aspects for the judgement are decided as they have
17  either been approved or reserved. I am also going to
18  inform counsel I am going to file a brief written order
19  on Count 4, kidnapping charge which you will both
20  receive, will be after, you know, we are done today.
21  Anything further?
22       THE DEFENDANT: Apologize for taking your time.
23       THE COURT: That is all right.