

FILED

JUL 1 8 2005

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

---

EXHIBITS FOR POST-CONVICTION RELIEF, RULE 61

---

05- 50 4

AA-O

25

```
  A. Yes, I do.
  Q. Did you do that in this particular case?
  A. Yes, I did.
  Q. What, if anything, did you collect?
5 A. I collected, I believe it was a rope, like a
6 clothes line, and some straps with Velcro restraints. I
7 believe a blindfold was in there as well.
  Q. I'm going to show you what's been marked as
9 State's Exhibit No. 8 and ask you to take a look at
10 these items, sir, that are within that envelope.
11    (Pause.)
12    THE WITNESS: Yes.
13 BY MR. WALLACE:
14    Q. Are those the restraints you're talking about,
15 sir?
16    A. Yes, sir.
17    Q. Where did you obtain those items, if you
18 recall?
19    A. Those were under the bed in the master bedroom.
20    Q. Okay. And were you present when they were
21 removed from the bed?
22    A. That's correct.
23    Q. Who removed them?
```

27

BY MR. BAYARD:
```
1 BY MR. BAYARD:
2    Q. Officer, good morning.
3    A. Good morning, sir.
4    Q. You first met Ms. Reynolds there at the gas
5 station?
6    A. That's correct.
7    Q. And at that time did she exhibit any marks of
8 assaultive behavior? Did she have any black and blue
9 marks or cuts or abrasions?
10    A. Not that I was aware of, no.
11    Q. You mentioned something about a gun, sir?
12    A. Yes, sir.
13    Q. Did you look for a gun in this house?
14    A. Yes, I did, sir.
15    Q. What were your results?
16    A. I had negative results, meaning I did not find
17 a gun.
18    Q. Did you make any inquiries of Mr. Zuppo about
19 the gun?
20    A. I believe I did.
21    Q. And did you then find a gun?
22    A. No, sir.
23    Q. Was there anybody there at the house when you
```

26

```
1    A. The alleged victim, Ms. Reynolds.
2    Q. And she handed them over to you?
3    A. Yes, sir.
4    Q. What did you do with them then?
5    A. I logged them into evidence.
6    Q. So they have been kept in an envelope like
7 that?
8    A. That's correct, put in an evidence envelope and
9 kept for safekeeping at my headquarters.
10    Q. Are those basically in the same conditions that
11 they were handed over to you that night?
12    A. That's correct.
13    Q. Any change, to your knowledge, about them?
14    A. No, sir.
15    Q. So after you had collected your evidence, made
16 your arrest, made sure any bail conditions were
17 appropriate, you then turn the case over?
18    A. That is correct.
19    MR. WALLACE: Thank you. I have nothing
20 further.
21
22    CROSS-EXAMINATION
23
```

28

```
1 went to the house with Ms. Reynolds?
2    A. Yes. Mr. Zuppo was.
3    Q. Anybody else there, sir?
4    A. No, sir.
5    Q. When you first met Ms. Reynolds there at the
6 gas station, was there anybody with her?
7    A. Yes, sir.
8    Q. Who was that, please?
9    A. Can I look in my report?
10    Q. Please.
11    A. That would be helpful.
12    I believe that was a Sean Hackett.
13    Q. May I ask, was he, Mr. Sean Hackett, present
14 while you were making -- when you were interviewing
15 Ms. Reynolds as to her complaint?
16    A. He was present. However, he was in a vehicle.
17 I interviewed Ms. Reynolds in my vehicle, outside of my
18 vehicle initially. Then as I got further involved, I
19 interviewed her in my vehicle.
20    Q. In other words, the questions you were asking
21 her was something that Mr. Hackett could not hear?
22    A. That is correct.
23    Q. He was in his own car?
```

AA-1

```
                        SUPERIOR COURT CRIMINAL DOCKET              Page     1
                        ( as of  08/22/2003 )                               OF
                                                                             7
State of Delaware v.  ANTHONY G ZUPPO                          DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.          AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.               ANTHONY ZUPPO


Assigned Judge:

Charges:
```

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|--------------|-------------|--------|-------------|
| 002 | 0101004412 | IN01030994 | TERROR THREAT | NOLP | 04/23/2001 |
| 003 | 0101004412 | IN01030995 | OFF TOUCHING | NOLP | 04/23/2001 |
| 004 | 0101004412 | IN01030998 | ATT. RAPE 1ST C | NOLP | 04/23/2001 |
| 005 | 0101004412 | IN01030996 | ASSAULT 3RD | NOLP | 04/23/2001 |
| 006 | 0101004412 | IN01030997 | RAPE 1ST INJURY | NOLP | 04/23/2001 |
| 007 | 0101004412 | IN01031000 | KIDNAP 2ND | NOLP | 04/23/2001 |
| 008 | 0101004412 | IN01031001 | KIDNAP 2ND | NOLP | 04/23/2001 |
| 009 | 0101004412 | IN01041810 | KIDNAP 2ND | NOLP | 04/23/2001 |
| 010 | 0101004412 | IN01041874 | TERROR THREAT | NOLP | 04/23/2001 |
| 011 | 0101004412 | IN01041875 | OFF TOUCHING | NOLP | 04/23/2001 |
| 012 | 0101004412 | IN01041876 | KIDNAP 2ND | NOLP | 04/23/2001 |
| 013 | 0101004412 | IN01041811 | ATT. RAPE 1ST C | NOLP | 04/23/2001 |
| 014 | 0101004412 | IN01041812 | RAPE 1ST CRIME | NOLP | 04/23/2001 |
| 015 | 0101004412 | IN01041813 | ASSAULT 3RD | NOLP | 09/24/2001 |
| 016 | 0101004412 | IN01041818 | NONC W/CON BOND | NOLP | 09/24/2001 |
| 017 | 0101004412 | IN01041819 | NONC W/CON BOND | NOLP | 09/24/2001 |
| 018 | 0101004412 | IN01041827 | HARASSMENT | NOLP | 09/24/2001 |
| 019 | 0101004412 | IN01041820 | NONC W/CON BOND | NOLP | 09/24/2001 |
| 020 | 0101004412 | IN01041815 | AGG.ACT/INTIMI. | NOLP | 09/24/2001 |
| 021 | 0101004412 | IN01041821 | NONC W/CON BOND | NOLP | 09/24/2001 |
| 022 | 0101004412 | IN01041822 | NONC W/CON BOND | NOLP | 09/24/2001 |
| 023 | 0101004412 | IN01041816 | AGG.ACT/INTIMI. | NOLP | 09/24/2001 |
| 024 | 0101004412 | IN01041817 | AGG.ACT/INTIMI. | NOLP | 09/24/2001 |
| 025 | 0101004412 | IN01041823 | NONC W/CON BOND | NOLP | 09/24/2001 |
| 027 | 0101004412 | N01041828 | COND OF RELEASE | NOLP | 09/24/2001 |
| 028 | 0101004412 | N01041829 | NON COMP BOND | NOLP | 09/24/2001 |
| 029 | 0101004412 | IN01081606 | PDWDCF | TNG | 02/04/2002 |
| 030 | 0101004412 | IN01081607 | ASSAULT 1ST | TG | 02/04/2002 |
| 031 | 0101004412 | IN01081608 | NONC W/CON BOND | NOLP | 02/04/2002 |
| 032 | 0101004412 | N01041830 | NON COMP BOND | NOLP | 02/04/2002 |
| 033 | 0101004412 | N01041831 | NON COMP BOND | NOLP | 02/04/2002 |
| 034 | 0101004412 | N01041383 | AGG.ACT/INTIMI. | NOLP | 06/20/2001 |
| 035 | 0101004412 | IN01092227 | UNLAW IMPR 1ST | TGLI | 02/04/2002 |
| 036 | 0101004412 | IN01092228 | TERROR THREAT | TNG | 02/04/2002 |
| 037 | 0101004412 | IN01092229 | OFF TOUCHING | TG | 02/04/2002 |
| 038 | 0101004412 | IN01092230 | KIDNAP 2ND | ACQT | 02/04/2002 |
| 039 | 0101004412 | IN01092231 | ATT. RAPE 2nd | TG | 02/04/2002 |
| 040 | 0101004412 | IN01092232 | RAPE 2ND | TG | 02/04/2002 |
| 041 | 0101004412 | IN01092233 | ASSAULT 3RD | TG | 02/04/2002 |
| 042 | 0101004412 | IN01092234 | NONC W/CON BOND | TG | 02/04/2002 |
| 043 | 0101004412 | IN01092235 | NONC W/CON BOND | TG | 02/04/2002 |
| 044 | 0101004412 | IN01092236 | HARASSMENT | TG | 02/04/2002 |
| 045 | 0101004412 | IN01092237 | NONC W/CON BOND | NOLP | 02/04/2002 |

