IN THE SUPERIOR COURT FOR THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE )  ID NO. #0107022384/010100 4412
)
vs )  Cr.A. NO. IN01-03-1923 et al.
)
_Anthony G. Zuppo_ )  05 - 504
Defendant )

Notice of Motion



To: Deputy Attorney General
Department of Justice
Carvel State Office Building
820 North French Street
Wilmington, DE 19801

PLEASE TAKE NOTICE that the within Motion for _Court to appoint new Counsel._
will be presented to this Honorable Court as soon as defendant may be heard.

Respectfully Submitted,

_Anthony J Zuppo_

MPCJF
Box 9561
Wilmington, DE 19809

Date: _12-5-01_

AA-26

In the Superior Court for the State of Delaware
In and for New Castle County

State of Delaware

v.

I.N. NO. #0101004412

Anthony Zuppo

## Motion to Dismiss Current Counsel and for Court to Appoint New Counsel.

Comes Now the Defendant, Anthony G. Zuppo prose, and request this Honorable Court to Appoint Defendant a new counsel.

1. The Defendant has been incarcerated for the past five months.

2. The Defendant feels strongly that his present Counsel dosn't have his best interest at heart.

3. Counsel should promptly advise his client of his rights and take all actions necessary to preserve them. Many rights can only be protected by prompt legal action.

Defendant has asked Counsel to enter a Rule 48B, Failure to Indict within 45 days of arrest. Defendant advised counsel that it was past 50 days of arrest and would like him to submit a Rule 48B motion. Counsel replyed that it wouldn't matter that the State would find ways around their delay for indictment. That leaves the Defendant with thoughts of why such Rules even exist?.

Counsel should also be concerned with the accuseds right to be released from custody pending trial and be prepared where appropriate to make Motions for pre-trial Motions and other Vital Motions for the preparation of his defense

A-2

4. Defendant fells strongly that present Counsel is not concerned with or has the Defendant's best intrest at heart. Counsel has not once in three seperate meetings asked to discusse what happened to bring up these charges or any potential strategies or tactical choices with his Client.

For the above reasons the Defendant request this Court for a hearing upon the above information and request this Honorable Court to appoint him a Court Appointed Lawyer.

Respectfully Submitted:
Anthony G Zuppo
Anthony G Zuppo
M.P.C.J.F.
1301 East 12th Street
Wilmington Del. 19809

AA-28

# AFFIDAVIT OF SERVICE

STATE OF DELAWARE}

NEW CASTLE COUNTY}


Anthony G. Zuppa _____ , being sworn, says:

I served a copy of the attached Motion to Dismiss Counsel and Appoint new counsel via mail by way of the Department of Corrections on ___5___ day of _Dec._____ , ~~19~~ 2001


Paul R. Wallace
Deputy Attorney
Department of Justice
State Office Building
820 North French Street
Wilmington, Del. 19801


James A. Bayard Jr.
Public Defender's Office
820 North French St.
Wilmington, Del. 19801


_Anthony G. Zuppa_
M.P.C.Jr.
1301 East 12th Street
Wilmington, Del. 19809

EUrgent


DATE: _12_ / _5_ / _01_


AA-29

57

1  Q. So in that incident around the middle of
2  December, a week before Christmas, what happened?
3  A. His son was visiting. And his son was playing
   video games.
5  Q. How old was his son?
6  A. Probably around seven now. I'm not exactly
7  sure.
8  Q. Okay.
9  A. His son was in the other bedroom playing video
10 games. And he got really angry with me.
11 Q. Who got really angry, his son?
12 A. Tony. Tony.
13 Q. Okay.
14 A. And I didn't know what I had done wrong. And I
15 kept asking him what was wrong, and he didn't want to
16 talk to me. He was just really angry. And he left the
17 bedroom. He went out to the living room and sat on the
18 sofa. And I followed him out because I wanted to talk
19 about it, whatever the problem was, that I wanted to fix
20 it.
21        And I can't remember what he said. I just know
22 that he was really angry, and he didn't want to talk to
23 me. So I kind of hit his arm, kind of grab/hit kind of

58

1  thing, not hard, but like to try to tell him, you know,
2  pay attention; I want to talk this out. And he just
3  turned and grabbed me and pinned me down on the sofa.
4  He had one hand on my jaw, and he was holding my head
5  down. The other hand he started punching me in the arm.
6  Q. From that incident did you have any marks on
7  your body, any bruises, anything?
8  A. I had a cut on my face, and I had bruises on my
9  jaw, bruises on my arm.
10 Q. Did you share with anybody after that incident
11 what had happened?
12 A. Yes. I told one of my co-worker, Maria
13 Maldonado.
14        And after that had happened I wanted to leave.
15 So I needed somebody to help me. So I called my friend
16 Sean Hackett.
17 Q. Now, Mr. Hackett, you described him as a
18 friend. Was he a former boyfriend of yours, also?
19 A. Yes.
20 Q. When did you have a relationship with him?
21 A. It was about six months after I split up with
22 my ex-husband.
23 Q. How long did that relationship last?

59

1  A. It was about a year, year and a half. Since
2  then we remained friends.
3  Q. Are you still friends with him?
4  A. Yes.
5  Q. So you said you called your friend Sean?
6  A. Yes.
7  Q. What were you attempting to do then?
8  A. I wanted to move out, but I knew that there's
9  no way that I could just leave. And at that time I had
10 called him and asked him to set up getting a moving
11 truck for me.
12 Q. Did you move out then?
13 A. No, I did not.
14 Q. What happened with that attempt to move out?
15 A. Tony came and picked me up from work and
16 promised me that things would be better and that he was
17 sorry.
18 Q. What did you do?
19 A. And I forgave him.
20 Q. What did you do then?
21 A. I stayed. I had already given Sean the money
22 for the truck. I wrote him a check for a hundred
23 dollars. And so I had just ate the costs for the truck

60

1  because he had already rented it, and I couldn't move.
2  Q. Did you contact Sean and tell him that you
3  weren't -- this wasn't going to happen; you weren't
4  going to move?
5  A. I know that I did. I can't remember if it was
6  the same day or if it was the next day.
7  Q. After this incident in the middle of December,
8  what happened?
9  A. He gave me an engagement ring for Christmas.
10 And I thought things would get better, but they didn't.
11 After Christmas, after the new year, around January 3rd,
12 he forced sex on me.
13 Q. Let's -- can you explain for the ladies and
14 gentlemen of the jury how that incident began.
15 A. We had ordered -- I think we ordered pizza for
16 dinner. And he started yelling at me that I ate too
17 much and about how fat I am. And I didn't say anything.
18 Q. Ms. Reynolds, in relation to how you look
19 today, how much lighter were you then than you are
20 today?
21 A. I've gained almost 40 pounds since August.
22 Q. So you were 40 pounds lighter at that time than
23 sitting here today?

**25**

cross-examined was Officer O'Sullivan. She did not
make any comment or statement that she was told by the
-- Miss Reynolds that this was an accidental event.
It was not -- that phrase was not -- I think the
confusion may lay, Your Honor, between what is
accidental and what is reckless, and that is maybe the
genesis of the confusion, and that's something perhaps
the Court is familiar with, but to a lay person, the
difference between accidental and reckless is somewhat
clouded.

    Did the officer say that Wendy told her that
it was an accident? The answer is no. Mr. Wallace
made a tape of it. If the Court wishes to hear the
tape, it's available.

    THE COURT: Well, the reason it was brought
up was because the defendant recalled that she had
said -- that it was accidental, and you listened to
the tape and it's not on there.

    MR. BAYARD: That's correct, Your Honor.

    THE DEFENDANT: Sir, I'm not losing my mind.
I'm not that old yet.

    When we were there, I do recall -- the only
thing I don't recall is if the defense were -- public

**26**

defender asked her did Wendy say it was accidental,
but I do remember that Mrs. O'Sullivan said Wendy did
state it was an accident, because when that happened,
I did ask the public defender then could you please
address bail, right then. The judge ruled, denied the
bail reduction, whatever she said, she could make it
higher.

    If anything, I'm wondering how could that be
if she stated it was an accident, and I ask if it was
possible, could I hear the tape. It was in August,
and it was the end of her statement, and there was
another arraignment in April and --

    THE COURT: How long is the tape?

    MR. BAYARD: We were told 17 minutes, Your
Honor.

    THE COURT: Do you have the recorder brought
to --

    MR. WALLACE: We can listen to it right now,
Your Honor.

    THE COURT: Well, all right. Let's go ahead.

    THE DEFENDANT: I'm very sorry, Your Honor,
but I know I heard that.

    THE COURT: I'll allow you to listen to the

**27**

tape.

    ' ' '

    (At this point the tape was played.)

    ' ' '

    MR. WALLACE: Then there's just the finding
by the Court, Your Honor.

    I think Mr. Bayard and I both, as I stated
before we even went down, you know, she was asked did
she ever say it was an accident, and she said, well,
it was not intentional, and it's charged as a reckless
act, and Mr. Zuppo may not understand the distinction,
but it's not inconsistent with the testimony of
Detective O'Sullivan.

    That's the only purpose the tape would be
used for. So, the question is whether or not Mr.
Bayard wants to cross-examine her on that point and
call her and ask her those same questions, but that's
what it is.

    MR. WALLACE: I would suggest it's Mr.
Bayard's choice.

    THE COURT: I would point out for you the
Assault Second Degree charge is one in which it is
alleged that you recklessly caused serious physical

**28**

injury, and that's the charge. It's not alleged that
you did so intentionally. It's alleged that you did
so recklessly. You know, that's what the attorneys
are getting at.

    I guess my position on it is that if -- if
Mr. Bayard wishes to call the officer and ask her any
questions in that area --

    THE DEFENDANT: That's fine. I want to
apologize.

    THE COURT: Say that again.

    THE DEFENDANT: I want to apologize. Honest
to God, I thought -- I was 100% sure she said Wendy
stated that it was an accident, and she didn't. I
apologize for taking the Court's time. It's my life
is on the line, and that's -- you know, I'm sorry to
both sides.

    THE COURT: I'm satisfied that the matter was
fully explored, and Mr. Bayard can proceed and --

    MR. BAYARD: Your Honor, may I have a moment,
please.

    THE COURT: Yes, certainly.

    MR. BAYARD: Thank you.

AA-31

81

1  outpatient social worker available,* and I encouraged
2  the patient to speak to her regarding the concerns.
3  She agreed and was escorted by the therapist to the
4  social worker's office.
5       MR. WALLACE: Thank you. No further
6  questions.
7       MR. BAYARD: Your Honor, may I have a brief
8  moment.
9       THE COURT: Yes.
10                · · ·
11              (Pause)
12                · · ·
13          CROSS-EXAMINATION
14                · · ·
15  BY MR. BAYARD:
16      Q. Did -- when Miss Reynolds went for therapy,
17  did she have anybody drive her?
18      A. I'm sorry.
19      Q. Did anybody bring her to your therapy place?
20      A. Yes.
21      Q. Do you recognize anyone in this courtroom
22  that, in fact, did do that?
23      A. Yes.

83

1       MR. BAYARD: Thank you.
2                · · ·
3              (Pause)
4                · · ·
5       MR. BAYARD: Miss Lee, thank you for your
6  help.
7       MR. WALLACE: Nothing further, Your Honor. I
8  ask this witness be excused.
9       MR. BAYARD: No objection, Your Honor.
10                · · ·
11           (Witness excused.)
12                · · ·
13      MR. WALLACE: State calls Patrolman Rogers.
14      THE COURT: All right.
15                · · ·
16      PATROLMAN DANIEL ROGERS, called as a witness
17  on the part and behalf of the State, being duly
18  sworn,was examined and testified as follows:
19                · · ·
20          DIRECT EXAMINATION
21                · · ·
22  BY MR. WALLACE:
23      Q. Good afternoon, Patrolman Rogers.

82

1       Q. Could you tell me who you recognize.
2       A. Tony.
3       Q. Tony. We're talking about the gentleman in
4  the blue shirt?
5       A. Right there, uh-huh.
6       Q. Okay.
7       Of your own personal observation, was it a
8  compatible relationship when he brought her in?
9       A. Compatible?
10      Q. A friendly one, not a hostile one?
11      A. It appeared that way.
12      Q. Did she identify who she actually spoke to
13  this July 30th that you just related to?
14      A. Yes, she did.
15      Q. Who did she indicate?
16      A. She said Sean.
17      Q. Sean called her, and as a result of Sean's
18  call, that's when she became upset, and then you all
19  have the conversation and you took her to the
20  additional therapist?
21      A. Yes.
22      MR. BAYARD: May I ask for one more moment.
23      THE COURT: Uh-huh.