AA-2

```
046    0101004412    IN01092238    AGG.ACT/INTIMI.       TG      02/04/2002
047    0101004412    IN01092239    NONC W/CON BOND       NOLP    02/04/2002
048    0101004412    IN01092240    NONC W/CON BOND       TG      02/04/2002
049    0101004412    IN01092241    AGG.ACT/INTIMI.       TG      02/04/2002
050    0101004412    IN01092242    AGG.ACT/INTIMI.       TG      02/04/2002
051    0101004412    IN01092243    NONC W/CON BOND       TG      02/04/2002
052    0101004412    IN01092226    NONC W/CON BOND       TG      02/04/2002
055    0101004412    IN01092225    PDWBPP                SEV     02/04/2002
```

```
       Event
No.    Date          Event                           Judge
------------------------------------------------------------------------------
1      03/12/2001
       INDICTMENT, TRUE BILL FILED.NO 164
       ARRAIGNMENT AND BAIL REPRESENTATION 04/05/01 AT 08:30
       CASE REVIEW 04/30/01 AT 1:45
2      03/26/2001
       SUMMONS MAILED.
       04/05/2001                              REYNOLDS MICHAEL P.
       ARRAIGNMENT, BAIL STATUS & CONTROL FOR REPRESENTATION CONTINUED.
       NEW DATE SET 041001.
3      04/10/2001                              REYNOLDS MICHAEL P.
       ARRAIGNMENT CALENDAR, CONTINUED.
       042001
4      04/16/2001                              REYNOLDS MICHAEL P.
       BAIL HEARING HELD.
       BAIL SET:
       HELD ON SECURED BAIL  43000.00   100
       COND: NO CONTACT, DIRECT OR INDIRECT WITH VICTIM
       ARR 5/2/01 AT 9:30 A.M.
8      04/23/2001
       REINDICTMENT - TRUE BILL FILED.
5      05/01/2001                              REYNOLDS MICHAEL P.
       ARRAIGNMENT CALENDAR, CONTINUED.
       050801
6      05/01/2001
       NOTICE OF SERVICE & ACKNOWLEDGEMENT OF RECEIPT OF DISCOVERY.
       05/08/2001                              REYNOLDS MICHAEL P.
       ARRAIGNMENT CALENDAR - CONTROL FOR REPRESENTATION CONTINUED.  NEW DATE
       SET. 051501
       05/15/2001                              REYNOLDS MICHAEL P.
       BAIL MODIFIED.  BAIL NOW SET AT
       HELD ON SECURED BAIL              73000.00 100
       NO CONTACT W/VICTIM.
       MTN.REDUSED BAIL - DENIED.
7      05/15/2001
       ARRAIGNMENT CALENDAR, ARRAIGNED.
11     05/15/2001
       NOTICE OF SERVICE & ACKNOWLEDGEMENT OF RECEIPT OF DISCOVERY.
       L. ARLEN MEKLER
9      06/05/2001
       BAIL POSTED IN THE AMOUNT OF $43000.00 BY BOVELL & LOWINGER
```

AA-3

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    3
                      ( as of  08/22/2003 )                            of
                                                                        7
State of Delaware v.  ANTHONY G ZUPPO                          DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.         AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.              ANTHONY ZUPPO