84

1       Sir, how are you presently employed?
2       A. I'm employed by the City of Wilmington Police
3  Department.
4       Q. And how long -- one moment.
5       How long have you been employed by the
6  Wilmington Police Department, sir?
7       A. Almost two years now.
8       Q. And your duties as a Wilmington police
9  officer are to take complaints from citizens, things
10  like that?
11      A. That's correct.
12      Q. On March 16th of 2001, do you recall that
13  day, sir?
14      A. Yes, I do.
15      Q. And were you employed as a Wilmington police
16  officer then?
17      A. Yes, I was.
18      Q. Did there come a time that you made a service
19  call to 1205 West 7th Street?
20      A. Yes, I did.
21      Q. And what was that call about, sir?
22      A. The call was in reference to a -- harassing
23  phone calls. The 31 on the Complaint was actually two

AA-32

85

1 people, Sean Hackett and Wendy Reynolds.
2    Q. And did you speak to either of those two
3 people?
4    A. Yes. I spoke to both of them.
5    Q. And based on speaking to either Mr. Hackett
6 or Ms. Reynolds, did you do anything to trace some
7 phone calls that came to that house that day?
8    A. The only way I was able to trace phone calls
9 which the -- both Wendy and Sean said were made by the
10 defendant, Anthony Zuppo, the caller ID said that the
11 caller came from Manor Amoco, which was near where the
12 defendant supposedly lived at the time. That's what I
13 was told.
14    Q. So, you traced a phone call to 7th Street
15 from Manor Amoco through the --
16    A. It was verified by the caller ID at the
17 residence.
18    Q. Based on that phone call, sir, did you make
19 -- did you initiate a criminal charge against the
20 defendant in this case?
21    A. Yes, I did.
22       We were able to verify through DELJIS that No
23 Contact Order existed with Wendy Reynolds, and by him

86

1 having contact with her home, which was 12 -- or 1205
2 West 7th, he violated that Order.
3    Q. Okay.
4       So, you would actually had gone to the home,
5 verified that Ms. Reynolds lived there?
6    A. Yes.
7    Q. Verified the No Contact Order?
8    A. Yes, I did.
9       MR. WALLACE: No further questions.
10       THE COURT: Mr. Bayard.
11       MR. BAYARD: Your Honor, if I may, I'm just
12 going to take a moment, please.
13              . . .
14              (Pause)
15              . . .
16       CROSS-EXAMINATION
17              . . .
18 BY MR. BAYARD:
19    Q. Officer, you indicated that there were two
20 people at this residence that you went to.
21       Who actually was pursuing the Complaint?
22    A. I spoke to actually both of them. The -- I
23 spoke to Sean Hackett initially. He stated that Mr.

87

1 Zuppo, when he called him on the phone, threatened his
2 life by saying, "Your days are numbered." That was a
3 separate charge from the No Contact Order, which he
4 violated by calling the residence of Wendy Reynolds.
5       So, there were actually two victims of this
6 Complaint.
7    Q. One single charge, but two victims; is that
8 what you're saying?
9    A. Yes.
10       So, there were two victims is the answer to
11 the question.
12    Q. And the conversation that allegedly -- or the
13 phone call that allegedly came from Mr. Zuppo, who
14 actually took that call?
15    A. I believe Sean Hackett took the phone call,
16 as I recall.
17    Q. He is the sole person who got the phone call?
18    A. As I remember it, yes.
19    Q. Okay, and Ms. Reynolds was in the residence
20 at the time the phone call was received by
21 Mr. Hackett?
22    A. Yes.
23       I believe the Court Order stated he should

88

1 have no contact with Wendy Reynolds at her residence.
2 By him calling there, he violated it.
3    Q. And I'm sorry, did you establish that, in
4 fact, 1205 West 7th Street was her residence on March
5 the 16th?
6    A. Yes, we did. She did state to us that she
7 was staying at that address at the time.
8    Q. And the offensive phrase that Mr. Hackett
9 shared with you is, "Your days are numbered;" is that
10 correct?
11    A. Yes. He said that's the statement Mr. Zuppo
12 made to him over the phone.
13    Q. And that was the only articulation of a
14 disparaging comment or a --
15    A. That was the only thing he said that could be
16 articulated as a crime, which was Terroristic
17 Threatening under Delaware Code.
18       MR. BAYARD: Your Honor, again, if I may just
19 briefly confer, I think we can wrap this up.
20       THE COURT: Yes.
21              . . .
22              (Pause)
23              . . .

169

1  A. She had left. She -- she convinced him to
2  let her take the car to go shopping. That was the
3  only way she was able to even leave without his
4  presence, and at that point she met up with Sean
5  Hackett, and he returned with the cops and a truck to
6  get her belongings.
7  Q. I'm sorry. I have the date wrong. That was
8  Saturday, January 6th.
9      On Saturday, January 7th -- June 7th, 2001,
10 did you come in contact with a police officer,
11 Wilmington police officer, to talk about phone calls
12 you may have received?
13 A. Would that be Officer Mayberry?
14 Q. No, before that, with the Wilmington police
15 officer.
16 A. I don't recall.
17 Q. Okay.
18 A. There has been so many, they run into each
19 other. I apologize.
20     MR. WALLACE: Your Honor, may I approach the
21 witness.
22     THE COURT: Yes.
23              . . .

170

1  BY MR. WALLACE:
2  Q. I'm going to ask you to take a look at this
3  document, read it to yourself to refresh your
4  recollection as to dates and things like that.
5  A. (Witness complies)
6  Q. Does that refresh your recollection as to
7  whether or not you did talk to a Wilmington officer
8  that day?
9  A. Yes.
10 Q. And what did you tell him -- or I guess that
11 same day, had Mr. Zuppo tried to contact you?
12 A. Several times.
13 Q. And what was he trying to contact you about,
14 if you recall.
15 A. To try to get me to talk to Wendy and to go
16 into the police and say that -- to get him out of
17 prison, more or less, to bail him out, that --
18 Q. What, specifically, did he say to you, if you
19 recall, that date.
20 A. That he was sorry and things of that nature.
21 May I ask -- things run, like I say, they run
22 together.
23 Q. If you don't recall, that's fine. Say I

171

1  don't recall.
2  A. Could have been the first threat that he gave
3  me.
4  Q. Were you aware that there was a Court Order
5  not allowing him to have contact with Ms. Reynolds?
6  A. Yes.
7  Q. Did he ask you to contact her on his behalf?
8  A. Yes.
9  Q. What was he asking you to do?
10 A. To try to get her to bail him out.
11 Q. And to speak to the police?
12 A. And say things didn't happened. That's
13 correct.
14 Q. Later in that week was there a time at work
15 when you did speak to the Delaware State trooper about
16 phone calls from Mr. Zuppo?
17 A. Yes, and that would be Officer Mayberry.
18 Q. You met with him one day?
19 A. Yes, I did, about 7 p.m.
20 Q. What had been going on that day? Why did you
21 ask to speak with him?
22 A. I believe -- I'm not quite sure, but I
23 believe Tony was then --

172

1  Q. I don't want to know where he was. I want to
2  know what did you want to say to the police officer?
3  A. That I was receiving -- I had received a
4  couple of phone calls from Tony, and I went to Wendy's
5  desk because she kept getting phone calls from Tony,
6  and I picked up her phone.
7  Q. Did you speak to him?
8  A. Yes, I did.
9  Q. Were you familiar with his voice?
10 A. Very.
11 Q. How did you know his voice so well?
12 A. I've known Tony since September, and I have
13 seen Tony practically every day because he came into
14 the job.
15 Q. So, on the 9th, you actually picked up
16 Wendy's phone and heard his voice?
17 A. Yes.
18 Q. What was he saying then?
19 A. He wanted to speak to Wendy, and I said,
20 "You're not allowed to speak to Wendy."
21 Q. Were you aware of any voice mail messages?
22 A. Yes.
23 Q. Did you hear those? Did you recognize --

A
A-34

17

type of court order I'll be enforcing.

So when I asked Ms. Reynolds what was going on, she stated she had an argument with her boyfriend.

Q. Did she identify who that boyfriend was?

A. Yes.

Q. And who did she say that was?

A. That was an Anthony Zuppo.

Q. Did you eventually come in contact with Anthony Zuppo that evening?

A. Yes.

Q. Do you see that person in the courtroom today, sir?

A. Yes, I do.

Q. Would you point him out.

A. Yes. He's seated right over there.

Q. In the blue sweater?

A. That's correct, or turtle neck.

Q. Now, sir, when you met with Ms. Reynolds at first, you said you wanted to find out is there already a court order or something else going on; correct?

A. Yes.

Q. And did she explain to you basically what was going on?

18

A. Yes. She explained that -- that she had an altercation with her boyfriend or a fight and it had gotten physical overnight.

Q. Did she say what she wanted to do -- why she was asking you to come there?

A. Yes. She said she was terminating the relationship and she wanted me to be there while they gathered up her belongings and left.

Q. Now, sir, when you get these types of calls, are you trained to do anything further to investigate what has happened?

A. Yes. Usually there's if the victim or the person that called

THE COURT: Officer, that's alleged victim.

THE WITNESS: I'm sorry. Yes, sir.

The alleged victim or person that calls in the complaint, if they go on -- if there's evidence of a domestic dispute, if there's an argument or something, I'm going to ask the details of the argument to see why, what's going on, is there something that needs to be further addressed, if there's something else I need to do.

BY MR. WALLACE:

19

Q. So if it's just a, I don't get along with this person, it's a verbal argument, you just kind of stand by and --

A. Yeah. I stand by. They get their stuff. Most of the time that's what happens.

Q. What if they tell you more?

A. Then I take the proper action with that.

Q. And what did Ms. Reynolds first tell you, if you recall?

A. She told me that she had gotten in an argument with her boyfriend overnight. She had wanted to leave and it had gotten physical. He wouldn't allow her to leave. And then in the morning she said she was going to the store, I believe, and that's how she got out of the residence. That sparked me into going into further questions.

Q. Now, is there some format that you ask these questions in, sir? Is there something that you use as a tool to try and ask the right questions in these cases?

A. Yes. They're called risk assessment questions.

Q. Risk assessment for what, sir?

A. Domestic violence.

Q. And how many questions are there to that?

20

A. 21 questions.

Q. And what type of questions do you ask, if you could tell the ladies and gentlemen of the jury.

A. They're questions that are yes or no questions. Do you want me to read the list?

Q. What are the types of questions that you ask, if you recall?

A. There are types of questions that would give me more information about the incident and about the defendant's background.

Q. Okay. Now, these are basically yes/no questions that you ask?

A. That's correct.

Q. What's the first question, for instance?

A. The Question No. 1: Is there a gun present in the home or accessible to the suspect?

Q. If that's a yes, how do you note that?

A. I will check the "yes" in the block. And then I go into further detail as to where the gun is, who owns the gun; is it hidden or is it exact -- accessible. I just don't leave it as yes or no.

Q. Of the 21 questions, how many yes answers did Ms. Reynolds give you and what are the things she

**33**

1 to answer that?
2    MR. BAYARD: The officer is empowered, Your
3 Honor, to formulate a charge and bring it against any
4 citizen. And then it's up to the state to review that
5 to see what they want to proceed with when it comes to
6 court. The officers have to make the decision at the
7 time of arrest every time.
8    THE COURT: I'll sustain the objection to that
9 specific question.
10 BY MR. BAYARD:
11    Q. Unlawful imprisonment, sir, what was the basis
12 of that, please?
13    A. The alleged victim, Ms. Reynolds, stated
14 that... I'm sorry. One second, please.
15    The fact that the defendant would not allow her
16 to leave, that he threatened to kill her with a nine
17 millimeter handgun he had hidden in the residence if she
18 had left the residence. Alleged victim stated she was
19 only to leave the residence around two o'clock that day
20 by lying and telling him she was going to the store.
21    Q. And it's your testimony, although she told you
22 about the gun, you weren't able to locate the gun?
23    A. That is correct.

**35**

1    Q. Sir, when you were doing your assessment, from
2 your interview you heard, you said a alleged sex act
3 took place that was not welcomed?
4    A. The rape?
5    Q. The rape.
6    A. Yes, sir.
7    Q. Did you have her medically checked to see if
8 she was physically all right regarding that alleged
9 rape?
10    A. No, I did not.
11    Q. When you were there at the house -- and I take
12 it this was a house actually; it wasn't an apartment.
13 Would that be a fair statement?
14    A. That is correct. Yes, it was.
15    Q. I thought I heard the word "apartment" before.
16 So it really was just a single-dwelling unit?
17    A. Yes, sir, it was.
18    Q. Okay.
19    Any problems with Mr. Zuppo? I mean, was he
20 loud, boisterous?
21    A. No problem.
22    Q. Defensive?
23    A. None whatsoever.