        Event
No.    Date           Event                              Judge
-----------------------------------------------------------------------------
        NEXT DUE BACK AT 1:45 ON 6/18/01
        06/18/2001                               TOLIVER CHARLES H. IV
        CASE REVIEW CALENDAR:  SET FOR FINAL CASE REVIEW.
        072301.
10     06/20/2001
        NOLLE PROSEQUI FILED BY ATTORNEY GENERAL.
        1383, RSN: DISP.ON OTHER CHRGS.
12     07/02/2001
        MOTION TO WITHDRAW AS COUNSEL FILED.
        ARLEN MEKLER
        SCHEDULED 7/9/01.
        07/09/2001                               JURDEN JAN R.
        MOTION TO WITHDRAW AS COUNSEL GRANTED. COUNSEL TO PROVIDE DEFENDANT
        WITH COPY OF SIGNED ORDER BY REGISTERED MAIL.
13     07/09/2001                               JURDEN JAN R.
        ORDER: AND NOW THIS 9THD AY OF JULY, 2001 UPON CONSIDERATION OF THE
        MOTION TO WITHDRAW FILED BY DEFENSE COUNSEL COUNSEL ARLEN MEKLER, IT
        IS HEREBY ORDERED THAT SAID MOTION IS GRANTED.
15     07/16/2001
        LETTER FROM ARLEN MECKLER                     TO MR. ZUPPO
        RE: ENCLOSING A COPY OF THE COURT'S ORDER PERMITTING MR. MECKLER
        TO WITHDRAW AS COUNSEL IN THE CASE.
        07/23/2001                               GEBELEIN RICHARD S.
        FINAL CASE REVIEW:  TRIAL DATE TO BE SET.
        REFERRED TO TTPEND CALENDAR FOR TRIAL DATE SELECTION.
        NO ATTY. / PUT ON THE CONTROL CALENDAR 08/23/01
14     07/25/2001
        LETTER FROM L. ARLEN MEKLER, ESQ    TO MR. ZUPPO
        RE: THE COURT'S ORDER PERMITTING MR. MEKLER TO WITHDRAW AS COUNSEL.
        ATTACHED CERTIFICATE OF SERVICE -SENT CERTIFIED MAIL. PER COURT'S
        ORDER.
17     08/02/2001
        MOTION TO BE RELIEVED AS BONDSPERSON FILED.
        BY ROBERT BOVELL OF DELAWARE BAIL BONDS
        SCHEDULED 8/13
16     08/06/2001
        SUBPOENA(S) MAILED.
18     08/13/2001                               JURDEN JAN R.
        MOTION TO BE RELIEVED AS BONDSPERSON GRANTED.
20     09/24/2001
        REINDICTMENT - TRUE BILL FILED.  #142 (PROBLEM)
19     09/28/2001
```

AA-4

SUPERIOR COURT CRIMINAL DOCKET                    Page    4
( as of  08/22/2003 )                                     of
                                                          7

State of Delaware v. ANTHONY G ZUPPO                    DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.       AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.            ANTHONY ZUPPO

|      | Event |       |       |
|------|-------|-------|-------|
| No.  | Date  | Event | Judge |

NOTICE OF SERVICE - DISCOVERY REQUEST. JAMES BAYARD.

21   11/02/2001
     ORDER SCHEDULING TRIAL FILED.
     TRIAL DATE: 1/29/02
     CASE CATEGORY:     1
     ASSIGNED JUDGE (CATEGORY 1 CASES ONLY): JRS
     UNLESS THE COURT IS ADVISED WITHIN 2 WEEKS OF THE UNAVAILABILITY
     OF NECESSARY WITNESSES, THE COURT WILL CONSIDER THE MATTER READY
     FOR TRIAL.  ABSENT EXCEPTIONAL CIRCUMSTANCES, RESCHEDULING OR
     CONTINUANCE REQUESTS WILL BE DENIED.

22   01/04/2002
     SUBPOENA(S) MAILED.

23   01/25/2002
     STATE'S WITNESS SUBPOENA ISSUED ON 01/17/02 TRIAL 01/29/02
     DAG: WALLACE
     WENDY REYNOLDS
     SEAN HACKETT
     DET O'SULLIVAN NCCPD
     OFFICER ECKERD NCCPD
     OFFICER ESTERLING WPD
     CPL MAYBERRY DSP T1
     PTLM ROGERS WPD
     MARIA MALDONADO
     JOANNE KRATZ
     HERMO RIVERA
     LANCE EVANS

24   01/29/2002                          VAUGHN JAMES T. JR.
     TRIAL CALENDAR- WENT TO TRIAL JURY

25   02/04/2002
     ORDER: THE MOTION FOR JUDGMENT OF AQUITTAL GRANTED AS TO COUNT IV,
     KIDNAPPING SECOND DEGREE.
     SINCE THE KIDNAPING CHARGE WAS ALSO THE UNDERLYING FELONY WHICH
     ELEVATED THE ATTEMPTED RAPE AND RAPE CHARGES TO FIRST DEGREE, THEY
     ARE NOW REDUCED TO ATTEMPTED RAPE IN THE SECOND DEGREE AND RAPE IN
     THE SECOND DEGREE, RESPECTIVELY.
     IT IS SO ORDERED.

26   02/04/2002                          VAUGHN JAMES T. JR.
     JURY TRIAL HELD.
     JUDGE VAUGHN AND JUDGE GEBELEIN (VERDICT ONLY)
     COURT CLERK: C. MILSOM
     COURT REPORTER: VERECHIA, MORGANO, FARRELL, AND DONNELLY
     DEFENSE ATTY: JAMES BAYARD

AA-5

SUPERIOR COURT CRIMINAL DOCKET                    Page    5
( as of  08/22/2003 )                                    of
                                                         7

State of Delaware v.  ANTHONY G ZUPPO                    DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.        AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.             ANTHONY ZUPPO

        Event
No.    Date              Event                          Judge
-----------------------------------------------------------------------------
        STATE'S ATTY: PAUL WALLACE
        MOTIONS: 1. DEFT'S MTN TO SEVER COUNT 21 OF INDICTMENT. DECISION:
        GRANTED. 2. DEFT ZUPPO'S MTN FOR NEW COUNSEL. DECISION: DENIED. 3.
        DEFT ZUPPO'S MTN TO REPRESENT HIMSELF. DECISION: DENIED. 4. DEFT'S MTN
        FOR JUDGEMENT OF ACQUITTAL. DECISION: DENIED. 5. DEFT'S MTN FOR
        ACQUITTAL ON COUNT 4. DECISION: GRANTED.
        DEFT WAIVED HIS RIGHT TO DOUBLE JEPORDY.
        TRIAL DATES: 01/29/02, 01/30/02, 01/31/02, 02/01/02, AND 02/04/02.
        PSI ORDERED. SENTENCING DATE 04/05/02. BAIL REVOKED.
        JURY FOUND DEFT GUITLY OF UNLAWFUL IMPRIS. 1ST DEGREE (LIO)(2227),
        OFF TOUCHING (2229), ATTEMPTED RAPE 2ND DEGREE (2231), RAPE 2ND DEGREE
        (2232), ASSAULT 3RD DEGREE (2233), NON COMP W/ BOND COND (2234), NON
        COMP W/ BOND COND (2235), HARASSMENT (2236), AGG ACT OF INTIMIDATION
        (2238), NON COMP W/ BOND COND (2240), AGG ACT OF INTIMIDATION (2241),
        AGG ACT OF INTIMIDATION (2242), NON COMP W/ BOND COND (2243), NON
        COMP W/ BOND COND (2226), AND ASSAULT 2ND DEGREE (1607). JURY FOUND
        DEFT NOT GUILTY OF TERROR THREAT (2228) AND PDWDCF (1606). JUDGE
        SEVERED PDW AND/ OR AMMUNITION (2225). STATE NP NON COMP W/ BOND COND
        (2237), NON COMP W/ BOND COND (2239), AND NON COMP W/ BOND COND (1608)
        KIDNAPPING 2ND DEGREE (2230) WAS ACQUITTED. EXHIBITS GIVEN TO
        CRIMINAL DEPUTY EDGAR JOHNSON TO BE PUT IN VAULT.
27    02/04/2002                                VAUGHN JAMES T. JR.
        CHARGE TO THE JURY FILED.
28    02/28/2002
        STATE'S SUPPLEMENT SUBMISSION FOR SENTENCING FILED.
        FILED BY PAUL WALLACE, DAG
        04/11/2002                              VAUGHN JAMES T. JR.
        SENTENCING CALENDAR: DEFENDANT SENTENCED.
32    04/11/2002                                VAUGHN JAMES T. JR.
        SENTENCE: ASOP ORDER SIGNED AND FILED.
29    04/15/2002
        STATE'S SUUPLEMENT SUBMISSION FOR SENTENCING.
        FILED BY PAUL WALLACE, DAG.
30    04/19/2002
        LETTER FROM SUPREME COURT TO KATHLEEN FELDMAN, COURT REPORTER
        RE: THE NOTICE OF APPEAL WAS FILED IN THE ABOVE CAPTIONED MATTER
        ON APRIL 15, 2002. THE TRANSCRIPT IS DUE TO BE FILED WITH THE
        PROTHONOTARY NO LATER THAN MAY 28, 2002.
        208, 2002
31    04/29/2002
        TRANSCRIPT FILED.
        SENTENCING TRANSCRIPT. APRIL 11, 2002.

AA-6

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    6
                       ( as of  08/22/2003 )                            of
                                                                        7
State of Delaware v.  ANTHONY G ZUPPO                           DOB: 05/06/1965
State's Atty: PAUL R WALLACE , Esq.          AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.               ANTHONY ZUPPO


        Event
No.     Date          Event                                Judge
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
        BEFORE JUDGE VAUGHN.
36      05/01/2002
        LETTER FROM PAUL WALLACE, DEPUTY ATTOREney GENERAL TO JUDGE VAUGHN
        RE: THIS MATTER WAS BEFORE THE COURT FOR SENTENCING ON APRIL 11, 2002.
        AT THAT TIME THE STATE WAS GRANTED 30-DAY LEAVE TO RESOLVE ANY
        FURTHER ISSUES. OUR OFFICE HAS CONTACTED THE VICTIM, MS. REYNOLDS, AND
        SHE IS REQUESTING NO DIRECT RESTITUTION IN THIS MATTER. I BELIEVE IT
        IS SIMPLY HER HOPE TO SEVER ALL TIES WITH THE DEFENDANT AND THEREFORE
        IS WILLING TO FOREGO ANY RESTITUTION WHICH MAY BE OWNED TO HER. THUS,
        THE ONLY RESTITUTION NECESSARY IS THAT TO THE VIOLENT CRIMES COMPEN-
        SATION BOARD AS SET FORTH IN THE PRE-SENTENCE REPORT. THE STATE WOULD
        REQUEST THAT THE COURT ORDER SUCH RESTITUTION.
33      05/09/2002
        TRANSCRIPT FILED.
        TRIAL TRANSCRIPT. JANUARY 31, 2002.
        BEFORE JUDGE VAUGHN.
34      05/09/2002
        TRANSCRIPT FILED.
        TRIAL TRANSCRIPT. FEBRUARY 1, 2002.
        BEFORE JUDGE VAUGHN.
35      05/10/2002
        TRANSCRIPT FILED.
        TRIAL TRANSCRIPT. JANUARY 30, 2002.
        BEFORE JUDGE VAUGHN.
37      05/28/2002
        TRANSCRIPT FILED.
        TRANSCRIPT OF CLOSING ARGUMENTS AND JURY CHARGE. FEBRUARY 4, 2002.
        BEFORE JUDGE VAUGHN.
42      06/03/2002
        LETTER FROM:ANTHONY ZUPPO                        TO:PROTHONOTARY
        MR. ZUPPO ASKED THAT PROTHONOTARY MAKE A COPY OF HIS LETTER &
        SENTENCING ORDER & REQUESTED THAT HIS INFORMATION BE FORWARD TO MR.
        BAYARD, PUBLIC DEFENDER. LETTER WAS SENT TO MR. BAYARD ON 7/15/02.
38      06/04/2002
        RECORDS SENT TO SUPREME COURT.
39      06/04/2002
        RECEIPT FROM SUPREME COURT ACKNOWLEDGING RECORD.
40      06/05/2002
        LETTER FROM SUPREME COURT TO SHARON AGNEW, PROTHONOTARY
        RE: THE COURT REPORTER'S NOTICE OF THE FILING OF THE FINAL
        TRANSCRIPT WAS FILED WITH THE PROTHONOTARY ON MAY 28, 2002.
        THE RECORD AND TRANSCRIPT MUST BE FILED WITH THIS OFFICE
```

AA-7

SUPERIOR COURT CRIMINAL DOCKET                    Page    7
( as of  08/22/2003 )                                      of
                                                            7

State of Delaware v.  ANTHONY G ZUPPO                    DOB: 05/05/1965
State's Atty: PAUL R WALLACE , Esq.      AKA: ANTHONY ZUPPO
Defense Atty: JAMES A BAYARD , Esq.           ANTHONY ZUPPO

| No. | Event Date | Event | Judge |
|-----|-----------|-------|-------|
| | | NO LATER THAN JUNE 10, 2002. | |
| | | 208, 2002 | |
| | | (SENT 06/04/02) | |
| 41 | 06/10/2002 | | |
| | | DEFENDANT'S LETTER FILED. | |
| | | RE: COPY OF MOTION FOR TRANSCRIPT OF RECORD SENT TO PD. AND ATTORNEY | |
| | | GENERAL'S OFFICE | |
| 43 | 06/20/2002 | | |
| | | LETTER FROM: ANTHONY ZUPPO TO: MR. BAYARD | |
| | | RE:TRIAL TRANSCRIPTS | |
| 44 | 07/29/2002 | | |
| | | LETTER FROM:ANTHONY ZUPPO  TO: MR.BAYARD | |
| | | RE: TRIAL TRANSCRIPTS AND RULE 16 | |
| 45 | 08/14/2002 | | |
| | | DEFENDANT'S LETTER FILED. | |
| | | TO: JAMES BAYARD | |
| | | REPLY TO THE STATES ANSWERING BRIEF. | |
| | | COPY OF LETTER SENT TO MR. BAYARD. | |
| 46 | 10/24/2002 | | |
| | | MANDATE FILED FROM SUPREME COURT:  SUPERIOR COURT JUDGMENT AFFIRMED. | |
| | | SUPREME COURT CASE NO: 208, 2002 | |
| | | SUBMITTED: SEPTMEBER 10, 2002 | |
| | | DECIDED: OCTOBER 4, 2002 | |
| | | BEFORE VEASEY, CHIEF JUSTICE, HOLLAND AND STEELE. | |
| 48 | 03/28/2003 | | |
| | | DEFENDANT'S LETTER FILED. | |
| | | RE: DEFT IS REQUESTING DOCUMENTS FROM DEFENSE ATTY | |
| 47 | 05/23/2003 | | |
| | | DEFENDANT'S LETTER FILED. COPY TO COURT. LETTER TO JUDGE VAUGH ADDRESS | |
| | | ING DISATISFACTION WITH DEFENSE COUNSEL. | |
| 49 | 07/21/2003 | | |
| | | DEFENDANT'S LETTER FILED. | |
| | | TO: J. BAYARD | |
| 50 | 07/21/2003 | | |
| | | MOTION FOR TRANSCRIPT FILED PROSE.  REFERRED TO JUDGE | |

*** END OF DOCKET LISTING AS OF  08/22/2003 ***
PRINTED BY: CSCVELL

AA-8

STATE V. ZUPPO

9

THE COURT: We have rules of evidence and those
are the rules under which decisions are made as to
whether this particular document or that particular
document is admittable. I may have misspoke, I don't
know whether Ms. Reynolds is still available to be
called or not. I am going to, at this point, to defer
to counsel to see whether they wish to address those
points that the defendant is bringing up.