**34**

1    Q. You took the gentleman to JP court for
2 arraignment?
3    A. No, sir. What I did, I took him to the New
4 Castle County Police headquarters where he was detained
5 until I was able to swear two warrants. And then he was
6 video arraigned through the computer system.
7    Q. Was there bail set, sir?
8    A. That's correct.
9    Q. What do you recall?
10    A. I have to look at the...
11    According to this, the bail was set at $1500.
12    Q. Secured or unsecured, sir?
13    A. It does not state. However, he used a bail
14 bondsman. So I'm going to assume it was secured.
15    Q. Were you present when he made the bail or was
16 that something that happens after you've left?
17    A. That happens after I'm out of the picture, sir.
18    MR. BAYARD: Your Honor, if I may have a moment
19 to confer, please?
20    THE COURT: Certainly.
21    MR. BAYARD: Thank you.
22    (Pause.)
23 BY MR. BAYARD:

**36**

1    Q. Cooperative? Would that be a fair phrase?
2    A. Yes, sir.
3    Q. Did Ms. Reynolds express any concern for this
4 friend of hers, Sean, that was with her vis-a-vis asking
5 her, a police officer to help her get her belongings?
6    A. I'm sorry. You're going to have to rephrase.
7    Q. Ms. Reynolds had a man with her?
8    A. That's correct.
9    Q. That's this Sean Hackett?
10    A. Yes.
11    Q. Did she express any concern for Sean Hackett's
12 well-being in asking for an officer's assistance to get
13 things out of the house?
14    A. No, sir.
15    MR. BAYARD: Thank you, sir.
16
17    REDIRECT EXAMINATION
18
19 BY MR. WALLACE:
20    Q. Officer Eckerd, Mr. Bayard asked you on
21 cross-examination what you had asked Ms. Reynolds first.
22 And you told the jury earlier one of the first things
23 you ask is basically why am I here; correct?

89

1     Q. Even though he's in prison?
2     A. Yes.
    Q. Were you fearful that he might get out of
prison at some point?
5     A. I thought for a sure he would get out of
6 prison.
7     Q. And what did you think would happen if he got
8 out of prison and you hadn't done what he said?
9     A. He'd kill me. He said he'd get less time for
10 murder than for these charges.
11     Q. Now, and still you helped him?
12     A. Yes.
13     Q. And still you said things to protect him?
14     A. Yes.
15     Q. Did there come a time after April that he did
16 get out of prison?
17     A. Yes.
18     Q. Approximately when was that, do you know?
19     A. I don't know the date. I know it was in May.
20     Q. I want to back up one moment to April for a
21 second.
22     A. Okay.
23     Q. You said that he got arrested picking you up

90

1 from work?
2     A. Yes.
3     Q. That would have been April 10th when you were
4 coming out of work, if you recall?
5     A. I think that was the date.
6     Q. Did the police come back to your -- to the
7 house that you were sharing at that time to 107 Lea
8 Road --
9     A. Yes.
10     Q. -- and look for anything?
11     A. Yes. They had a search warrant for my journal.
12     Q. For your journal?
13     A. Yes.
14     Q. Where was this journal when they did the search
15 warrant?
16     A. It was in a spare room with most of my stuff.
17 I collect books. And I had it in with all those books.
18     Q. What did you tell the police about your journal
19 when they came to look for it?
    A. I said that I had thrown it away and that I
didn't have it anymore.
22     Q. Why did you tell them that?
23     A. Because if Tony found out about it, I knew I

91

1 was going to be in a lot of trouble.
2     Q. Why did you think you were going to be in
3 trouble for keeping a journal like this?
4     A. Because I wrote down what happened in there.
5     Q. So you lied to the police about its existence?
6     A. Yes.
7     Q. Did you want them to find this?
8     A. Part of me did. But I was afraid that if they
9 found it then, I knew Tony would find out; and I was
10 scared of whatever he might do.
11     Q. Sorry. Now, let's go back to May. And did
12 they actually take this from your house on that day?
13     A. Yes.
14     Q. Back to May. The defendant gets out of prison?
15     A. Yes.
16     Q. You bailed him out?
17     A. Yes.
18     Q. With your retirement money from your job?
19     A. It was actually a second loan that I took out
20 on the Camaro.
21     Q. Once he's out of prison, what happened?
22     A. I met him and the bail bondman across the state
23 line in Pennsylvania. And --

92

1     Q. What was the bail bondman's name, if you
2 remember?
3     A. Mr. Bobell.
4     Q. Had you been talking to Mr. Bobell up to that
5 point?
6     A. Yes.
7     Q. What had you told Mr. Bobell about these
8 charges?
9     A. That they didn't happen.
10     Q. Why did you tell him that?
11     A. Because I was afraid that if I told him that
12 Tony had done these things, that no one was going to
13 help.
14     Q. You met the defendant and Mr. Bobell up across
15 the line. What happened then?
16     A. Tony got out of his car and went over. I gave
17 him the keys. And he drove me to a motel in
18 Pennsylvania.
19     Q. Did you stay up in Pennsylvania with him?
20     A. Yes. We stayed there for a week.
21     Q. What happened then?
22     A. The abuse started right away. He held me down
23 on the floor and had his arm around my throat and choked

93

1    me.

2        Q. What types of things was he saying to you at

3    that point?

4        A. Things like how skanky I am and that I'm a

5    piece of shit.

6        THE COURT: Would counsel come forward for a

7    moment, please.

8        (The following sidebar conference was held.)

9        THE COURT: We're talking about things that

10    happened in Pennsylvania. Any of these charges based

11    on --

12        MR. WALLACE: We're coming back to Delaware

13    right now.

14        THE COURT: Okay.

15        MR. WALLACE: I think this happened in

16    Delaware, but I'll --

17        MR. BAYARD: She's specifically said, too, that

18    Delaware --

19        MR. WALLACE: I'm leading up to in Pennsylvania

20    when they got married. And I want them to be able to,

21    the jury, to understand why would you marry this man in

22    these circumstances. It's to explain what was, seems to

23    be really inexplicable behavior.

94

1        THE COURT: I think you should move, you know,

2    to the marriage issue. I don't want to, you know, have

3    other bad acts coming in. If you want to -- a sort of

4    instruction or follow up on this later, we can do so.

5    We don't need to do it right now.

6        MR. BAYARD: Thank you.

7        (The sidebar having concluded, examination

8    continued.)

9    BY MR. WALLACE:

10        Q. You said that you stayed up in Pennsylvania for

11    about a week in a hotel?

12        A. Yes.

13        Q. Did you then come back to Delaware?

14        A. Yes.

15        Q. And where were you living then?

16        A. At his house on Lea Road.

17        Q. Did there come a time that you actually got

18    married to the defendant after that?

19        A. Yes.

20        Q. When did that happen?

21        A. June 20th.

22        Q. What caused you to marry the defendant?

23        A. He wanted to get married. And I didn't.

95

1        Q. How was your relationship going with him at

2    that point on June 20th?

3        A. I still had a black eye from when he had

4    punched me in the face in the car.

5        Q. So is that a way of saying the relationship was

6    not going well?

7        A. No, it wasn't. I had tried to leave over and

8    over and over again.

9        Q. And what did he do when you tried to leave?

10        A. He either shoved me to the floor or choked me.

11    The incident in the car --

12        Q. I just want to get to the marriage. Why didn't

13    you want to marry him on June 20th?

14        A. I wanted to leave him. I didn't want to be

15    with him anymore.

16        Q. Why did you marry him then?

17        A. He told me that if I didn't do what he wanted

18    me to do and if I embarrassed him in any way, that I

19    would be sorry.

20        Q. Did you go through with the marriage?

21        A. Yes, I did.

22        Q. Did you continue to live with him in that house

23    at 107 Lea Road?

96

1        A. Yes, I did.

2        Q. Up to this point now, from the time he's

3    arrested in April until around June 20th, early July,

4    did you have contact with your friends like Sean or

5    Maria?

6        A. Not that I can remember.

7        Q. Did you try to get help from anyone?

8        A. Everyone was very upset with me for going back

9    to him. And no one really wanted to talk to me.

10        Q. Did you feel as if you could go to anyone?

11        A. No, I didn't.

12        Q. Early July, July 1st, did an incident happen at

13    your house there on 107 Lea Road?

14        A. Yes.

15        Q. Could you describe what happened in the early

16    evening hours there?

17        A. I was making meat loaf for dinner. And I was

18    cutting carrots. Everything was fine. He wasn't upset

19    with me. He bent down maybe about five feet away from

20    me to get something out of the lower cabinet. And while

21    he was there, he just flipped out. He started --

22        Q. What do you mean he flipped out?

23        A. He started to yell at me and called me a slut

**101**

1  911. So he went to get a neighbor to take me to the
2  hospital.
3      Q. Did you go to the hospital?
4      A. Yes. The next-door neighbor took me to the
5  hospital.
6      Q. Were you treated for the wound to your hand,
7  ma'am?
8      A. Yes.
9      Q. Are you still being treated for the wound to
10 your hand?
11     A. Yes.
12     Q. What did they do to treat your hand that night?
13     A. They looked at it. They stitched it up. But
14 there was not much they could do because I had to go
15 back for surgery.
16     Q. How many times have you had that hand operated
17 on since this incident in July?
18     A. Twice.
19     Q. And what types of operations did you have?
20     A. The first one he had to reconnect the tendons
21 for all three fingers and the two nerves.
22     Q. What type of use of your hand do you have even
23 today?

**102**

1      A. (Indicating).
2      Q. Is that all the further you can grip?
3      A. That's it. And that's as straight as they can
4  go.
5          MR. WALLACE: I'm going to ask Ms. Reynolds to
6  please step down and -- her hand is difficult to see.
7  And I'm asking -- going to ask her to walk around the
8  jury box.
9          THE COURT: Do you want to say something?
10         MR. BAYARD: No, Your Honor. There is no
11 objection.
12         THE COURT: Very well. Okay. And you're
13 welcomed to -- Mr. Bayard, you're welcomed to go over
14 and look as well.
15         MR. BAYARD: Thank you, Your Honor.
16         MR. WALLACE: You can't say anything because
17 they can't take it down -- just show your hands. If you can
18 turn them so they can see both hands, the difference in
19 them.
           (Pause.)
   BY MR. WALLACE:
22     Q. Ms. Reynolds, did you report this incident to
23 the police?

**103**

1      A. Not at that time.
2      Q. Why not?
3      A. He told me to say that it was an accident and
4  that I fell in the kitchen with a knife in my hand.
5      Q. Is that what you told them?
6      A. Yes.
7      Q. Did you tell everybody who treated you that?
8      A. At that time, yes.
9      Q. Did there come a time that you finally
10 disclosed to somebody what actually happened to you?
11     A. Yes.
12     Q. Who did you tell?
13     A. My physical therapist.
14     Q. How long had you been working with your
15 physical therapist at that point?
16     A. I think it was about two weeks, 'cause it
17 was... after surgery. And then -- it was after the
18 abuse started again. So I think it was about weeks.
19     Q. After your hand got cut like that, how was your
20 relationship then?
21     A. He was the nicest man in the world.
22     Q. Did there come a time that that changed?
23     A. Yes.

**104**

1      Q. And when that changed, is that when you talked
2  to your physical therapist?
3      A. Yes.
4      Q. What, if anything, did she say to you, just
5  about reporting it to the police?
6      A. She was worried about me. And she had told me
7  that -- I think she had a relative that went through
8  something similar.
9      Q. Did she talk you into contacting the police?
10     A. No, she didn't. I had called Sean at his
11 mother's house. He answered the phone. And I told him
12 what happened and that I wanted to get in contact with
13 Detective O'Sullivan.
14     Q. Up to this point for a while, from March, I
15 guess, until this point, had you contacted Detective
16 O'Sullivan voluntarily at all?
17     A. No.
18     Q. Why not?
19     A. Well, 'cause I knew that she wasn't going to
20 believe me if I told her that I lied about everything
21 and -- and I know that you could tell from my injuries
22 that it wasn't self-inflicted.
23     Q. Why did you finally contact the police?

105

1    A. Because I thought if I stayed much longer that
2    he really would kill me.
3       Q. Was it your decision finally to get out of this
4    relationship and contact the police?
5       A. Yes, it was.
6       Q. Did you meet with Detective O'Sullivan after
7    you talked to your physical therapist after you talked
8    to Sean?
9       A. Yes.
10      Q. Did you have pictures taken of yourself by
11   Detective O'Sullivan of at least what you looked like by
12   the time you were finally able to speak to her?
13      A. Yes.
14      Q. I'm going to show you what's been marked as
15   State's 7-A, B, and C. You said you were bleeding from
16   your head that night, too. Where were you cut there?
17      A. Right here (indicating).
18      Q. Did you get any treatment there?
19      A. I had three stitches, I think.
20      Q. Is that what's depicted in those photographs, I
21   guess, your overall hand? Is that the contraption you
22   had to wear on your hand for a while?
23      A. Yes.