MR. WALLACE: Your Honor, the State, both sides
have rested, and certainly Mr. Zuppo may read certain
things. He did not read everything. He reads selected
bits and pieces. For instance, Mr. Reynolds' account of
what happened on the first day, if you recall the very
question I asked Detective O'Sullivan was who has more
time to sit down and talk to her and make sure
everything is right. Who taped the statement, things
like that. Most probably -- I don't speak for
Mr. Bayard, he can speak for himself -- she went over --
Detective O'Sullivan went over those very things with
her during the taped statement, said wait a minute
police report said there no. He must have written that
down incorrectly. Certainly Mr. Bayard being the long
term attorney that he is knows what is helpful to him

10

and what may hurt him.

You know, what seems to be inconsistency to
Mr. Zuppo may be explained earlier in the case and
Mr. Bayard didn't waste his time on that. We will go
through a great waste of time. Mrs. Reynolds is not
available any longer. She has gone back out of state.
I released her when they closed evidence. He kept her
here just in case we had rebuttal until Friday
afternoon.

Secondly, we would have to call a couple
witnesses, call patrolman Eckerd, say it is possible
that I made a mistake, call Detective O'Sullivan to
explain that again, go through the taped statement she
took from Mrs. Reynolds.

Mr. Zuppo wants to complain that certain things
were not done. Certainly, from the perspective of the
State everything has been done that Mr. Bayard could do
up to this point. Something that he hasn't done, he
probably has great reason for and to attempt to open
that case back up simply to satisfy Mr. Zuppo, the State
would be greatly prejudiced by this. We can't call
those witnesses back.

MR. BAYARD: Your Honor, again, the trial

11

attorney does have the responsibility of asking
decisions as to how case is going to be run. And having
the information in front of myself, having looked at it,
having talked to Mr. Zuppo, having had a chance to speak
to Mr. Wallace in this matter, I think what was
presented is what I was hoping the jury would hear
clearly during the course of the trial. There may be
disagreement between counsel and client as to what
should or should not have been presented. Ultimately
this is the attorney's responsibility to make those
decisions as to what would be presented.

I think what has been presented is appropriate.
To start going off in the finite detail that Mr. Zuppo
is looking at, I can't see to be productive for him in
the long run. It is the long run for this gentleman is
the objective of, you know, his reputation here.

THE DEFENDANT: I can understand Mr. Bayard's
point, especially Mr. Wallace wants a conviction. I can
understand that. I hope he would want the truth. He
said that in the statement could have given different to
Mrs. O'Sullivan, to the police officer when
Mrs. O'Sullivan's statements speak with Wendy. I mean,
how different can you get. The woman is raped. She is

12

going to show she is on her -- not to be ignorant -- on
her back or stomach when she is raped. I mean, the
State what Officer Eckerd wrote down Wendy said she was
thrown down on her stomach, held down, pants were pulled
off. While she is still on her stomach nothing about
any toy other thing into, on or to her anything them you
know was supposedly insert myself, then ejaculate all
over her back. That is totally different than
everything else, first thing she gave.

Also in what I can read, what I overlook
Mr. Bayard stated in one of them statements that I get
all the evidence to be able to look at to this evidence.
That I didn't see. I requested to hear both statements
that were given from my wife. You know, I would like to
hear them, see if they are different. The only person
that heard them would be three gentleman, two gentlemen
and a lady. Right now I don't know how they -- what is
on there. I don't know what is different. I don't know
if I am just looking at something that are totally
different than what is down. We want the truth to come
out.

We have the first statement from the police she
gave to them then you have second statement she gave to

13

1  Detective O'Sullivan. Than you have the journal. All
2  three are different, specifically the difference. They
3  wind up going to the Attorney General's office, indict
4  me on the charges. It is like a story. That is got all
5  three into one, and exaggerates with which is I don't
6  know that is not saying that is something wrong with
7  that when it is out on the other end of the line. It
8  scares heck out of me.
9        Also in her journal on the Fifth, not in
10  evidence states in, Your Honor, all we did we fought all
11  night. There was nothing stated on the stand if she is
12  write down in her hone a diary of what happened, that
13  has to be the facts. What if the other stuff is not
14  true either. All of this is clashing with everything
15  else said by the State, if you understand what I am
16  saying.
17        Also the tape from the preliminary hearing, I
18  feel that shouldn't be too much trouble entered into
19  evidence. We have Detective O'Sullivan, the one that
20  spoke on the tape. She could be cross examined if she
21  had to about it. That is something they can hear also
22  for the -- I mean, like I said, not scared of the
23  possession. I am little bit -- I never did touch a

14

1  knife. I told Mr. Bayard supposedly cut my throat on
2  the stand everything. Everything, one thing I am liar
3  said something smart to start an argument, my wife got
4  cut by it. I am not happy. I am willing to take the
5  charge possession. I did not do -- I didn't want to get
6  in trouble for something I did not do.
7        Tape also does state, they state Wendy said
8  that I did try to take the knife from her, never stated
9  if I got the knife, didn't say that I walked away with
10  the knife. Just states that I tried to, if I did.
11  Didn't say anything with I threw her against the wall.
12  Like I said, also states that, if I recall correctly,
13  this time that wasn't intentional for a woman to say
14  sitting down and talking to the detective in her stating
15  wasn't intentional. That witness stood up on the stand
16  say he rammed into me, threw me up against the wall, had
17  a knife. That is two different sides of the spectrum.
18  That is something I hope the jury, you know, would at
19  least be able to see that, if not anything, at least
20  that.
21        THE COURT: Well --
22        MR. BAYARD: Your Honor, I think the record
23  should be made there was two taped statements made by

15

1  Mrs. Reynolds and one by Mr. Zuppo. The prison does not
2  allow tape recorders there to be brought into the
3  prison as I sat, I listened to it, I took notes. Those
4  notes were viewed with the gentleman. So he did not
5  hear the actual words, but he was certainly the contents
6  were shared with him.
7        THE COURT: All right. First of all, in
8  response to Mr. Zuppo I don't see anything. I would
9  like to just state for the record I see absolutely
10  nothing wrong at all with the facts that the State told
11  Mrs. Reynolds to go on back to wherever she lives
12  because on Friday someday both sides has rested.
13  Nothing wrong with that at all. As to that other issues
14  you are raising, like I say, the journal is in evidence.
15  Mrs. Reynolds was examined and cross examined. You gave
16  your statement and were cross examined. I don't think
17  that there is sufficient cause shown to reopen your case
18  even if your attorney asked for that.
19        So to the extent that you are asking to reopen
20  the case to present additional evidence on your own
21  and -- well, I am just going to say you have not shown
22  sufficient cause. I am --
23        THE DEFENDANT: Nothing for the statement, for

16

1  Sean's police report --
2        THE COURT: You have shown insufficient cause
3  to allow you to reopen your case. I am not going to do
4  that. I will follow up on one thing when I came into
5  the courtroom this morning, the attorneys could see that
6  I had ruled on this kidnapping issue. You know from the
7  one that corresponded with the alleged rape. I also
8  came in here intending to inform the attorneys that I,
9  when I was making that decision, I also did decide to
10  reserve decision on that possession of a firearm during
11  the commission of a felony. I'm going to reserve
12  decision on that count, going to submit that to the
13  jury.
14        I will, you know, that will be a reserved part
15  of the motion for motion of judgement of acquittal. All
16  other aspects for the judgement are decided as they have
17  either been approved or reserved. I am also going to
18  inform counsel I am going to file a brief written order
19  on Count 4, kidnapping charge which you will both
20  receive, will be after, you know, we are done today.
21  Anything further?
22        THE DEFENDANT: Apologize for taking your time.
23        THE COURT: That is all right.

AA-10

Dear Mr. Hawthorne,                    Feb, 6, 02

I'm sorry for writing you again.
Thankyou very much for you quick response!
What I really needed in the letter you
sent back was that it is posable for
a Public Defender to bring taped statements
to his client in jail for client to listen
to, in other words can the Public Defender
play a recorded statement on his recorder
to his client. Does it have to be at a
interview room in booking or can it be in
the one on the pod?.