106

1       Q. And that's your hand after it had been operated
2    on, things like that?
3       A. Now you mean?
4       Q. No. Here in this picture, 7-B?
5       A. Yes, after the operation.
6       Q. While it was healing?
7       A. Yes.
8       Q. Since the time that you went to Detective
9    O'Sullivan and told her what had occurred, have you had
10   any more contact with the defendant?
11      A. His mom. He's tried to get his mom to contact
12   me, but I haven't wanted to speak with anyone.
13      Q. Have you tried to stay away from him?
14      A. Yes.
15      Q. Have you, in fact, moved out of state to ensure
16   that you don't have contact with him?
17      A. Yes, I have.
18      Q. You are living out of state now?
19      A. Yes.
20      Q. Are you working?
21      A. No.
22      Q. Are you getting any kind of assistance?
23      A. I'm on Medicaid.

107

1       Q. Because of your hand injury?
2       A. Yes.
3       Q. Are you getting any kind of counseling,
4    anything like that?
5       A. Yes. I go every week.
6       MR. WALLACE: Your Honor, I don't have any
7    further questions.
8       THE COURT: All right. We need to take an
9    afternoon recess at some point. Any objection to taking
10   it now?
11      MR. BAYARD: No, Your Honor. It would be
12   appropriate.
13      THE COURT: Ladies and gentlemen, we'll take a
14   15-minute recess.
15      (Jury leaves courtroom, 3:10 p.m.)
16      THE COURT: I guess Ms. Reynolds, when she went
17   over, she made some little brief comment to somebody.
18      MR. WALLACE: I think she was just saying, here
19   it is; this is my other hand, those kinds of things.
20   That's why I told her you can't say anything to the
21   jury.
22      MR. BAYARD: I think that's what I heard, Your
23   Honor.

108

1       THE COURT: It was very brief. I don't think
2    anything needs to be done about that.
3       MR. WALLACE: Thank you.
4       THE COURT: Okay. You're free to move around.
5    We're going to take a 15-minute recess.
6       (A short recess was taken, 3:11 p.m. to 3:30
7    p.m.)
8       THE COURT: All right. Bring in the jury.
9       (Jury enters courtroom, 3:30 p.m.)
10      THE COURT: All right. Mr. Bayard, proceed.
11      MR. BAYARD: Thank you, Your Honor.
12
13              CROSS-EXAMINATION
14
15   BY MR. BAYARD:
16      Q. Ms. Reynolds, good afternoon.
17      Ms. Reynolds, I'm just going to kind of go
18   through the indictment by the various charges. And I'm
19   going to ask you a series of questions. I'll ask you to
20   be patient with me, please. But that's going to be the
21   basic format of most of my questions.
22      A. Okay.
23      Q. You're talking here on January the 5th about

205

1  a misdemeanor charge?
2      A. That's correct.
3      Q. Now, after that incident, did there come a
4  time, on or about April 10, that you came in contact
5  with Mr. Zuppo again?
6      A. That's correct.
7      Q. And this was eight days later, correct?
8      A. That's correct.
9      Q. Was the same No Contact Order then pending?
10     A. Yes, it was.
11     Q. The house at 107 Lea Road, that's New Castle?
12     A. New Castle, Delaware, New Castle County,
13  State of Delaware.
14     Q. That is New Castle County, Delaware?
15     A. That's correct.
16     Q. The Manor Park Amoco or Manor Amoco that was
17  discussed earlier, are you familiar with that?
18     A. Yes.
19     Q. How far is that from Mr. Zuppo's house?
20     A. Within a quarter mile.
21     Q. Okay.
22        Walking distance, basically?
23     A. Yes.

207

1      Q. Based on that, were you going to charge him
2  with any criminal offenses?
3      A. That's correct, Aggravated Intimidation.
4      Q. Did you get a warrant for those charges?
5      A. Yes.
6      Q. Were you trying to serve that warrant on
7  April 10?
8      A. Yes, that's correct.
9      Q. Where did you come in contact with Mr. Zuppo
10  that day?
11     A. I learned Mr. Zuppo had taken Wendy Reynolds
12  to her place of employment, Concord EFS, that morning
13  and was due to pick her up 5:00 that evening. I had
14  two officers, one on Philly Pike and one another
15  location, standing by, and we were set up in the
16  parking lot to see if, in fact, he was picking her up.
17     Q. On that same -- did you come in contact with
18  him?
19     A. That's correct. I also learned that Mr.
20  Zuppo's license was revoked. His license was revoked,
21  and he shouldn't have been driving. He did show up to
22  the place of employment shortly after five, and Miss
23  Reynolds entered the passenger seat of the vehicle.

206

1      Q. Is that also the same county and state?
2      A. That's correct.
3      Q. Now, on April 10th, where did you come in
4  contact with Mr. Zuppo, at his house or somewhere
5  else?
6      A. Somewhere else.
7      Q. Where was that?
8      A. It was a vehicle stop performed on
9  Philadelphia Pike at Duncan Road.
10     Q. And what caused you to come in contact with
11  Mr. Zuppo? Why were you looking for him that day?
12     A. It was two-fold. I had received information
13  from Maria Maldonado and Hermo Rivera that Mr. Hackett
14  had responded to Mr. Rivera's job at Pep Boys in --
15     Q. You said Mr. Hackett.
16     A. I mean Mr. Zuppo responded to Mr. Rivera's
17  place of employment, Pep Boys, New Castle, and he had
18  went into the store, had threatened him to stay out of
19  court, to leave him and Wendy alone, to watch his
20  back, things were going to happen, and made some
21  inferences that some photographs were in the mail to
22  that Marie's ex-husband in reference to this, and he
23  needed to watch out.

208

1      They drove away and once on Philadelphia Pike we had
2  a patrolman officer stop them.
3      THE COURT: Counsel, come forward, please.
4          • • •
5      (Sidebar conference held off the record.)
6          • • •
7      THE COURT: Ladies and gentlemen, it's
8  necessary that you base your decision only on relevant
9  evidence that's presented in the case.
10         With regard to the comment just made about
11  not having a license, I instruct you to ignore and
12  disregard that comment. Do not allow that comment to
13  play any part whatsoever in your deliberations.
14         • • •
15  BY MR. WALLACE:
16     Q. Did you actually see Mr. Zuppo in the
17  presence of Miss Reynolds on April 10?
18     A. Yes, I did.
19     Q. And again, was that same No Contact Order
20  from Court 11 then pending?
21     A. Yes, it was.
22     Q. Now, thereafter, ma'am, did you become aware
23  that there may be pertinent evidence at the home that

AA-41

77

1    A. That's Wendy.

2    Q. The dressing, or I guess whatever that is on

3    her hand, could you explain what that is?

4    A. That's known as a dorsal protective splint,

5    which is common post-operatively after a person has

6    had tendon repairs.

7    Q. And does that fairly and accurately represent

8    the physical condition that you saw Miss Reynolds back

9    in July of 2001, August, 2001, as you were treating

10    her, what she looked like?

11    A. Yes.

12    Q. Ma'am, in late July of 2001, was Miss

13    Reynolds at a physical therapy session -- with the

14    occupational therapy session with you when something

15    unusual happened?

16    A. What was the date again? I'm sorry.

17    Q. Late in July.

18    If you need to refresh your recollection with

19    the date, that's fine.

20    A. She was there in late July, July 30th.

21    Q. And what, if anything, happened that was

22    unusual at that therapy session?

23    A. Can I read the -- my docket notes.

79

1    completed her examination and she has left, and so I

2    want to caution the State, you know, about soliciting

3    prior statements.

4    MR. WALLACE: Yes.

5    THE COURT: You know that she's not going to

6    be here perhaps to be subject to cross-examination.

7    MR. WALLACE: I assured Mr. Bayard that she

8    will remain -- she's going to remain for the rest of

9    today. If there are any questions, she will be here,

10    and we've shared any possible statements. I don't

11    think there's any problem in that regard, and I'm

12    making her fully available.

13    MR. BAYARD: There was a request earlier to

14    that effect, that she be kept available, and Mr.

15    Wallace indicated that --

16    THE COURT: All right. Fair enough.

17    If there aren't any objections, I'll allow

18    this to proceed, and if there are any statements, you

19    know, that are testified about, you know, that you do

20    want to cross-examine Miss Reynolds on --

21    MR. BAYARD: Yes, Your Honor.

22    THE COURT:  -- you'll have to call her back.

23    MR. WALLACE: I will, absolutely.

78

1    Q. If it helps to recall, yes.

2    A. That date when she came in for therapy, she

3    came in and we proceeded to start her treatment and

4    she had received a phone call during the treatment,

5    which she got up and took the phone call.

6    When she got off the phone, she -- she seemed

7    like something -- like it wasn't a normal phone call,

8    like when do you want me to pick you up, and I asked

9    her if everything was okay, and she told me, no, it

10    wasn't okay, and --

11    THE COURT: Excuse me. I want to have a

12    brief conversation with both counsel.

13    Ladies and gentlemen, I'm going to ask you to

14    step to the jury room briefly.

15    ...

16    (The jury exited the courtroom at 12:04 p.m.)

17    ...

18    THE COURT: Just wanted to bring up a point.

19    I think that as to all of the various prior

20    statements, you know, that Ms. Reynolds made at

21    various places and at various points in time, I think

22    they have all been admissible under 3507, whereas,

23    prior inconsistent statement, and Miss Reynolds has

80

1    THE COURT: Then Mr. Bayard will be able to

2    give his cross.

3    MR. WALLACE: I understand.

4    THE COURT: We'll proceed on that basis.

5    Bring the jury back.

6    ...

7    (The jury entered the courtroom at 12:07

8    p.m.)

9    ...

10    THE COURT: All right. Mr. Wallace, proceed.

11    ...

12    BY MR. WALLACE:

13    Q. I'm sorry.

14    So, you were discussing that -- is everything

15    okay. She stated no. What happened from there?

16    A. I'm going to read right from my note here.

17    'The patient received a phone call during

18    treatment. Following the phone call, the patient

19    appeared anxious. Patient then reported, 'I'm having

20    Tony arrested today.' Patient then reported that her

21    hand injury was caused by her husband. Explained to

22    patient that Christiana Care' -- excuse me, I can't

23    read my own writing -- 'that Christiana Care had an

141

1  hand, my hand was cut and my head was cut, and the knife
2  was in his hand. It never dropped.
3      Q. Never dropped. The cut on your head, was that
   when you were pushed back against the wall --
5      A. No. It was made by the knife when the swing
6  came down.
7      Q. And that's when you were going down on your
8  knees?
9      A. I was already on my knees.
10     Q. All right. On your knees. Okay.
11     A. My head was facing down. If it had been facing
12  up, it probably would have taken my eye.
13     Q. We're dealing with what really happened, not
14  speculation.
15     A. Yes.
16     Q. And who was it that took you to the hospital,
17  ma'am?
18     A. The next-door neighbor.
19     Q. Any name?
20     A. I don't know her name.
21     Q. Okay. And at that time you felt or you decided
22  to tell the doctors a story about tripping and falling?
23     A. I told them exactly what he told me to tell

143

1  have heard that from the police, but I can't say for
2  sure that I heard that from them.
3      Q. When this document was written, the diary, was
4  that diary -- was there anybody present?
5      A. Sean Hackett was in the house.
6      Q. Did he help --
7      A. No.
8      Q. -- you know, suggest the content or form of
9  anything like that?
10     A. No. All from my mind.
11     Q. And your handwriting, too?
12     A. Yes.
13     Q. Sean was aware of the diary?
14     A. I found out later that, yeah, he knew where it
15  was, and he obviously seen it.
16     Q. Had you and Sean talked about the diary, ma'am,
17  prior to --
18     A. I told him that I was going to write it down in
19  the diary.
20     Q. You told him you were going to create this
21  document?
22     A. Yes.
23     Q. Okay. But...