Thankyou again for your time and
soon awaited response. And again I'm
truly sorry for writing back to you after
recieving your first letter.

                              Sincerly
                              ~~Anthony Zuppo~~

                              Anthony Zuppo
                              283480
                              2F  cell #15

Yes But it is the Public
Defender's responsibility
to make these Arraingings
not you.

Arr →

2-1-11

37

1    A. That's correct.

2    Q. Is that when she specifically told you about

3  what had happened the night before; we had an argument;

4  he wouldn't let me leave?

5    A. That's correct.

6    Q. Now, sir, did you do a police report in this

7  case?

8    A. Yes, I did.

9    Q. And did you try to put in there in caption what

10  Ms. Reynolds told you about that night before, January

11  5th, and what had happened to her?

12    A. Yes.

13    Q. I'm going to ask you to look at page 2 of your

14  report, if you don't mind.

15    A. Okay. Which report? My report?

16    Q. Yes. Your report, page 2, down towards the

17  bottom where it says "statement."

18    A. Yes.

19    Q. Is that where you would have said what

20  Ms. Reynolds told you that night?

21    A. That's correct.

22    Q. Okay. Could you read over it and tell the

23  ladies and gentlemen of the jury as best you can what

38

1  specifically she was able to tell you.

2    (Pause.)

3    THE WITNESS: She explained she had had an

4  argument with her boyfriend overnight and that argument

5  had gotten physical and that she wanted to leave the

6  residence. And she told him it was over, the

7  relationship was over. And he then grabbed her and

8  pulled her into the back bedroom.

9  BY MR. WALLACE:

10    Q. Did she say what he did right after he grabbed

11  her and pulled her into the bedroom?

12    A. Yes, she did. However, that's on another

13  report. That's on the rape investigation.

14    Q. Okay. Let me ensure that we have the right --

15    A. Okay.

16    (Pause.)

17  BY MR. WALLACE:

18    Q. I'm going to ask you to take a look...

19    The report that has the risk assessment part of

20  it, three-page report?

21    A. Yes.

22    Q. Looking to statement -- this is where -- I

23  apologize. Yours was run off on a different printer

39

1  than mine, so we're at different places.

2    She said he grabbed her and pulled her back

3  into the bedroom. What happened then?

4    A. Alleged victim stated she started screaming

5  and --

6    Q. Before that what happened?

7    A. Oh, the defendant climbed on top of her and

8  started choking her.

9    Q. How did he choke her?

10    A. By squeezing her throat.

11    Q. Then what happened?

12    A. She started screaming. And the defendant

13  released her throat and put his hands over her mouth.

14  And the victim -- the alleged victim stated that she

15  felt suffocated and then attempted to kick him off.

16    Q. And then what did she say happened?

17    A. She said she got -- the defendant got off of

18  her and told her he would kill her with a nine

19  millimeter handgun that he had hidden in the residence

20  if she had left him.

21    She stated -- she indicated she was able to

22  leave the residence about 14:00, or two o'clock that

23  afternoon, by lying to the defendant and telling him she

40

1  was going to the store.

2    Q. Based on the fact that she said he had

3  threatened her with a handgun that he supposedly had

4  hidden in the residence, is that why you would have put

5  in the risk assessment gun and suspect may have one

6  accessible?

7    A. That's correct.

8    Q. And you did search for a gun but none was

9  found; correct?

10    A. Yes, sir, I did.

11    Q. The conversation that you had with

12  Ms. Reynolds, what was her emotional state as she's

13  talking to you?

14    A. She appeared nervous at first and then

15  everything -- she started -- opened up and started

16  giving me a lot of information at once.

17    Q. Were you asking her a lot of questions or was

18  she doing a lot of talking to you?

19    A. She did a lot of the talking.

20    Q. Were you trying to pull things out of her?

21    A. No, sir, not at all.

22    Q. You said earlier to Mr. Bayard just kind of

23  stumbled on it?

AA-12

61

1    Q. Mr. Bayard just asked you questions about
2  whether or not you did, in fact, attempt suicide?
3    A. Yes.
4    Q. And you did, correct?
5    A. Yes.
6    Q. And you did leave, in fact, a note; didn't
7  you?
8    A. Yes.
9      MR. BAYARD: Your Honor, my client and I have
10  had access to these documents before, and there's no
11  objection.
12      MR. WALLACE: I would ask that these one-page
13  notes, which I'll have the witness describe, be marked
14  as the next State exhibits, and then the next,
15  Harassment, by me, by the Attorney General, marked as
16  the exhibit.
17      THE PROTHONOTARY: So marked as State's
18  Exhibits 13 and 14.
19          · · ·
20      (Whereupon, letters were marked State's
21  Exhibits Nos. 13 and 14 into evidence.)
22          · · ·
23  BY MR. WALLACE:

62

1    Q. Miss Reynolds, I'll show you what's been
2  marked as State's Exhibits 13 and 14.
3    Do you recognize those two documents, ma'am?
4    A. Yes.
5    Q. Did you, in fact, generate the note, for lack
6  of a better term, the suicide note?
7    A. Yes.
8    Q. Is that how you felt at that time?
9    A. Yes.
10    I thought that if I died, then I would be out
11  of the relationship, and he wouldn't be able to
12  threaten me anymore, and that he would go free because
13  of my statement after I'm dead.
14    Q. How about the second note, "Harassment by the
15  Attorney General," how did that come to be generated?
16    A. He told me over the phone that I had to say
17  that the State was harassing him. He said the State
18  was harassing him, and that they -- that I had to say
19  that the State forced me to do all those things.
20    Q. Ma'am, have you ever been forced by the State
21  to say anything?
22    A. No.
23    Q. Have you disagreed with the detective at

63

1  times on what she did or how she acted in the
2  investigation of this case?
3    A. At the time I did.
4    Q. Why did you?
5    A. Well, at the time, I couldn't see that they
6  -- that everyone was looking out for my safety, and at
7  the time I thought that everyone was against me.
8    Q. Did you feel like you would be helped by
9  anyone?
10    A. No.
11    Q. Mr. Bayard asked you a little bit about
12  medications that you're taking now.
13    A. Yes.
14    Q. Was that ever a point of contention between
15  you and the defendant during your relationship about
16  when, or if, you took your medications?
17    A. He didn't want me to take any medication.
18    Q. How did he express that to you?
19    A. He said I couldn't take any medication.
20    Q. Did he ever physically take them from you?
21    A. I can't say that he actually did. I'm not --
22  I don't really remember.
23    Q. Did you ever stop taking medication because

64

1  of him?
2    A. Yes.
3    Q. Why?
4    A. (No response).
5    Q. I guess what brought about that is my
6  question.
7    A. I can't remember why. It seems to me that he
8  didn't like the sexual side effects, because you don't
9  really want to have sex, but I can't swear to that.
10    Q. Did you stop taking them?
11    A. Yes.
12    Q. Attached to one of your letters trying to get
13  him out of trouble, the one that's got the caption,
14  "Wendy Reynolds, April 15th, 2001," State's Exhibit
15  No. 1, do you remember this letter?
16    A. Yes.
17    Q. In fact, you attached a doctor's note there,
18  correct?
19    A. Yes.
20    Q. From a treating doctor that you had?
21    A. Yes.
22    Q. How did that note come about to be made?
23    A. Tony told me I needed to get a note from the

A A-13

65

1  doctor, and that he wanted to blame everything on the
2  medication, so I did what he told me to do. I went to
3  the doctor.
4       The doctor got out the Physicians' Desk
5  Reference, the PDR manual, and we had to look up
6  symptoms to find symptoms that we could use in the
7  letter.
8       Q. Did you really have those symptoms when you
9  were taking the medication?
10      A. No.
11      Q. Does it make you more confused and --
12      A. No. We pulled these directly from the
13  Physicians' Desk Reference.
14      Q. But are those symptoms that you actually had?
15      A. No.
16      Q. Did you tell the doctor what it was for?
17      A. Yes.
18      Q. Ma'am, going back to the voice mail messages
19  left for you on January 9th, did you actually hear the
20  voice mail messages left on your voice mail at work?
21      A. I did, but I don't remember what he said.
22      Q. At the time, were you able to identify them
23  as Mr. Zuppo's voice?

66

1       A. Yes.
2       Q. Was there any doubt in your mind it was his
3  voice?
4       A. No.
5       Q. How many times have you spoken to him on the
6  phone?
7       A. More than I could count.
8       Q. When -- when you were at work, did you ever
9  have difficulties in your employment because of Mr.
10 Zuppo calling you or visiting you or anything like
11 that?
12      A. Well, yes.
13      He called all the time, and if I didn't
14 answer the phone, then I had to explain myself of why
15 I didn't answer the phone or why I was on the phone.
16 He also showed up there, and he would sneak past
17 security and come up in the building.
18      Q. Did they ever make for difficult times for
19 you at work?
20      A. Yes, it was very uncomfortable. My boss
21 didn't appreciate that because he's not supposed to do
22 that. He's not supposed to be there.
23      Q. Did you ever tell him not to do these things?