142

1  him.
2      Q. Did you have a police interview while you were
3  at the hospital?
4      A. No.
5      Q. Did the police ever interview you until you
6  came forward to them about the cut on your hand?
7      A. No.
8      Q. They never came to the hospital and talked to
9  you about a wound to your hand?
10     A. No.
11     Q. Okay. So until you came forward, the only
12  story on record was the one that you gave the doctors?
13     A. Yes.
14     Q. If I suggested to you that diary that you've
15  discussed earlier this afternoon was written at the
16  behest of Sean, would I be right or wrong?
17     A. You'd be wrong.
18     Q. At whose behest was it written, ma'am?
19     A. I wrote it for me.
20     Q. But who instilled the idea into you to write
21  the diary?
22     A. I know that from the Domestic Violence Center.
23  I know we had talked about it there. And I think I may

144

1          (Pause.)
2          MR. BAYARD: Excuse me, ma'am.
3          (Pause.)
4  BY MR. BAYARD:
5      Q. You were asked about going to several
6  attorneys. I think I've heard the name of Aren Makler?
7      A. Yes.
8      Q. And you went to Aren Makler because of why?
9      A. Tony told me he wanted to find an attorney. He
10  didn't want a public defender.
11     Q. Okay. Was that the only thing you did with
12  Mr. Makler?
13     A. What do you mean?
14     Q. Was that the only thing he wanted from him to
15  do --
16     A. Was to represent Tony.
17     Q. Okay. Did you actually pay Mr. Makler
18  anything?
19     A. I paid him a couple hundred dollars, which is
20  all I had. And he had me sign a paper and he had Tony
21  sign a paper to say that he would be paid the rest of
22  the money.
23     Q. All right. And so you and Tony, Mr. Zuppo met

AA-43

61

1    A. I was probably about 25 to 30 pounds lighter
2    than I am right now.
3        Q. And he was saying how fat you were?
4        A. Yes.
5        Q. Complaining about what you ate?
6        A. Un-huh.
7        Q. After this fight about what you ate, what
8    happened?
9        A. He left the living room. He went back to the
10   bedroom. He was back there for maybe 15 minutes at the
11   most. It wasn't a long time. And he called me to come
12   back. And I didn't answer right away 'cause I was still
13   angry that he wasn't changing. He just kept doing this
14   to me. He called again. So I knew if I didn't get up
15   and go back there that I was going to be in trouble for
16   that. So I did.
17       When I got back there, he was waiting in the
18   bedroom for me. He had restraints in his hands.
19       Q. I'm going to show you what's been marked
20   State's Exhibit 8.
21       Are you familiar with these items, ma'am?
22       A. Yes.
23       Q. How are you familiar with them?

62

1        A. We had used them before.
2        Q. We meaning who?
3        A. Tony and I had used them before this incident.
4        Q. So they were in your house; you knew they were
5    there?
6        A. Yes.
7        Q. And during your consensual relationship with
8    him --
9        A. We tried them out, yes.
10       Q. On this night, what happened?
11       A. On this night he called me back there. He
12   started taking off my clothes. And I told him I didn't
13   want him to touch me, that I didn't want to do this. He
14   kept going, and I was scared.
15       Q. You said he had these restraints in his hands.
16   What, if anything, did he do with those?
17       A. He pinned my hands behind my back and put them
18   on me.
19       Q. Did he bind you in any other way?
20       A. After he pushed me down on the bed, later he
21   put a rope around my neck.
22       Q. The rope, this rope?
23       A. Yes.

63

1        Q. Had you ever used this?
2        A. No.
3        Q. Was this part of anything you had done
4    consensually with him?
5        A. No.
6        Q. When he placed it around your neck, what did he
7    do?
8        A. He put it around my neck and then crisscrossed
9    it under my breasts.
10       Q. What did he do then?
11       A. Well, like I said, he didn't do that right
12   away. After he pinned my wrists behind me, he pushed me
13   on the bed and he put himself inside my mouth. I tried
14   to bite him. And he pulled out and put it back in. And
15   I tried again.
16       Q. I need to stop you for a moment. And I
17   apologize.
18       A. Okay.
19       Q. I know it's uncomfortable.
20       When you say he tried to place himself in your
21   mouth, what exactly did he do?
22       A. He put his penis in my mouth.
23       Q. And you tried to bite his penis?

64

1        A. Yes.
2        Q. So you had your hands restrained behind your
3    back this time?
4        A. Yes.
5        Q. And he tried to place his penis in your mouth?
6        A. Yes, that's correct.
7        Q. What happened then?
8        A. After the second time, I was on my side, and he
9    rolled me onto my back. And that was when he put the
10   rope on me and the blindfold.
11       Q. He blindfolded you?
12       A. Yes.
13       Q. Again, was that part of anything that had ever
14   been something you had done with him before?
15       A. I think we may have tried the blindfold once.
16   I don't remember a time when we did.
17       Q. On these occasions when you may have used these
18   instruments before, was it always consensual?
19       A. Yes. It was very controlled environment. It
20   was not a rape.
21       Q. What was different between this time and those
22   other times?
23       A. I said no. I said I didn't want to. But he

AA-44

229

1  THE COURT: He's got to do cross-examination
2  too. I'm just saying that we will go for essentially
3  10 more minutes.
4      MR. BAYARD: Thank you, Your Honor.
5      THE COURT: Bring in the jury.
6          ...
7      (The jury entered the courtroom at 4:45 p.m.)
8          ...
9      THE COURT: All right, ladies and gentlemen.
10 You heard the State has rested its case. We will now
11 turn to the defense, and we're going to go till five
12 of five and we'll stop for the day. However far we
13 get, that's when it's going to stop.
14     MR. BAYARD: Defense would call Mr. Milton
15 Lockwood to the stand.
16     THE COURT: All right.
17         ...
18     MILTON LOCKWOOD, called as a witness on the
19 part and behalf of the State, being duly sworn, was
20 examined and testified as follows:
21         ...
22     DIRECT EXAMINATION
23         ...

230

1  BY MR. BAYARD:
2   Q. Mr. Lockwood, do you know the gentleman over
3  here?
4   A. Yes.
5   Q. Who is it?
6   A. Tony Zuppo.
7   Q. Do you know a woman, Wendy Reynolds?
8   A. Yes.
9   Q. Has Mr. Zuppo worked for you, sir?
10  A. Yes, he has.
11  Q. Has Miss Reynolds worked for you?
12  A. Yes.
13  Q. Have you ever had a conversation with Miss
14 Reynolds regarding her veracity, or lack of veracity,
15 regarding allegations she may have made regarding Mr.
16 Zuppo?
17  A. Yes.
18  Q. What did she tell you, sir?
19  A. There were several occasions where she tried
20 to go to the State and admit that she lied about the
21 charge.
22  Q. Did you have an occasion to try to facilitate
23 her contacting the County Police?

231

1   A. She -- I don't know when, but last year
2  sometime she asked me to come down, pick her up and
3  she took me -- I took her to Claymont State Police,
4  and she wanted to admit to the State that she did lie
5  about the charges, but it was out of their
6  jurisdiction, so we had to go back to New Castle,
7  pardon me, and she gave me $500 once I got in there,
8  when she went in -- before we went in, she gave me
9  $500 in the car, and I -- I went in with her.
10     She went in to see the sergeant -- I mean the
11 patrolman, and she came back out and she said that
12 didn't do any good because they think how do we know
13 you're not lying now.
14  Q. You saw these two people together, Miss
15 Reynolds and Mr. Zuppo?
16  A. Yes.
17  Q. Did she evidence fear or apprehension about
18 him in your presence?
19  A. Not at all.
20  Q. Did -- do you know about when Mr. Zuppo was
21 made aware of these -- of the indictment regarding
22 rape charges, sir?
23     Do you remember about when he became aware of

232

1  that?
2   A. I would say probably back in April, July --
3  April, May, somewhere around there.
4   Q. If the date of St. Patrick's Day was
5  suggested to you, would that help you?
6   A. No, it wouldn't. I'm not too good with
7  dates.
8   Q. But sometime in the spring of '01?
9   A. Yes.
10     MR. BAYARD: All right, sir. Thank you.
11         ...
12     CROSS-EXAMINATION
13         ...
14 BY MR. WALLACE:
15  Q. Hi, Mr. Lockwood. How are you doing?
16  A. All right.
17  Q. Mr. Lockwood, you have no idea, because you
18 were not personally there for any of the incidents
19 involving Wendy Reynolds and Anthony Zuppo; were you?
20  A. No.
21  Q. So, you don't know whether they did happen or
22 they didn't happen, right?
23  A. What are you talking about?

AA-45

235

1  Q. Whether he ever assaulted her; you don't know
2  anything, right?
3      A. No.
4  Q. On July 31st though, you knew that the police
5  were looking for Mr. Zuppo; didn't you?
6      A. Yeah.
7  Q. They talked to you on the phone, right?
8      A. Yes, sir.
9  Q. They told you don't tell him --
10     A. That's exactly right --
11  Q. -- isn't it a fact --
12     A. -- it is not true --
13     THE COURT: Let him complete the question,
14  and Mr. Wallace, let him finish his answer.
15     THE WITNESS: I know what he's going to say.
16                    ...
17  BY MR. WALLACE:
18  Q. It's not true that you gave a telephone
19  warning to Mr. Zuppo?
20     A. No, I didn't.
21  Q. You didn't?
22     A. No, I didn't.
23  Q. So, if Mr. Zuppo said that, that's not true

1      A. Yes, sir, several times.
2      MR. BAYARD: One moment, please.
3                    ...
4               (Pause)
5                    ...
6      MR. BAYARD: Thank you, sir. No other
7  questions.
8      THE COURT: You may step down, sir.
9                    ...
10              (Witness excused.)
11                   ...
12     MR. BAYARD: Defense would call Robert
13  Buvall.
14     THE COURT: How long is this witness?
15     MR. BAYARD: I'm hoping two, three minutes.
16     THE COURT: All right.
17                   ...
18  ROBERT BUVALL, called as a witness on the
19  part and behalf of the State, being duly sworn, was
20  examined and testified as follows:
21                   ...
22     DIRECT EXAMINATION
23                   ...

234

1  either?
2      A. I don't know what he'll say, but I'm telling
3  you what happened.
4  Q. Okay.
5      A. I told --
6  Q. Fair to say you're better friends with Mr.
7  Zuppo than Miss Reynolds?
8      A. I was trying to help.
9  Q. Is it fair to say you are better friends with
10  Mr. Zuppo --
11     A. No, it's not fair, no, because then I
12  wouldn't have done all that for Wendy.
13  Q. You haven't had much more contact with Mr.
14  Zuppo than Miss Reynolds?
15     A. Naturally, he worked with me.
16     MR. WALLACE: Thanks. I have no further
17  questions, Your Honor.
18     THE COURT: All right.
19                   ...
20     REDIRECT EXAMINATION
21                   ...
22  BY MR. BAYARD:
23  Q. However, you did try to assist her?

236

1  BY MR. BAYARD:
2  Q. Mr. Buvall, do you know the gentleman in the
3  corduroy jacket?
4      A. Yes, I do.
5  Q. Who is he?
6      A. Anthony Zuppo.
7  Q. What is your occupation, sir?
8      A. Bailbondsman.
9  Q. Have you ever had contact with a woman, Wendy
10  Reynolds?
11     A. Yes, I did.
12  Q. When Miss Reynolds came to you, what did she
13  -- why did she come to you?
14     A. To bail out Mr. Zuppo.
15  Q. Would she ever explain her rationale for
16  wanting to bail him out, sir?
17     A. She just wanted him released from jail
18  because it was her fiance.
19  Q. Did she make any reference as to the
20  allegations against him, sir, as to their credibility
21  or lack of credibility?
22     A. Not to my knowledge.
23     MR. BAYARD: Your Honor, if I might confer

AA-46

237

briefly.

    THE COURT: All right.

    * * *

    (Pause)

    * * *

BY MR. BAYARD:

    Q. Sir, about how much time do you think you spent in the presence of Ms. Reynolds, just a couple of minutes like we are right now, half-hour, over the course of your professional relationship?

    A. Some hours.

    Q. Some hours?

    A. Yeah.

    Q. During those some hours, and I guess that's more than one or two; would that be fair to say?

    A. Yes.

    Q. Okay.

    Did she -- could you relate to us how she felt or expressed herself regarding Mr. Zuppo?

    A. She was trying very hard to get him out of jail and the different bails that he had, whether it was cash and/or secured.

    MR. BAYARD: Thank you, sir.

238

    MR. WALLACE: I have no questions for this witness, Your Honor.

    THE COURT: You may step down, sir.

    MR. BAYARD: Thank you, Your Honor.

    * * *

    (Witness excused.)

    * * *

    MR. BAYARD: We have other witnesses, but looking at the clock, we'll reserve them until tomorrow.

    THE COURT: That'll be fine.

    Ladies and gentlemen, that will conclude today's proceeding.

    Do either counsel have a problem with starting 9:30 --

    MR. BAYARD: No, Your Honor.

    MR. WALLACE: None.

    THE COURT: We'll start at 9:30.

    I remind you to be mindful of the instructions that I've given you regarding your conduct.

    Please be at the courthouse here by 9:30 tomorrow morning.

239

    * * *

    (The jury exited the courtroom at 4:56 p.m.)