67

1       A. Yes, but I told him he's not supposed to do
2  that and basically he didn't care.
3       Q. Did there come a point towards the end of
4  your employment there that all of the circumstances
5  surrounding your dealings with Mr. Zuppo made it very
6  difficult for you at work?
7       A. Yes.
8       Like I said, he called all the time. He took
9  me to and from work. I didn't have any freedom. If I
10 talked to a client on the phone for a long -- because
11 I used to do trouble-shooting -- so sometimes I'd be
12 on the phone for a while, and when he called, he'd
13 start paging if I didn't answer, and later on he gave
14 me a cell phone and I had to answer that, which I had
15 to keep on me.
16      Q. Mr. Reynolds, is anyone forcing you to
17 testify today?
18      A. No.
19      Q. Are you getting any financial benefit from
20 testifying?
21      A. No.
22      Q. What's your financial status after being
23 involved with Mr. Zuppo?

68

1       A. I don't have a financial status. I don't
2  have anything.
3       Q. Where did all your money go?
4       A. The retirement money, you mean?
5       Q. Any money that you had.
6       A. Whatever I had, I've either spent on
7  transportation or for doctors, medications, things
8  like that.
9       Q. Did you gain any money from coming forward
10 with these allegations against Mr. Zuppo?
11      A. No.
12      Q. Getting any money from him because of the
13 divorce or anything like that?
14      A. No.
15      Q. Are you currently trying to get divorced?
16      A. Yes.
17      Q. On December 18th, did Tony Zuppo punch you?
18      A. Yes.
19      Q. On January 3rd, did he force sex upon you?
20      A. Yes.
21      Q. On January 5th of 2001, did he choke you and
22 threaten to use a .9 millimeter on you?
23      A. Yes, he did.

A A-14

137

1   A. Yes.
2   Q. -- to the morning of the 18th, did she come
3   back after she had been to Bankshots?
4   A. Yes.
5   Q. And then she left your place?
6   A. Yes.
7   Q. Did she come back anymore after that, sir?
8   A. No.
9   Q. Would it be fair to say she didn't return to
10  your house, and after she left somewheres between the
11  17th and 18th, until the daytime hours of the 18th?
12  A. Correct.
13  Q. And that's when she announced that she was
14  moving out?
15  A. Correct.
16  Q. And when she did move out, did I understand
17  that this met with your disfavor and you did not think
18  this was advisable?
19  A. I didn't like the idea, but I also told her
20  that she couldn't live here anymore.
21  Q. In other words, if she chose to leave at that
22  point, you did not want her to come back to your
23  place?

138

1   A. I didn't want to break the No Contact Order
2   that was involved if she went back to him. If she was
3   going to live there, it put me in jeopardy.
4   Q. So, concern for your own self, you, in part,
5   that's why you said, "Look, if you want to leave,
6   that's okay, but you're not coming back here?"
7   A. Yes.
8   Q. Okay.
9   When she was under your roof paying money as
10  a tenant, did you ever set any conditions for her as
11  to her contact with Mr. Zuppo, like you can't have
12  anyone over, or please invite him over or any of that
13  nature?
14  A. Yes.
15  Q. What conditions did you set for her?
16  A. I just stated that she should follow the
17  police rule, not make any contact with him.
18  Q. You indicated there was a phone call there
19  around March the 16th?
20  A. Uh-huh.
21  Q. Just before St. Patrick's Day, and you heard
22  phrases like, 'watch your back' and 'your days are
23  numbered'?

139

1   A. Uh-huh.
2   Q. Was there amplification on the two phrases,
3   sir?
4   A. They sounded somewhat intimidating.
5   Q. Somewhat intimidating?
6   A. Yes.
7   Q. But was there amplification as to how these
8   -- or other than just what you said, they just sounded
9   intimidating?
10  A. Define "amplification".
11  Q. How should you watch your back, when should
12  you watch your back.
13  A. No. It was a short and sweet message.
14  Q. When you saw him there in the parking lot of
15  Denny's, that was the night, early morning hours
16  between the 17th and the 18th?
17  A. That's correct.
18  Q. And at that time, he just basically told you
19  to mind your own business?
20  A. That and he threatened me; yes.
21  Q. And you just hung around for a while, and
22  then seeing she was okay, you left?
23  A. I reluctantly left. She said she would

140

1   follow home shortly.
2   Q. And, in fact, she did not?
3   A. No, she did not.
4   Q. You indicated that you -- when she did leave,
5   that you went to her diary, photocopied her diary,
6   gave a photocopy to the State?
7   A. Correct.
8   Q. Was there any other documents that you
9   provided the State with that belonged to her?
10  A. Yes.
11  Q. Do you recall what they were, sir?
12  A. Yes. There were digital picture files.
13  Q. Now, help me understand what a digital
14  picture file is.
15  A. It could be a photograph from a digital
16  camera saved into an electronic file.
17  Q. Could you describe the photos were talking
18  about?
19  A. It was a collection in an album of
20  photographs of bruises on Wendy's body.
21  Q. Okay, and these you provided the State?
22  A. Yes.
23  Q. Other than what you just described to us, was

209

1  Mr. Zuppo was living at with Miss Reynolds?
2      A. That's correct.
3      Q. What was that?
4      A. A diary in which there were entries regarding
5  the January 6th alleged rape, as well as a digital
6  camera and some mail and other documents that might
7  prove to be evidence of breach of release in this
8  case.
9      Q. Okay.
10         The mail was basically things with Ms.
11  Reynolds' name and that address on it; is that
12  correct?
13      A. That's correct.
14      Q. You talked about the digital camera. What
15  part did that play?
16      A. I was advised by the Attorney General's
17  Office that Sean Hackett had reported to them that he
18  had taken some photographs --
19      MR. BAYARD: Your Honor, could we approach
20  for a minute, please?
21              . . .
22      (Sidebar conference held as follows:)
23      MR. BAYARD: I have an objection to make

211

1  showed those to Mr. --
2      MR. BAYARD: They are one inch by one inch
3  photos. Nobody can --
4      MR. WALLACE: Nobody can blow them up. If
5  he's not going to mention them, he's not going to say
6  where are those things if the State had them --
7      MR. BAYARD: I'm not going to bring it up.
8  It would be hypocritical --
9      THE COURT: With him, then that's fine. She
10  was about to say that the Attorney General's Office
11  told her so and such and such, and that's hearsay
12  anyway. So, I'll sustain the objection.
13      You say these are -- why didn't you say
14  anything when Mr. Hackett was testifying?
15      MR. BAYARD: Because at that point the State
16  made reference to them in the oblique, and now what I
17  thought we were doing was laying the foundation for
18  bringing in the photos, and my concern was they would
19  get before the jury.
20      THE COURT: I'll sustain the objection.
21              . . .
22      (Sidebar conference concluded.)
23              . . .

210

1  about the digital camera and the pictures that were
2  taken. It's something we only learned about here
3  today for the first time, and it's not been provided
4  in discovery. It seems to be inappropriate to develop
5  it further, because we haven't had a chance to
6  evaluate it, look at it, even formulate any thoughts
7  about it. It's just something that kind of came up
8  today, and I'm asking the Court to exclude any further
9  comments with reference to the individual camera, much
10  less any pictures that came from it.
11      To the State's credit, they have not tried to
12  enter the pictures. I'm --
13      MR. WALLACE: I don't plan on doing that.
14  Mr. Hackett mentioned them. I simply don't want to --
15  (inaudible) -- where are the pictures, because what
16  Detective O'Sullivan would say -- (inaudible) -- they
17  couldn't actually, and that's why they are not here.
18      If there's not going to be argument --
19  (inaudible) --
20      THE COURT: What happened to the pictures?
21      MR. WALLACE: They were in digital files.
22  Problem is that nobody seems to have the right
23  software to get them out. There's a thumbnail, and I

212

1  BY MR. WALLACE:
2      Q. Detective O'Sullivan, I want to concentrate
3  on the diary itself.
4      A. Okay.
5      Q. Did -- did you go to 107 Lea Road to get the
6  diary?
7      A. Yes, I did.
8      Q. Did you discuss that with Ms. Reynolds?
9      A. Yes, I did.
10      Q. Did you have a search warrant at that time to
11  try to get it?
12      A. Yes, I did.
13      Q. What did you say to her about the diary?
14      A. Told her that I was going into the residence
15  to look for a diary.
16      Q. What did she say about it?
17      A. She told me that not to waste my time, that
18  she had destroyed the diary because she didn't want
19  Anthony to know about it.
20      Q. What did you say to her?
21      A. Told her I was going to look anyway.
22      Q. Was it -- was this a friendly conversation
23  you had with Miss Reynolds?