    * * *

    THE COURT: At this point, you know we've been in trial so much the last two days that I haven't had an opportunity to even really find out whether a draft of the instructions has been completed. It's being worked on, but I haven't had a chance to find out if it's done.

    So, my view is that tomorrow we'll proceed with the defendant's case, and then we'll just -- I'm not inclined to try to go to extraordinary measures, you know, to necessarily get the case fully to the jury tomorrow. If we can, that's great, but I don't know how much time we're going to have to spent with these instructions. We have 19 counts, and there may be requests, motions, I don't know, but we'll go as far as we can, and if it goes into Monday, so be it, as far as I'm concerned.

    MR. BAYARD: Yes, Your Honor.

    THE COURT: As soon as I do have the draft that I'm content to have given to you, then I'll do so.

240

    MR. BAYARD: Thank you.

    THE COURT: Anything further before we conclude for the day?

    MR. BAYARD: No, Your Honor.

    MR. WALLACE: No.

    THE COURT: Then we'll adjourn until 9:30 tomorrow.

    * * *

    (Court recessed at 4:57 p.m.)

    * * *

AA-047

225

1  occurs.

2      Q. And are there standards for when they are

3  used and when they are not used?

4      A. That's correct.

5      Q. And what's the basic standards you use in the

6  investigation of rape crimes here in New Castle County

7  about getting rape kits done or not?

8      A. There are several, but I guess the big key in

9  here, there's a 72-hour window for evidence,

10  specifically semen. If it's present, there's a

11  72-hour window that the kit must be completed within.

12      Q. And Miss Reynolds didn't even first talk to

13  any police officer until after that 72 hours had

14  expired, correct?

15      A. That's correct.

16      Q. Is this a case then normally that even if you

17  had been there on the 6th, you would say let's get a

18  rape kit?

19      A. I would not.

20      Q. Are there other factors, such as they are

21  domestic partners, that would keep you from doing a

22  rape kit?

23      A. That's correct.

226

1      In most domestic instances, if there was an

2  allegation of rape that occurs, it would have to be

3  determined if both parties have to say that sexual

4  intercourse did occur. So, in a domestic situation,

5  if you were to get a rape kit say for DNA evidence, if

6  the suspect in the case said, yeah, we had sex,

7  consensual, the fact that you had DNA evidence

8  wouldn't matter because they are boyfriend/girlfriend.

9      Q. So, it's not something you generally do in

10  those type of cases?

11      A. Not usually.

12      MR. WALLACE: Thank you.

13      MR. BAYARD: Thank you, ma'am. No other

14  questions.

15      THE COURT: Step down, ma'am.

16          • • •

17      (Witness excused.)

18          • • •

19      MR. WALLACE: State has no further evidence.

20  I believe all the exhibits have been moved in, and the

21  State would rest.

22      THE COURT: All right.

23      Ladies and gentlemen, let me speak with the

227

1  attorneys about scheduling. You can go to the jury

2  room for a few minutes.

3          • • •

4      (The jury exited the courtroom at 4:40 p.m.)

5          • • •

6      THE COURT: All right.

7      Mr. Bayard, both of you will recall that

8  after Miss Reynolds left the stand, that we said if

9  any subsequent witness gave any testimony about any

10  prior statements which -- if you wished to

11  cross-examine her further on any such statements, you

12  know, that the State would be obligated to recall her

13  to the stand and examine her briefly with regard to

14  those statements, so that you could conduct your

15  cross-examination.

16      Are you content with the record as it is?

17      MR. BAYARD: Your Honor, may I have a moment

18  to confer, please.

19      THE COURT: Certainly.

20      MR. BAYARD: So I can speak --

21      THE COURT: Sure.

22          • • •

23      (Pause)

228

1          • • •

2      MR. BAYARD: Your Honor, I think there's some

3  minor points that cause my client some concern, but I

4  don't think it serves any benefit to have Miss

5  Reynolds called, and I do not ask the Court to call

6  her back.

7      THE COURT: All right.

8      MR. WALLACE: State's rested then, Your

9  Honor.

10      THE COURT: Very well.

11      Okay, Mr. Bayard, would you like to

12  accomplish anything else today?

13      MR. BAYARD: I sure would. There's Mr.

14  Robert Buvall and Milton Lockwood outside. My guess

15  is we're not going to do 15 minutes.

16      THE COURT: Sum total between the two?.

17      MR. BAYARD: Examination, direct and cross.

18      THE COURT: What I'll do is bring the jury

19  in. I'm going to tell the jury that we're going to

20  stop not later than five, and if somebody is in the

21  middle, we'll just stop.

22      MR. BAYARD: Understood, Your Honor. We'll

23  try to abide by the representation.

9

1    THE DEFENDANT: I was told it would be proper
2  to ask for a private meeting with counsel and the
3  judge, if there was a possibility, or I don't know --
4    THE COURT: No, any -- any meeting that I'm
5  involved in, Mr. Zuppo, is going to take place right
6  here in the courtroom.
7    THE DEFENDANT: I have a lot of conflicting
8  interests with my counsel at the time. I stuck a
9  motion -- presented a motion on the 12th of December
10  for change of counsel. Apparently, they never reached
11  Mr. Bayard, Mr. Wallace or the Attorney General's
12  Office. I talked to another private attorney that
13  can't get involved because it's conflicting interests
14  with me and my wife, and he told me to bring it up to
15  you and ask if there was a possibility of getting new
16  counsel. I have notes that he told me to keep as we
17  were going through the meetings before trial and in
18  trial, in case it got worse, that I could let -- I
19  know what has been going on -- so I could prove it's
20  ineffective counsel, and this is to keep from getting
21  a mistrial at the end of the trial --
22    THE COURT: What exactly are you asking me to
23  do?

10

1    THE DEFENDANT: Reassign counsel.
2    THE COURT: Reassign counsel?
3    THE DEFENDANT: This is a class one trial.
4  I've got a public defender, and every -- everything
5  I've brought up that -- also private attorney told me
6  to get the transcripts of all the times my wife showed
7  up at trial, to straighten this matter out, all the
8  times -- every -- certain things I needed, this
9  gentleman says it doesn't matter, certain things.
10    The trial, now as we were going on
11  cross-examination, questions I wanted to ask, this
12  gentleman, he doesn't see any valid reason to bring it
13  in when a private attorney sees that's a very strong
14  part of the case, to prove the woman is lying on the
15  stand.
16    What else? I'm nervous. There's certain
17  people being subpoenaed. Arlen Mekler and Jerome
18  Capone and my fiance at the time went to have him draw
19  up the sworn affidavit to admit into the courts for
20  us. I was stating she gave a false police report, and
21  Arlen Mekler, she went and got him, and both of those
22  attorneys are credible, and they know what she told
23  them. That's a big thing, to have them subpoenaed,

11

1  and he told me why. I asked him, 'Could you have this
2  subpoenaed,' and he asked me, 'Why would that matter
3  with the trial,' and he knew the factors of when he
4  did proceed, and she retained Mr. Mekler for me and
5  Jerome Capone for herself.
6    So many factors. This morning we're
7  downstairs and I asked him a big thing of her
8  testimony yesterday was that when we got back together
9  on the 17th, she said it was a week or two later she
10  told me of the big charges I was going to be indicted
11  on. It was, in fact, that night, that Monday. We
12  were in a lawyer's office discussing it with them, and
13  also, she testified that this lawyer said he wouldn't
14  take the case because he wouldn't be able to win it,
15  and she told him the truth. Last night, on the phone,
16  this gentleman told me that this is not what she is
17  testifying she told him, and he said yeah, you were
18  there the 19th of March, that morning, asking what we
19  could do about that, because how she lied, and now I'm
20  in all this trouble, and Arlen Mekler -- Mr. Bayard, I
21  asked him could we have him subpoenaed. I know it's
22  the end of the trial, but this is a crucial witness
23  now we could get in here to testify she's lying on

12

1  certain occasions. As it goes on, I will be able to
2  prove she's lying on many occasions, and he doesn't
3  see any relevance in allowing that to happen.
4    If you would like, I have so many things that
5  happened through the times we were having meeting. We
6  got into heated discussions --
7    THE COURT: We're in the middle of your trial
8  right now.
9    THE DEFENDANT: And I'm fighting for 15 to
10  life twice.
11    THE COURT: I know, but I'm not going to
12  delay your trial. We're in the middle of your trial.
13  We're underway. I'm not going to delay your trial.
14    THE DEFENDANT: I understand that.
15    THE COURT: I'm not going to appoint a second
16  or new lawyer for you. So, if your request is, you
17  know, that I somehow appoint another lawyer for you,
18  I'm going to have to deny that request.
19    THE DEFENDANT: Okay.
20    THE COURT: Do you have any further requests?
21    THE DEFENDANT: Only thing I could see from
22  there is to have -- to proceed as my own lawyer and
23  have him as assisting counsel. That's the only thing

AA-49

41

1    A. Yes, sir.  I stumbled across it by asking why I
2  was there.  And then it just -- she mentioned about the
3  domestic argument.  And I asked her a little -- you
4  know, what happened last night?  Why were you arguing,
5  etc.?  Questions like that.  And then it just -- she
6  opened up.  And as a matter of fact, I believe I had to
7  stop her to call my supervisor to let them know what was
8  going on.  After that she continued.
9    Q. And you charged him with the offenses that you
10  were sure about that night and then sent the other ones
11  on for investigation?
12    A. That's correct.
13       MR. WALLACE:  Okay.  Thank you.
14       I have no further questions, Your Honor.
15       MR. BAYARD:  Your Honor, may I have just a
16  moment to confer, please?
17       THE COURT:  Yes.
18       MR. BAYARD:  Thank you.
19       (Pause.)
20
21             RECROSS-EXAMINATION
22
23  BY MR. BAYARD:

42

1    Q. Sir, you've just described to the State about
2  Ms. Reynolds saying that she was screaming, she was
3  strangled or throttled.
4       And I guess my question again to you is:  You
5  had a chance to see her pretty close, as close as, say,
6  you to the court reporter?  Would that be a fair
7  statement?
8    A. That's correct.
9    Q. Two, three feet away?
10    A. Yes.
11    Q. Not bad lighting or anything like that?
12    A. No, sir.
13    Q. And did you see any marks on her?
14    A. No, sir, I did not.
15       MR. BAYARD:  Thank you, sir.
16       THE COURT:  Any final questions?
17
18             REDIRECT EXAMINATION
19
20  BY MR. WALLACE:
21    Q. It happened the night before, though; correct?
22    A. That's correct.
23    Q. She didn't say she had any injuries, did she?

43

1    A. No, she did not.
2       MR. WALLACE:  Okay.  Thank you.
3       THE COURT:  You can step down, Officer.
4       THE WITNESS:  Thank you.
5       MR. WALLACE:  I'll help him with the evidence,
6  Your Honor.
7       THE COURT:  All right.
8       (Pause.)
9       THE COURT:  Okay.  Ladies and gentlemen, at
10  this time I would like to instruct you as to your
11  conduct during this trial.  I would like to give you
12  certain admonitions, certain warnings that will remain
13  with you throughout the entire trial.
14       First one is that you are not to discuss this
15  case among yourselves while the evidence is being
16  presented to you.  The first time you'll be allowed to
17  discuss the case among yourselves is after you've had
18  heard all the evidence, the arguments of counsel, and
19  the instructions of the Court, and have retired to the
20  jury room.  Then and only then should you begin to
21  discuss and deliberate this case.
22       The reason for the rule you are not to discuss
23  this case while the evidence is being presented is that

44

1  you might commit yourself one way or the other before
2  you have had an opportunity to hear all the evidence,
3  instructions, and the discussion of your other jury
4  members.  Therefore, the Court asks you not to discuss
5  the case until you've heard all the evidence, the
6  Court's final instructions, and all the arguments of
7  counsel.
8       The second warning is that you're not to
9  discuss this case with anyone else, any third party,
10  until your verdict is delivered and you've been relieved
11  of your duties as a juror.  The reason for this rule is
12  that these third parties have not heard the evidence or
13  had an opportunity to observe the witnesses.  Discussion
14  with third parties could possibly influence you.  And to
15  prevent the possibility of that happening, you are not
16  to discuss the case with anyone else.
17       Third, should any other juror or anyone else
18  attempt to discuss this case with you, I want you to
19  immediately notify me personally.
20       Fourth, you're not to read or listen to any
21  accounts or discussions of the case reported by the
22  paper or other publications or by television or radio.
23       Fifth, you're not to visit or view any premises

AA·50

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,              ID# 0101004412

v.

ANTHONY G. ZUPPO,

    Defendant.