AA-16

LAW OFFICE

# JEROME M. CAPONE

ATTORNEY-AT-LAW

TOWNE CENTER, SUITE 200
4 EAST 8TH STREET
WILMINGTON, DELAWARE 19801

TELEPHONE (302) 654-3260
TELECOPIER (302) 655-5358

May 4, 2001

Paul Wallace, Esq.
Deputy Attorney General
Department of Justice
State Office Building
9th and French Streets
Wilmington, DE 19801

RE: Anthony Zuppo

Dear Paul:

I represent Wendy Reynolds, the complaining witness in your case against Anthony Zuppo. She has retained me to advise you that the charge of Rape and related charges she initiated against her boyfriend, Anthony Zuppo, on January 6, 2001, are false. She told me that she made up this false story in order to obtain police assistance while she moved her personal belongings out of the house she shared with Mr. Zuppo.

She has instructed me to bring her falsehoods to the attention of the Attorney General's Office in writing, with the knowledge that such an admission could well result in her own prosecution. She is also aware of the other serious ramifications this admission could have for her. I have explained to her that her admissions do not necessarily mean that you will drop the charges against Mr. Zuppo, due to the fact that you could try to use her original statement at trial pursuant to 11 Del. C. §3507.

Despite these serious ramifications, she nevertheless wishes to reveal her wrongdoing to the Attorney General's Office in order to try to correct the hardship her actions have caused to Mr. Zuppo. She is willing to meet with you to discuss this matter.

Very truly yours,

Jerome M. Capone

Cc: Wendy Reynolds

AA-17

May 21, 2003

To whom this may concern:

This letter is in regards to Anthony Zuppo and Wendy Reynolds. My name is Dr. William A. Roe. I am an ordained minister and a professor of Ethics and Philosophy at Neumann College.

Recently I was contacted by Mr. Zuppo and was informed of the events that transpired after the wedding in June of 2001. He asked me to recall the events of the original interview and the wedding itself.

First of all: the initial interview. When I interviewed this couple in March of 2001, both the bride and the groom seemed quite intent on entering into marriage. I cannot recall any appearance of anyone being forced into the marriage relationship. We also met for a second time on April 2, 2001, with no problems cited.

Second: the wedding. The wedding took place at Beechwood Park Chapel in Aston, PA on June 20, 2001. There was absolutely no sign of the bride (Wendy Reynolds) having a black eye or any other marks of battering. Both the bride and the groom seemed happy and fully prepared to commit to one another in marriage.

I pray that this information helps clear up some of the issues.

Yours truly,

DR William Roe
Dr. William A. Roe

WAR/kls
enc.

Sworn and subscribed before me on this

22 day of MAy 2003

Notarial Seal
John Anthony Rim, Notary Public
Lower Chichester Twp., Delaware County
My Commission Expires Jan. 26, 2006

Member, Pennsylvania Association of Notaries

AA-18

# MARRIAGE LICENSE

No.2001-1214

### VOID AFTER SIXTY DAYS FROM DATE

### THIS LICENSE VALID ONLY IN THE STATE OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,  } ss:
COUNTY OF DELAWARE

*To any person authorized by law to solemnize marriage:*

You are hereby authorized to join together in the holy state of matrimony according to the laws of the

Commonwealth of Pennsylvania,

..... ANTHONY GEORGE ZUPPO ..................... and ........... WENDY ANN REYNOLDS ...................
OF LEGAL AGE                                                                    OF LEGAL AGE
MARRIED ONCE BEFORE                                                  MARRIED ONCE BEFORE
..... DISSOLVED BY DIVORCE ...................................... DISSOLVED BY DIVORCE ...............
DIV. #94-
07911☐                                                                          DIV. #99-
..... NEW ...............................................................39299☐
CASTLE Given under my hand and seal of the Orphans' Court Division of said County of Delaware at
CO.                                                                              NEW CASTLE
Media, this ....20ᵗʰ............................. day of .... JUNE ..................... A.D. 2001
                                                                                CO.

X  *[signature]*                                          MICHAEL F.X. GILLIN, ESQUIRE
        TO BE RETURNED TO
CLERK OF ORPHANS' COURT DIVISION
        IF NOT USED 15                                    .................................................
                                                          Clerk of Orphans' Court Division, Delaware County, Pa.
X  *[signature]* Laura Lockwood
officiating: D.R. Wilkes                                  *[signature]* Michael F. X. Gillin

AA-19

101

1    911. So he went to get a neighbor to take me to the
2    hospital.
3    Q. ~~Did you go to the hospital?~~
4    
5    
6    Q. Were you treated for the wound to your hand,
7    ma'am?
8    A. Yes.
9    Q. Are you still being treated for the wound to
10   your hand?
11   A. Yes.
12   Q. What did they do to treat your hand that night?
13   A. They looked at it. They stitched it up. But
14   there was not much they could do because I had to go
15   back for surgery.
16   Q. How many times have you had that hand operated
17   on since this incident in July?
18   A. Twice.
19   Q. And what types of operations did you have?
20   A. The first one he had to reconnect the tendons
21   for all three fingers and the two nerves.
22   Q. What type of use of your hand do you have even
23   today?

102

1    A. (Indicating).
2    Q. Is that all the further you can grip?
3    A. That's it. And that's as straight as they can
4    go.
5    MR. WALLACE: I'm going to ask Ms. Reynolds to
6    please step down and -- her hand is difficult to see.
7    And I'm asking -- going to ask her to walk around the
8    jury box.
9    THE COURT: Do you want to say something?
10   MR. BAYARD: No, Your Honor. There is no
11   objection.
12   THE COURT: Very well. Okay. And you're
13   welcomed to -- Mr. Bayard, you're welcomed to go over
14   and look as well.
15   MR. BAYARD: Thank you, Your Honor.
16   MR. WALLACE: You can't say anything because
17   they can't take it down. Just show your hands. You can
18   turn them so they can see both hands, the difference in
19   them.
20   (Pause.)
21   BY MR. WALLACE:
22   Q. Ms. Reynolds, did you report this incident to
23   the police?

103

1    A. Not at that time.
2    Q. Why not?
3    A. He told me to say that it was an accident and
4    that I fell in the kitchen with a knife in my hand.
5    Q. Is that what you told them?
6    A. Yes.
7    Q. Did you tell everybody who treated you that?
8    A. At that time, yes.
9    Q. Did there come a time that you finally
10   disclosed to somebody what actually happened to you?
11   A. Yes.
12   Q. Who did you tell?
13   A. My physical therapist.
14   Q. How long had you been working with your
15   physical therapist at that point?
16   A. I think it was about two weeks, 'cause it
17   was... after surgery. And then -- it was after the
18   abuse started again. So I think it was about week.
19   Q. After your hand got cut like that, how was your
20   relationship then?
21   A. He was the nicest man in the world.
22   Q. Did there come a time that that changed?
23   A. Yes.

104

1    Q. And when that changed, is that when you talked
2    to your physical therapist?
3    A. Yes.
4    Q. What, if anything, did she say to you, just
5    about reporting it to the police?
6    A. She was worried about me. And she had told me
7    that -- I think she had a relative that went through
8    something similar.
9    Q. Did she talk you into contacting the police?
10   A. No, she didn't. I had called Sean at his
11   mother's house. He answered the phone. And I told him
12   what happened and that I wanted to get in contact with
13   Detective O'Sullivan.
14   Q. Up to this point for a while, from March, I
15   guess, until this point, had you contacted Detective
16   O'Sullivan voluntarily at all?
17   A. No.
18   Q. Why not?
19   A. Well, 'cause I knew that she wasn't going to
20   believe me if I told her that I lied about everything
21   and -- and I know that you could tell from my injuries
22   that it wasn't self-inflicted.
23   Q. Why did you finally contact the police?