BEFORE:    HONORABLE JAMES T. VAUGHN

APPEARANCES:

    PAUL R. WALLACE, ESQ.
    Deputy Attorneys General
      for the State

    JAMES A. BAYARD, JR., ESQ.
      for the Defendant

- - - - - - - - - - - - - - -
SENTENCING TRANSCRIPT
APRIL 11, 2002
- - - - - - - - - - - - - - -

MICHELE L. ROLFE
SUPERIOR COURT OFFICIAL REPORTERS
1020 King Street - Wilmington, Delaware 19801
(302) 577-2400 Ext. 415

---

**Page 2**

April 11, 2002
Courtroom No. 301
1:00 p.m.

PRESENT:

As noted.

- - - -

MR. WALLACE: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. WALLACE: Your Honor, this is the time set aside for sentencing in State versus Anthony Zuppo. As the Court is aware, the Court heard this case.

I brought to counsels attention and the Courts that I did read through the presentence investigation. And just at the outset, I noted that there appeared to be an error of a presumptive sentence for Attempted Rape in the Second Degree, that instead of a ten-year minimum that is actually a two-year minimum mandatory because of 11 Del C. Section 531 and 772.

And, therefore, there is the ten-year minimum as to the actual Rape Second Degree. But as to the Attempted Rape Second Degree, there would be a two-year minimum.

---

**Page 3**

Other than that, I will let Mr. Bayard go forward with his sentencing presentation.

THE COURT: All right, Mr. Bayard.

MR. BAYARD: Your Honor, good afternoon. Your Honor, since the Court did listen to the trial, and has first-hand information about the facts of this case, and the Court has had an opportunity, I take it, to read the presentence report. I think there is really very little to say here.

What I would like to say is that it is clear that there is going to be need for some kind of mental health evaluation and treatment for this gentleman, regardless. There seems to be a need to help him deal with some of the issues that obviously brought him to the Courts attention in this matter. The presentence report indicated that -- I really think it is in his future best interest that something along those lines are certainly given.

As to the actual sentencing and the meeting out of the number of years here, Your Honor, we're asking the Court -- cognizant of the fact that there is a ten-year minimum on the Rape Second and a two-year minimum on the Attempted Rape Second, and

---

**Page 4**

that brings us to twelve years, and then there are thirteen other charges that the Court has to sentence the gentleman on this afternoon -- we're asking the Court to consider probation for most of those.

We're also asking the Court to consider minimal sentences for the balance. There reaches a point of diminishing return when a person gets huge quantities of time, which I'm not sure it really proves anything to anybody.

The young lady has apparently started over a new life and new location. And after the 12-year minimums that Mr. Zuppo is going to be facing, I would imagine that she is going to be well established and moved on in her life.

Really what I'm asking Your Honor to consider is the minimums, which the Court has to. But beyond that, we're asking the Court to consider small amounts, a year or so, for each of the serious charges and probation for the misdemeanor charges.

THE COURT: All right. Mr. Zuppo, is there anything you would like to say?

THE DEFENDANT: Yeah, a lot, but a couple things I wanted to bring up that -- like versus us

AA-51

5

1  ~~[redacted]~~
2  ~~[redacted]~~
3  ~~[redacted] for cross-examination on the witnesses~~
4  ~~testimonies.~~
5       Then I asked to listen to them, Mr. Bayard
6  said he could not bring them in, from which I got a
7  letter from the warden, Mr. Hawthorne, and he said he
8  could bring them in for me to be able to listen to the
9  tapes. I constantly asked him to enter them into
10 evidence. Nothing is consistent out of all three
11 statements in the police reports.
12      THE COURT: All right. That can be addressed
13 in another forum. We're here -- is there anything you
14 want to say about the sentence that I need to impose
15 today?
16      THE DEFENDANT: No, Your Honor, I just hope
17 you realize things that went on through the trial
18 itself, that's all.
19      THE COURT: All right.
20      MR. WALLACE: Your Honor, while there are
21 many times that I agree with Mr. Bayard as to whether
22 there is a point of diminishing returns in a
23 particular sentencing, I don't know that we reached

7

1       And Anthony Zuppo certainly took advantage of
2  that, time and time again he breached the conditions
3  of release. And while Wendy Reynolds is an adult and
4  maybe she would make her own decisions, certainly she
5  was somebody who was particularly vulnerable to
6  Anthony Zuppo.
7       He found himself the perfect victim, and he
8  abused her more so than we had seen any of the
9  previous victims. And I don't say that they are
10 victims simply lightly because there were some
11 investigations. He was convicted of those crimes or
12 he admitted them through diversionary programs.
13      This isn't us just saying, Well, we think
14 he's beaten his wife or he's done these things in the
15 past. The submission the State put in are convictions
16 and the police reports. And all of that information,
17 which tells you exactly how he treated women before,
18 and why we're not at all surprised what did happen to
19 Wendy Reynolds.
20      She ended up being raped. She ended up being
21 threatened by him. She ended up being, in the final
22 assault, maimed to a point where the Court certainly
23 saw her on the days of trial, saw her hands, saw what

6

1  that in this case.
2       While Wendy Reynolds may be away from Anthony
3  Zuppo now, as the Court knows on February 28, 2002, I
4  filed a state supplemental submission for sentencing.
5  And, basically, what that did was outline the domestic
6  violence past of Anthony Zuppo. Wendy Reynolds is not
7  the first victim, and, quite frankly, I doubt she
8  would be the last.
9       Anthony Zuppo is a person who is headed
10 towards probably one of the more tragic situations we
11 come across in the criminal justice system and that is
12 Domestic Violence Murder. You can see in the way he
13 treated his first wife from the way he treated his
14 subsequent girlfriends with threats like, I'm going to
15 blow your head off, you just cut your throat,
16 assaults, reckless endangering against them.
17      And then finally he found, perhaps, his best
18 victim from his perspective as far as how willing she
19 was or how far she would go in being victimized.
20      And if you look at Wendy Reynold's past, her
21 first marriage ended with a shotgun being held to her
22 head and the system did nothing, and perhaps that's
23 why she felt the way she did during this case.

8

1  had occurred to her.
2       You could see in the picture that the State
3  put into evidence just the victim's face at the time
4  that she finally came forward to the police after the
5  end of this. If you recall seeing the picture with
6  her in the soft cast after her surgery, and you could
7  see what a different woman she was. How she was drawn
8  and just simply looked like a victim, someone who had
9  basically been through a terrible, terrible ordeal,
10 and that ordeal was Anthony Zuppo.
11      The State suggests the minimum mandatories
12 are not appropriate for him. We do suggest that for
13 the Rape Second that ten years may be an appropriate
14 minimum mandatory.
15      For the Attempted Rape, we would suggest that
16 it is more -- that the two years is not appropriate.
17      And most importantly, during this case, every
18 time someone tried to help Anthony Zuppo or any time
19 the police tried to come between him and her and
20 basically tried to assist her, what did he do? He
21 threatened them, time and time again.
22      He's been convicted of three counts of
23 Aggravated Active Intimidation. Sean Hackett, Maria

AA-52

**Page 1**

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR NEW CASTLE COUNTY

STATE OF DELAWARE,

v.                          ID
                            No. 0101004412

ANTHONY C. ZUPPO,

        Defendant.

BEFORE    HON. JAMES T. VAUGHN, J. AND JURY
          - - - - - -

TRANSCRIPT OF CLOSING ARGUMENTS AND
JURY CHARGE
- - - - - -

COPY

JOHN P. DONNELLY, RPR
SUPERIOR COURT REPORTERS
1020 N. KING STREET   WILMINGTON, DELAWARE 19801
(302) 577-2400

**Page 2**

February 4, 2002
Courtroom No. 102
10:00 a.m.

PAUL R. WALLACE, ESQUIRE
DEPARTMENT OF JUSTICE
    820 N. French Street
    Wilmington, Delaware 19801
    for State of Delaware

JAMES A. BAYARD, ESQUIRE
PUBLIC DEFENDERS' OFFICE
    820 N. French Street
    Wilmington, Delaware 19801
    for Defendant

**Page 3**

1  THE COURT: Good morning. You have both had an
2  opportunity to at least scan the instructions, I think.
3  MR. WALLACE: Yes. Thank you.
4  MR. BAYARD: Yes. Thank you, Your Honor.
5  THE COURT: I concluded that the judgement of
6  acquittal should be granted on Count 4, kidnapping. I
7  concluded that there was not any evidence of kidnapping
8  as to that apart from the alleged rape itself.
9  MR. BAYARD: Thank you, Your Honor.
10 Appreciated.
11 THE COURT: That will not affect of renumbering
12 of attempted rape first to second or attempted rape
13 second, and the rape first to rape second. Now, I only
14 made one correction since the draft that you have was
15 done. That is in the aggravated intimidation charges
16 the count numbers were corrected to correspond with, you
17 know, the current numbers. Anything to address before
18 we proceed?
19 MR. BAYARD: Your Honor, Mr. Zuppo is going to
20 address the Court.
21 THE DEFENDANT: Yes, Your Honor. I am not
22 familiar with this. I don't know how this trial goes I
23 am learning as I am here. I am not a lawyer. Both

**Page 4**

1  sides rested, apparently, Friday. There was some
2  evidence that I went over and I also mentioned to
3  Mr. Bayard on Thursday about a couple instances that
4  prove without a doubt that lies on the stand that was
5  written down from the police officer. I don't know if
6  it could still be entered. Sean Hackett, who was on the
7  stand tells him that I said his days are numbered. He
8  said watch your back in the police report on two
9  different occasions. On the first page has nothing
10 about watch your back. Says your days are numbered, go
11 where the police officer got back and he typed it up.
12 He is the gentleman that called and says your
13 days are numbered, nothing about watch your back. That
14 wasn't entered into evidence for them, for the jury to
15 see. I did mention it, said it can be a typo. I don't
16 think that could be a typo, typo would be if you had
17 didn't and it was did, instead you know what I mean?
18 Also in the January 8th police statement Sean
19 Hackett or Sean [illegible] statement [illegible]
20 statement in police report Mr. Bayard [illegible]
21 [illegible] don't understand anyone had to be the [illegible]
22 [illegible] [illegible]
23 [illegible]

5

1    back. She was on her couch.
2         THE COURT: Is what it said in the police
3    report.
4         THE DEFENDANT: That is impossible to be a
5    typo. A month later Detective O'Sullivan gets in touch
6    with her, tells her what happened. It is ...that is not
7    on that police report. And it also on the journal that
8    he wrote for what happened. It is not there either,
9    plus the paper is totally different than what Detective
10   O'Sullivan typed out to give to the Grand Jury to indict
11   me on. that was she had with Wendy.
12        And one other quick thing I was asking for you
13   to do, if possible; could we also have the tape from my
14   preliminary entered into evidence, also, of the night
15   because on there stating it was not intentional, could
16   go both ways. What my wife did testify on the stand
17   makes it seem like it was real intentional that in fact
18   did not happen, saying I charged at her, threw her
19   against a wall. That is reckless big time. That did
20   not occur at that time.
21        There are things, we rested. I didn't know .
22   what was going on. I was hoping maybe allow this to
23   come back in, put it in so the jury could read over it.

6

1    you know, when they are looking all this, you know.
2         THE COURT: There is two issues now, Mr. Zuppo,
3    is you know whether the Court would allow the defense to
4    reopen its case after it rested. That is one issue.
5    The second issue is if I did so, you know, is there
6    admissable evidence that could be introduced.
7         THE DEFENDANT: Not to waste anymore time, I
8    heard back up try to blow out 400 cases this month, I
9    don't mean to waste time. There is a paper there we
10   have is factual, that is what the police wrote down what
11   she stated to him that night. The journal is totally
12   different. Statement they give Detective O'Sullivan is
13   totally different. Also Sean Hackett on the stand,
14   Mr. Wallace is a great prosecutor, maybe looks like an
15   idiot stating I am not lying. They are all lying. But
16   this also will prove that some of them were lying,
17   either Sean Hackett did lie. Here is the police report
18   this night is fresh in his head he did not state,
19   nothing where I said watch your back because it was not
20   said. Then she said your days are numbered.
21        Okay, which wasn't said, this is what he was
22   saying was said the night it happened, but then 6, 7, 8,
23   nine months later, almost or nine months later, 11

7

1    months later he is stating he knows for sure, watch your
2    back.
3         THE COURT: I am going to defer to counsel in a
4    moment here, give counsel an opportunity to speak. If
5    they wish with respect to Sean, Sean Hackett, there be
6    an issue there or whether or not the contents of the
7    police report themselves are admissable evidence. He
8    has given his testimony. He is gone. The issue would
9    be what witnesses, you know would, be called. He may be
10   able to address that point.
11        THE DEFENDANT: I don't think there would be
12   actually need a witness, I mean, we have the gentleman's
13   testimony. We also have documents that are factual from
14   the police officer. There wouldn't need a witness for
15   cross examination on that.
16        THE COURT: There is procedure for admitting
17   documents into evidence. You can't just hold it up and
18   say this is evidence. So that is an issue. As to your
19   comment about Mrs. Reynolds' description of how this
20   alleged rape occurred where the pants being taken down,
21   I caught that as part of your comment.
22        THE DEFENDANT: That is a big issue.
23        THE COURT: She testified. She was cross

8

1    examined, you know, on I think the first day of trial
2    when evidence was taken. She has been thoroughly
3    examined, and given her account, examined. She has been
4    released, as well.
5         THE DEFENDANT: The big issue on that is that,
6    you know, she lied. She did not lie. She lied, then
7    she did not lie. That is where that comes in because
8    when we got back together she got in touch with me,
9    informed me on charges, everything that went down. She
10   wanted to recant her statement because it did not
11   happen. Now, I mean, like was wondering where she was
12   on medication after a year of this saying now it did
13   happen. And this way let the jury see that she may be
14   unstable. What she said on the police officer's first
15   journal is totally opposite, and then also the testimony
16   she give on tape is different.
17        THE COURT: Well, the journal is an easy one.
18   Journal has been admitted.
19        THE DEFENDANT: I know that.
20        THE COURT: That is in evidence.
21        THE DEFENDANT: I didn't understand why the
22   other two wouldn't have been when he did that either, so
23   they could see the three.