AA-20

97

```
 1   and a piece of shit.  And I knew what was coming.
 2        Q.  What do you mean you knew what was coming?
 3        A.  This is the same behavior that I had seen
 4   before when I was choked or shoved or punched.
 5        Q.  What did you do?
 6        A.  I thought in my head, this is the last time,
 7   and I'm not going to let him hurt me any more.  But I
 8   couldn't do anything.  I kept thinking that that's it.
 9   I want to stab him, and I want him to die.  That's the
10   only way I'm ever going to get away from him.
11        Q.  What did you do?
12        A.  He started to get up.  And I just grabbed the
13   cut carrots.  I threw them toward his feet, like the
14   lower part of his legs.  And he was coming at me.  And I
15   just told him to stay away from me, leave me alone.  And
16   I was standing there, still had the knife in my hand.
17   And I had my hand over the counter, and he grabbed me,
18   grabbed my wrist, and I hit the wall.
19        Q.  Why did you hit the wall?
20        A.  I went backwards.  He came at me with so much
21   force that I just went flying backwards.
22        Q.  As you were standing there, did you come toward
23   him at all?
```

99

```
 1        A.  No.
 2        Q.  Is that the knife you're talking about?
 3        A.  No.
 4        Q.  Is that the knife?
 5        A.  Yes.
 6        Q.  This was the knife that you had in your hand?
 7        A.  Yes.
 8        Q.  I'll put an X on that one.
 9            Ma'am, you had that knife in your hand.  You're
10   frozen.  He comes at you.  What happened then?
11        A.  He pinned my wrist to the wall, and I dropped
12   down to my knees.  I was trying to get him off of me.  I
13   still had the knife in my hand.
14        Q.  Are you right-handed or left-handed?
15        A.  Right-handed.
16        Q.  Why did you have a hold of the knife at that
17   point?
18        A.  I had the knife like this with the blade facing
19   outward.
20        Q.  As you normally hold a knife, your hands around
21   the black handle and the blade out here?
22        A.  You can't really see with that hand, but yeah.
23        Q.  What happened then?
```

98

```
 1        A.  No, I did not.
 2        Q.  You said you thought this was it; I just want
 3   to stab him.  Why didn't you?
 4        A.  I couldn't do it.
 5        Q.  So how did you act when he was coming towards
 6   you?
 7        A.  I just froze.
 8        Q.  With the knife in your hand?
 9        A.  Yes.
10        Q.  You said, Leave me alone?
11        A.  Yes.
12        Q.  And he grabbed you and shoved you back?
13        A.  Yes.
14        Q.  I'm going to show you what's been marked as
15   State Exhibit 9, a collection of knives.  Do you
16   recognize these knives that are in here, ma'am?
17        A.  Yes.
18        Q.  I'm just going to slide them out of their
19   sheaths.  And I'm going to ask you if any of these are
20   the ones you were talking about that you had in your
21   hand?  If they weren't taped so strongly, I would do
22   that.
23            Is this the knife that you're talking about?
```

100

```
 1        A.  He had my wrist pinned.  And he was trying to
 2   take the knife out of my hand.  I was on my knees.  And
 3   I bit the inside of his thigh as hard as I could to try
 4   to get him off.
 5        Q.  Did he say anything to you?  Was he saying
 6   anything to you?
 7        A.  I don't remember him saying anything.
 8        Q.  What's the next thing you do remember?
 9        A.  He let me go.  And I brought my hand forward.
10   And I could see the bones in my fingers.  And I had
11   blood coming from my head.
12        Q.  You said you could see the bones in your
13   fingers?
14        A.  Yes.
15        Q.  Was your hand cut that badly?
16        A.  My hand was cut from here around to here, the
17   inside here and across this finger, when it was brought
18   across.
19        Q.  What happened then?
20        A.  I couldn't say anything except for, Call 911.
21   He grabbed a towel and wrapped it around my hand.  I
22   think he may have said something like, Oh, my God, which
23   was kind of shocking.  And he went -- he wouldn't call
```

129

1   some of them were gone?

2       A. She had grabbed some clothes and left.

3       Q. When she left, did you look at any of her

4   things?

5       A. Yes.

6       Q. What did you look at specifically?

7       A. I immediately went and down-loaded

8   photographs from her camera that we had previously

9   taken of her, and her journal.

10      Q. When you took her journal, did you read it?

11      A. Yes.

12      Q. Did you do anything with it?

13      A. Yes, I photocopied it.

14      Q. Why did you do that?

15      A. In fear that if she took it with her, that it

16  may be destroyed.

17      Q. Is this the journal that you took, this item

18  marked as State's Exhibit Number 6?

19      A. Yes.

20      Q. So, you photocopied it, and what did you do

21  to it?

22      A. I turned it into the Attorney General's

23  Office.

130

1       Q. What did you do with the actual book?

2       A. Let her keep it.

3       Q. Prior to reading it then and photocopying it,

4   did you read it before? Did you know what it said?

5       A. No.

6       Q. Had you ever told Wendy to write anything in

7   there?

8       A. No.

9       Q. Now, after she had left, what was your

10  relationship like with Ms. Reynolds?

11      A. After she had left?

12      Q. On March 18th.

13      A. We tried to be friends.

14      Q. Was that difficult?

15      A. Yes, it was.

16      Q. Did you express any anger, concerns, anything

17  towards her about what she was doing?

18      A. Yes. I was very concerned.

19      Q. How did she react?

20      A. Very irrationally.

21      Q. Now, after she left in March, did there come

22  some time in late July that she contacted you again

23  and asked you for help?

131

1       A. Yes.

2       Q. When was that, sir?

3       A. That was at the very end of July.

4       Q. Okay.

5           Was it July 30th; do you recall?

6       A. Yes.

7       Q. How did you come in contact with Wendy that

8   day?

9       A. She called me that morning.

10      Q. And where did she call you?

11      A. She called me from Tony's house.

12      Q. And what, if anything, did she say to you?

13      A. She said that the abuse is starting up again,

14  that he had cut her hand in a fight and she wanted to

15  get out.

16      Q. Did you agree to help her?

17      A. Yes.

18      Q. What, if anything, did you say to her she

19  should do?

20      A. I told her that I could call the police, try

21  to get ahold of Laura O'Sullivan.

22      Q. This detective here?

23      A. Yes.

132

1       Q. Had you worked with or spoken to Detective

2   O'Sullivan before?

3       A. I worked previously with Detective

4   O'Sullivan.

5       Q. Did you eventually contact Detective

6   O'Sullivan that day?

7       A. Yes, I did.

8       Q. And what, if anything, did you tell Detective

9   O'Sullivan?

10      A. That Wendy was trying to get out of the

11  relationship again and the abuse, and I told her about

12  what had happened to Wendy, and where she was at.

13      Q. And had you made arrangements with Wendy as

14  far as where you might contact her or where she might

15  be able to contact you?

16      A. Yes. She gave me a number for her physical

17  therapist.

18      Q. Did you call her?

19      A. Yes, I did.

20      Q. And what, if anything, did you tell Wendy

21  when you called the physical therapist that day or

22  wherever, the physical therapy office.

23      A. That I was trying to get ahold of Laura

AA-22



# PUBLIC DEFENDER OF THE STATE OF DELAWARE
## ELBERT N. CARVEL STATE OFFICE BUILDING
### 820 NORTH FRENCH STREET, THIRD FLOOR
### P.O. BOX 8911
### WILMINGTON, DELAWARE 19801

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

JAMES A. BAYARD, JR.
ASSISTANT PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

TELEPHONE
(302) 577-5121

October 5, 2001

Arlen Mekler, Esquire
710 N. King Street, #580
P.O. Box 2285
Wilmington, DE  19899

RE:  STATE OF DELAWARE v. ANTHONY ZUPPO

Dear Mr. Mekler:

I have been assigned to represent Anthony Zuppo for allegations regarding Wendy Ann Reynolds. Mr. Zuppo has advised me that you have been given a series of original letters from Ms. Reynolds to Mr. Zuppo while he has been at Gander Hill Prison in the year 2001.

On behalf of Mr. Zuppo, I am asking you to mail these letters to me at the Public Defender's Office.

Thank you for your help in this case.

Very truly yours,

James A. Bayard, Jr.
Assistant Public Defender

JAB,Jr./ks

cc:  Mr. Anthony Zuppo

AA-23



## PUBLIC DEFENDER OF THE STATE OF DELAWARE
### ELBERT N. CARVEL STATE OFFICE BUILDING
### 820 NORTH FRENCH STREET, THIRD FLOOR
### P.O. BOX 8911
### WILMINGTON, DELAWARE 19801

LAWRENCE M. SULLIVAN
PUBLIC DEFENDER

ANGELO FALASCA
CHIEF DEPUTY

JAMES A. BAYARD, JR.
ASSISTANT PUBLIC DEFENDER

TELEPHONE
(302) 577-5121

October 17, 2001

Mr. Anthony G. Zuppo
c/o MPCJF
1301 East 12th Street
Wilmington, DE  19809

Dear Mr. Zuppo:

I have spoken directly to Mr. Arlen Mekler regarding letters Wendy Ann Reynolds sent you in 2001. It is my understanding that Mr. Mekler does not believe he has custody of these letters.

Is it possible that Ms. Reynolds has reclaimed the letters from Mr. Mekler?

Currently, no court dates have been assigned to your case.

Very truly yours,

James A. Bayard Jr /ks

James A. Bayard, Jr.
Assistant Public Defender

JAB,Jr./ks

AA-24

October 24, 2001

Mr. Arlen Mekler
1216 King Street
Suite 100
Wilmington, DE 19801

Dear Mr. Mekler:

    I am writing you in regards to the letters that my wife, Wendy, wrote to me while I was in jail from April through May. You visited me in jail and I gave you several letters that she wrote to me. You said you would copy them and get them back to me.

I deeply regret the differences we've had but it turns out that my wife lied to you as well as to me again! Would you please be willing to check your files and try to find those letters for me. I really need them, and please send them to me.

    Again, I am sorry for the situation that my wife put us in and please accept my deepest apology for the inconvenience that she caused you as well as me.


        Sincerely,


        Anthony Zuppo  #283480
        MPCJF
        Box 9561
        Wilmington, DE 19809



AA-25