AA-54

29

```
 1            (Pause)
 2             • • •
 3        THE COURT: Do you need time to talk to your
 4   client?
 5        MR. BAYARD: I just spoke to Mr. Zuppo,
 6   asking if he wished to pursue a line of questioning,
 7   as you suggested, to Officer O'Sullivan on the stand.
 8   The response was, "It's your decision. You're the
 9   lawyer."
10        I asked further if he had any thoughts about
11   it, and no, he does not have any definitive thought,
12   pro or con, to that course of action. Based on what
13   our research picked up today, I don't see any
14   advantage to the defense for pursuing this line of
15   questioning in front of the jury.
16        Essentially, it's underscoring some
17   negativity that I don't think will be helpful.
18        THE COURT: I think the reason that it came
19   up was because he thought she had said something about
20   it being an accident, and having had the opportunity
21   to listen to the tape, it does not say that.
22        THE DEFENDANT: I apologize. I honestly
23   thought -- I honestly was 100% sure she said that, and
```

30

```
 1   it's not there. I apologize.
 2        THE COURT: That's fine. That's not a
 3   problem.
 4        THE COURT: All right.
 5        MR. BAYARD: While the jury is still out, we
 6   have no other witnesses.
 7        Mr. Zuppo remains. I have counseled him. I
 8   don't think it's in his best interest to testify. I
 9   don't think he is equipped to withstand any serious
10   cross-examination by the State. I am concerned that
11   he will open doors, particularly 404 (b) that I am
12   aware of.
13        He is aware of -- he's been told about there
14   are things that the jury doesn't need to know that Mr.
15   Wallace has available, and I shared them with Mr.
16   Zuppo, so he knows what I'm talking about, and quite
17   frankly, for him to get up there and testify, I think
18   is going to be detrimental to the overall profile of
19   this case.
20        Having said that, I've also told Mr. Zuppo
21   that he has an absolute right to testify if he
22   chooses, and the Court would make inquiry as to his
23   personal decision as to whether to testify or not.
```

31

```
 1        Having said that, please, Your Honor, I would
 2   ask if the Court would make inquiry of Mr. Zuppo as to
 3   what he would like to do.
 4        THE COURT: All right.
 5        Mr. Zuppo, if you'd rise, I'll address the
 6   matter.
 7        Do you understand that you do have an
 8   absolute right to testify if you want to?
 9        THE DEFENDANT: Yes.
10        THE COURT: And you understand that you also
11   have an absolute right not to testify, if you choose
12   not to?
13        THE DEFENDANT: Yes.
14        THE COURT: Do you understand that if you
15   choose not to do so, that there is an instruction that
16   the jury is given that's stated to the jury that
17   informs them that you do have an absolute right not to
18   testify if you choose not to do so, and they are not
19   permitted to draw any inferences -- to draw any
20   inferences from your election not to testify; do you
21   understand that?
22        THE DEFENDANT: Yes.
23        THE COURT: Okay.
```

32

```
 1        Do you understand that the decision to
 2   testify is your decision?
 3        THE DEFENDANT: Yes, I do.
 4        THE COURT: Do you understand that the
 5   attorney gives you his advice, tells you what he
 6   thinks you should do, which is what he's there for,
 7   but automatically, it's your decision whether you wish
 8   to testify?
 9        THE DEFENDANT: Okay.
10        THE COURT: Do you understand that?
11        THE DEFENDANT: Yes, I do.
12        THE COURT: All right.
13        What do you want to do?
14        THE DEFENDANT: Is it possible to tell Mr.
15   Bayard -- talk to Mr. Bayard for about 30 seconds?
16        THE COURT: Certainly. I'll leave the bench.
17   Take five minutes.
18        MR. BAYARD: Yes, Your Honor.
19        THE COURT: I'll leave the bench and come
20   back in five minutes.
21             • • •
22        (Court recessed at 11:07 a.m.
23             • • •
```

AA-55

121

1  A. No.
2  Q. Your understanding of this diary from her,
3  what was it?
4  A. That it was her private thoughts and
5  feelings.
6  Q. Now, come about the middle of March, from
7  late January when you're aware that she's in therapy
8  and things like that, until the middle of March, was
9  she living at your house?
10  A. Yes.
11  Q. Was she continuing to work in therapy, things
12  like that?
13  A. Correct.
14  Q. Come the middle of March, did you personally
15  have any contact with Mr. Zuppo?
16  A. Yes.
17  Q. I'm going to go specifically to March 16th.
18  Did you have any contact with Mr. Zuppo that day?
19  A. Yes.
20  Q. What type of contact did you have with Mr.
21  Zuppo that day?
22  A. He called the house.
23  Q. Okay.

122

1  Now, that house, that's the same one on 7th
2  Street, correct?
3  A. Correct.
4  Q. Was Ms. Reynolds living there at that time?
5  A. Yes.
6  Q. She had been living there from January till
7  then?
8  A. Correct.
9  Q. How did you know it was Mr. Zuppo that called
10  you?
11  A. I recognized his voice.
12  Q. How many times had you spoken to him before
13  then?
14  A. A few times.
15  Q. Any doubt in your mind it was him?
16  A. No doubt.
17  Q. Any doubt from the context of the
18  conversation it was him?
19  A. No.
20  Q. Can you tell the ladies and gentlemen what,
21  if anything, he said to you on the phone that day when
22  he called to your house.
23  A. Yes.

123

1  Q. What did he say?
2  A. He told me to watch my back, that my days
3  were numbered.
4  Q. Okay.
5  Did you take that as a threat, sir?
6  A. Yes, I did.
7  Q. At that point, had you been assisting Ms.
8  Reynolds?
9  By "assisting," I mean encouraging or helping
10  her to either deal with the police or telling her to
11  go get Court Orders or things like that?
12  A. Yes.
13  Q. What had you been doing?  What were the
14  conversations you were having with her and things --
15  A. I just told her she needed to do the right
16  thing.
17  Q. What did you mean by that?
18  A. By going to the police and following through
19  with her therapy.
20  Q. Now, back when she first said that she was
21  abused, back in December, did she talk to you about
22  that abuse?
23  A. In December?

124

1  Q. But later in January she talked to you more
2  about it?
3  A. Correct.
4  Q. As far as you knew, you were going to end up
5  being a witness?
6  A. Uh-huh.
7  Q. You fully agreed to be a witness and help in
8  any way you could?
9  A. Wholeheartedly.
10  Q. After that conversation on March 16th, did
11  you come in contact with Mr. Zuppo?
12  A. Yes.
13  Q. When was that?
14  A. The night of March 17th.
15  Q. St. Patrick's Day?
16  A. Yes.
17  Q. Where did you see him?
18  A. The parking lot at Denny's.
19  Q. Did you see him any place earlier in the
20  evening?
21  A. I saw him at a bar called Bankshots.
22  Q. When you saw him at Bankshots, what did you
23  do

To Whom It May Concern:                                         8/27/03

I run a General Contracting business, I hired Tony Zuppo as an employee, and Tony is a good worker and is very dependable. I trusted him with my truck while I was on vacation; he took care of my truck and tools, he completed jobs with out a problem. All of my customers were pleased with his work, he had Wendy there with him on some jobs, and my customers did not say anything about any problems between Tony and Wendy.

Tony and Wendy have been to my house several times, they had dinner with me and my family several times, we also had dinner out a few times, they been down to my boat several times, Tony and Wendy came to our church a few times and was married in our church, and Tony shingled the church's roof, in all the times I been with both Tony and Wendy I did not see Tony mistreat Wendy!

I tried to help Tony and Wendy with their spiritual and financial problems, I got them to come to our church, and they were trying to fix up their house, I loaned them tools, money, and helped them work on their house.

There has been several times I have been with Wendy alone, and she didn't act like she was threatened, there was one time she called me to come down to their house in New Castle, Del. To drive her to the police station to tell them that she lied about the charges on Tony, she told me that she had money to bail her out if they charged her with lying.

I hope and pray this letter will help Tony.

                                                  Sincerely Yours,

                                                  Milton Lockwood

AA-57

101

1     Q. How deep was your love for her?
2     A. Enough to marry her and die for her if need
3 be it; yes.
4     Q. Love her with all your heart?
5     A. Yes.
6     Q. Love her more than anybody else then?
7     A. Yes.
8     Q. So much so that you decided that you two
9 should live together, right?
10     A. Actually, that was a joint agreement.
11     Q. So much so -- I'm just asking about your part
12 of this, not hers -- that decided you should live
13 together, right?
14     A. Yes.
15     Q. At your house there on Lea Road?
16     A. Yes.
17     Q. And that would have been early December or
18 November? When did she actually move in?
19     A. It was November 1st was when her year was up
20 in Jason's house.
21     Q. That's not my question.
22     Do you know, as you sit there, what date she
23 moved in?

102

1     A. November -- her stuff was being moved in
2 through November -- end of October, and like November
3 3rd was the last time that all her stuff was at the
4 house.
5     Q. And at that time you loved her, you thought
6 you wanted to marry her, right?
7     A. Yes.
8     Q. And something happened while she was moving
9 in. You saw some pictures that you really didn't
10 appreciate, right?
11     A. It's not that I didn't appreciate them, but
12 yes.
13     Q. You thought they were questionable, you said?
14     A. Yes.
15     Q. What was questionable about them?
16     A. Would you like the description of the picture
17 or --
18     Q. Sure.
19     A. She was sitting in a bathtub with another
20 girl in a bathtub and there was a black man with boxer
21 shorts, and you got a view of them and then the two
22 looking at him.
23     Q. And that bothered you?

*AA·58*

103

1     A. Wanted to know actually -- like I said, we
2 decided to be married, but yes, it bothered me.
3     Q. And it bothered you that you saw her like
4 that with a black man?
5     A. No, it was the principle that she was in the
6 bathtub with two girls and a guy standing in front of
7 her.
8     THE COURT: Would counsel come forward with
9 the court reporter.
10     Sidebar conference held as follows:
11     THE COURT: I'm not quite sure what you're
12 trying to get at but --
13     MR. WALLACE: That's fine.
14     THE COURT: What was his last answer, the
15 witness' last answer?
16     MR. BAYARD: His concern was about the women
17 in a tub and one man period. I mean he brushed off --
18     THE COURT: You asked him was he concerned
19 because she was with a black man. That was your
20 question.
21     MR. WALLACE: That she was in this position.
22     THE COURT: Right.
23     MR. BAYARD: He said, no, it was the fact

104

1 that she was in the tub with these girls and there was
2 a man standing there.
3     THE COURT: What are you getting at?
4     MR. WALLACE: I'm getting into it --
5 (inaudible) -- because he didn't -- (inaudible) --
6     THE COURT: I don't want you to ask any
7 questions that have anything to do with race.
8     MR. WALLACE: I'm sorry, Your Honor. I'll --
9 the one that said two girls and a --
10     THE COURT: I'm just telling you.
11     MR. WALLACE: That's fine.
12     THE COURT: I'm instructing you not to
13 interject race into this trial.
14     MR. WALLACE: I'm not.
15     THE COURT: All right, proceed.
16     If you'd like any kind of an instruction, you
17 let me know --
18     MR. BAYARD: Not at the moment. I'll ask the
19 Court to leave it alone for the moment.
20     THE COURT: All right. Thank you.
21
22     (Sidebar conference concluded.)
23     • • •